UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| KATHERINE M. CADY, *as Personal Representative of the Estate of Paul Victor Galambos III* | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) 2:10-cv-00512-GZS ) ) |
| CUMBERLAND COUNTY JAIL, et al., | ) ) |
| Defendants | ) |

**RECOMMENDED DECISION ON MOTIONS TO DISMISS (Doc. Nos. 27 & 34)**

This is an action brought by the representative of the estate of Paul Victor Galambos, III who passed away after a sequence of events connected to his mental health issues and his pretrial detention at the Cumberland County Jail (CCJ). Galambos died on December 12, 2008, when he was in the custody of the Cumberland County Jail. The allegations in the second amended complaint are grim, as there is little question that Galambos was suffering from severe mental unrest during the period of his incarceration and short-term hospitalizations outside the jail in early December 2008. According to Cady's complaint, on December 8, 2008, Galambos hurled himself head first onto the floor of his cell from a metal table affixed to the wall.[1] The representative of his estate, Katherine Cady, has brought a civil rights action against multiple defendants involved in Galambos's incarceration and medical treatment, both within the jail and outside.

---

[1] (See 2d Am. Compl. ¶ 34, Doc. No. 32.) There are many other allegations that relay different or additional versions of self-inflicted injury during this period. Part of the plaintiff's theory is that the CCJ and CMS personnel were not being consistent in describing the particulars of the self-harm.

Before me now is a motion by Maine Medical Center (MMC) seeking dismissal with prejudice of the federal civil rights claims against it on the grounds that it is not a state actor within the compass of 42 U.S.C. § 1983 and that, even if it were somehow reachable because of its connections to state actors, the factual basis of the plaintiff's case against it is premised on a respondeat superior theory of recovery rather than direct rights-violating conduct on its part.[2] The other motion addressed in this recommended decision is forwarded by MMC (somewhat redundantly), Maine Medical Partners (MMP), and individual health care professionals associated with MMC and MMP: David E. Clark, M.D., Michael P. Juneau, PA-C, Leah M. Vosmus, PMN NPC, Catherine Lapointe, ANP-C, and Virginia Eddy, M.D. Cady has framed the Count I claim as one under the Eighth Amendment made applicable to the state under the Fourteenth Amendment. (2d Am. Compl. at 24.) Her theory as to this single federal count is that the defendants were so deliberately indifferent to Galambos's medical health needs that their conduct amounted to cruel and unusual punishment.[3]

## DISCUSSION

The two touchstones of my analysis of these motions to dismiss in the post-2009 pleading world are <u>Ashcroft v. Iqbal</u>, 556 U.S. __, 129 S.Ct.1937 (2009) and <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007). <u>See</u> generally <u>Ocasio-Hernandez v. Fortuno-Burset</u>, 640 F.3d 1 (1st Cir. 2011). The First Circuit summarized in <u>Decotiis v. Whittemore</u>: "The Federal Rules

---

[2] The parties have filed a stipulation of dismissal without prejudice on the state-law claims against all the defendants. (<u>See</u> Doc. No. 43.)

[3] Per the allegations of the complaint, Galambos was a pre-trial detainee. Counsel for Cady has conceded that an Eighth Amendment analysis can apply to the single federal count. <u>Compare</u> <u>Cagle v. Sutherland</u>, 334 F.3d 980, 985-86 (11th Cir. 2003) (applying a Fourteenth Amendment substantive due process deliberate indifference standard in the context of a suicide of a pretrial detainee). I do not see a huge distinction between the Eleventh Circuit's 'substantive due process' theory of deliberate indifference with respect to mental health care and an Eighth Amendment deliberate indifference analysis vis-à-vis medical care for those held in custody after conviction. In contrast to the Fourth Amendment excessive force doctrine verses the Eighth Amendment cruel and unusual punishment inquiry for correctional force allegedly applied to convicted individuals, the provision of necessary healthcare (as opposed to the infliction of force) does not seem to require such a dividing line between detainees and those convicted. The standard is clearly one of "deliberate indifference."

of Civil Procedure require a complaint to set forth 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" 635 F.3d 22, 29 (1st Cir. 2011) (quoting Fed.R.Civ.P. 8(a)(2)). "To survive a motion to dismiss, this short, plain statement must 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests,' and allege 'a plausible entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 555, 559). "Applying the plausibility standard is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 129 S.Ct. at 1950). And of relevance to the complaint as against these defendants, the First Circuit reflected in Peñalbert–Rosa v. Fortuño–Burset, 631 F.3d 592 (1st Cir.2011) that "some allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual." Id. at 595.

Taking at face value the legal status of MMC, MMP, and the individual defendants associated with Galambos's care during these brief periods of admission to MMC, these defendants are private and not state actors within the meaning of 42 U.S.C. § 1983. See Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). The "under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." Id. at 50 (omitting internal quotations to Blum v. Yaretsky, 457 U.S. 991, 1002 (1982) and Shelley v. Kraemer, 334 U.S. 1, 13 (1948)).

The First Circuit explained in a non-prison related case involving a school, that the inquiry is not formulaic: "In most contexts, section 1983's 'under color of state law' requisite is construed in harmony with the state action requirement of the Fourteenth Amendment. Lugar v. Edmondson Oil Co., 457 U.S. 922, 931-35 (1982). Broadly speaking, the Fourteenth Amendment protects individuals only against government (leaving private conduct to regulation

3

by statutes and common law). E.g., The Civil Rights Cases, 109 U.S. 3 (1883)." Logiodice v. Trs. Me. Cent.l Inst., 296 F.3d 22, 26 (1st Cir. 2002). Gauging the entitlement of this group of defendants to dismissal of the federal claim does not require the court to intricately parse each potential avenue for holding non-state actors liable premised on 42 U.S.C. § 1983 state action theory.[4] This is partly a consequence of the extremely helpful guidance of the Seventh Circuit's Rodriguez v. Plymouth Ambulance Services, 577 F.3d 816, 831 (7th Cir. 2009), highlighted below and very much on point with regards to the state actor/state function theory advanced by the plaintiff.[5]

Cady's allegation trying to shoe-horn MMC and the other moving defendants into this federal claim as state actors is articulated as follows:

> Due to the interconnected nature of the treatment of Galambos[6], while hospitalized and in the custody of the CCJ, by MMC (or its affiliates including Maine Medical Partners), CMS, and CCJ and due to the overriding influence of CCJ over the care of Galambos during the hospital stays that occurred from December 02 through December 12, 2008, defendant, MMC and its affiliated organizations including Maine Medical Partners acted under color of state law at all times relevant to this second amended complaint.

---

[4] The Logiodice Panel explained:
> Yet under several doctrines, acts by a nominally private entity may comprise state action- e.g., if, with respect to the activity at issue, the private entity is engaged in a traditionally exclusive public function; is "entwined" with the government; is subject to governmental coercion or encouragement; or is willingly engaged in joint action with the government. Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295-96 (2001). The doctrines are too generally phrased to be self-executing: the cases are sensitive to fact situations and lack neat consistency. See id.

Id.

[5] Rodriguez reflects:
> When a plaintiff brings a section 1983 claim against a defendant who is not a government official or employee, the plaintiff must show that the private entity acted under the color of state law. This requirement is an important statutory element because it sets the line of demarcation between those matters that are properly federal and those matters that must be left to the remedies of state tort law. See Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999); Jackson v. Metro. Edison Co., 419 U.S. 345, 349-51, (1974). Both the Supreme Court and the lower federal courts have acknowledged the difficulty of determining whether a private entity has acted under the color of state law.

Id. at 822-23 (footnote omitted).

[6] I have altered the text of the plaintiff's complaint by not using capital letters to spell Galambos.

4

(2d Am. Compl. ¶ 13.) [7]

I agree with these defendants that the plaintiff's reliance on <u>Conner v. Donnelly</u>, 42 F.3d 220 (4th Cir. 1994) construing <u>West v. Atkins</u>, 487 U.S. 42, 54-57 (1988) as standing for the proposition that <u>any</u> institution or physician to whom an inmate is referred for treatment acts under color of state law should be taken with a grain of salt in analyzing the state-actor requirement touching upon non-governmental employee conduct. <u>West</u> addressed a claim against a physician who had a contractual obligation to provide medical services <u>within</u> the prison to inmates. The analysis is more nuanced when it comes to medical services provided to inmates outside of the correctional facility. In <u>Rodriguez v. Plymouth Ambulance Services</u> the Seventh Circuit reasoned:

> The Eighth Amendment responsibility of correctional institutions that leads to a necessary unplanned hospitalization does not transform the out-of-facility medical facility into a state actor. With respect to Waupun Memorial, we believe that the allegations of the complaint are sufficient to allege state action. Here, an examination of the trilateral relationship of the state, Waupun Memorial and the prisoner-patient demonstrates that the provider was acting in the stead of the state in providing medical care to Mr. Rodriguez. <u>The complaint affirmatively alleges that he was placed in a prison ward</u> of the hospital, an allegation that suggests strongly that Waupun Memorial, unlike St. Agnes, had an ongoing relationship with the prison authorities for the care of prisoner-patients in need of hospitalization. Additionally, the <u>complaint makes clear that his stay at this facility was not simply for emergency treatment</u>, but rather involved a stay of several days.

---

[7] Paragraph 15 of the Second Amended Complaint further alleges:
> For several years prior to and throughout this period of incarceration, Galambos had been diagnosed with various mental illnesses including bipolar disorder, manic depression, schizo-affective disorder, schizophrenia, and/or anti-social personality disorder. One or more of these conditions had been treated more or less continuously with antipsychotic prescription drugs through Spring Harbor Hospital, an affiliate of MMC, and its community ACCESS program prior to August 03, 2008 and then by CMS while detained. MMC and Spring Harbor Hospital's ACCESS program continued to provide some services to Galambos while detained.

(Id. ¶ 15.)
The plaintiff has not named Spring Harbor as a distinct defendant and the allegations do not suggest that she is seeking to impose liability as to the prior treatment of Galambos by this MMC affiliate.

577 F.3d at 831(emphasis added); see also Callahan v. Sw. Med. Ctr., No. CIV-03-1434-F, 2005 WL 1238770 (W.D. Okla. April 29, 2005)(unpublished).

Cady's care by these defendants falls more within the realm of Rodriguez's St. Agnes non-state actor analysis, see Rodriguez, 577 F.3d at 831, and not its Waupun Memorial state actor liability conclusion. Cady's operative complaint alleges that on December 2, 2008, MMC released Galambos back into the jail's custody within hours of his being transported for a self-inflicted puncture wound. (2d Am. Compl. ¶¶ 20-22.) On December 10, 2008, he was again transported to the MMC emergency room after his head trauma incident. (Id. ¶ 44.) It was the jail and Correctional Medical Services that initiated efforts to transfer Galambos to the State of Maine psychiatric hospital, Riverview, on December 11, 2008. (Id. ¶ 61.) The complaint alleges that MMC released Galambos to the custody of the jail with the understanding that he was going to be transported to Riverview although the discharge note electronically signed four days after the death does not expressly indicate that there was an expectation that he would be transferred to Riverview. (Id. ¶ 58.) Galambos's third admission to MMC occurred the next morning, December 12, 2008, at which time he was pronounced dead. (Id. ¶¶ 67-68.) So these are the three admissions to MMC vis-à-vis which the plaintiff attempts to document some sort of enduring arrangement between the jail and MMC for prisoner emergency medical care. In some respects the allegations are at cross-purposes in terms of MMC's purported 'state action.' For example, there are several allegations that fault other defendants for not providing MMC and its staff with adequate information for Galambos's treatment during the first two admissions. There is no suggestion in the Second Amended Complaint that MMC had any formal agreement with the jail to provide Galambos and other inmates with medical care. The care given on the allegations of the complaint is nothing more than emergency care that would be provided for a

6

non-inmate with a similar profile of physical and mental symptoms transported by ambulance after, say, a police response to a domestic conflict.

The Seventh Circuit's Rodriguez is very well considered on this point:

> Although West tells us that the contractual relationship between the state and the medical care provider cannot be the focus of our inquiry, see West, 487 U.S. at 55, it nevertheless must be an important factor in determining whether the private health care provider has entered into its relationship with the state and the prisoner on a voluntary basis. We see no basis in the Supreme Court's case law for concluding that a private entity can be burdened with the responsibilities of the state for the care of its prisoners unless the entity assumes that responsibility voluntarily, and one of the principal ways, indeed the principal way, by which a private entity would undertake such a responsibility is by entering into a contractual relationship.

577 at 827 (footnote omitted). "When a party enters into a contractual relationship with the state penal institution to provide specific medical services to inmates," the Panel reasoned, "it is undertaking freely, and for consideration, responsibility for a specific portion of the state's overall obligation to provide medical care for incarcerated persons. In such a circumstance, the provider has assumed freely the same liability as the state." Id.[8]

"In contrast," the Panel reasoned,

> private organizations and their employees that have only an incidental and transitory relationship with the state's penal system usually cannot be said to have accepted, voluntarily, the responsibility of acting for the state and assuming the state's responsibility for incarcerated persons. For instance, an emergency medical system that has a preexisting obligation to serve all persons who present themselves for emergency treatment hardly can be said to have entered into a specific voluntary undertaking to assume the state's special responsibility to incarcerated persons. See Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd et seq. Rather, it has undertaken to provide a specific service, emergency medical care, to *all* who need those services. The fact that it does not, and cannot, discriminate against incarcerated individuals does not mean that it has agreed to step into the shoes of the state and assume the state's

---

[8] The current individual movants are not in the position of persons "accept[ing] employment with a private entity that contracts with the state" who should understand that they are "accepting the responsibility to perform [their] duties in conformity with the Constitution." Id.

7

> responsibility toward these persons. It has not " 'assume[d] an obligation to the [penological] mission that the State, through the [prison], attempts to achieve.' " West, 487 U.S. at 51(quoting Polk County, 454 U.S. at 320). In these circumstances, matters of professional judgment do in fact predominate over the achievement of state objectives. See id. at 52 n. 10.

Id. at 827-28. The Seventh Circuit indicated that it is "also important to emphasize that the Supreme Court in West did not focus simply on the relationship of the private medical provider to the state. It also considered the relationship of the private provider to the prisoner." Id. at 828. Rodriguez concluded that the Supreme Court "meant to emphasize that, in order to be liable *as the state* for the provision of medical services, the private provider must have a direct, not an attenuated, relationship with the prisoner-patient." Id. "In the fulfillment of its responsibilities to the state's prison population, a state must arrange for goods and services with many entities," and "[t]o the degree that a private entity does not replace, but merely assists the state in the provision of health care to prisoners, the private entity's responsibility for the level of patient care becomes more attenuated, and it becomes more difficult to characterize its actions as the assumption of a function traditionally within the exclusive province of the state." Id. "Such a situation simply does not implicate the basic concern of West that a state ought not be able to contract away its responsibility for providing adequate prisoner health care." Id. See cf. Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 7 (1st Cir. 2005) (no state action with regards to a 42 U.S.C. § 1983 plaintiff's involuntarily commitment and care at a private hospital, with private healthcare providers and physicians).

The most plausible reading of the complaint allegations sans the conclusory assertions of state action is that these defendants were merely assisting the CCJ in the provision of health care to Galambos. The notion that through litigation discovery the plaintiff might be able to unearth some sort of contractual relationship between MMC and the jail is insufficient to warrant

8

bringing MMC, MMP, and these individual defendants further into this suit on a 42 U.S.C. §1983 count[9] without any preexisting evidence of such an interlink. In a community such as Portland, Maine where there are two or more hospitals in close proximity, there is no concrete reason to suspect contractual joint state actor/private actor relationship just because there was another hospital thereabouts for transport purposes. (Id. at 13-14.) The fact that this individual in the custody of the jail was transferred three different times to MMC in a short time-frame for related mental health issues rather than the neighboring Mercy Hospital is, I believe, consistent with keeping a patient's emergency care under one roof rather than suggesting some sort of meeting-of-the-minds conspiracy. This consistency of care and medical records is an example of what the Supreme Court referred to in Twombly as an "obvious alternative explanation" for the conduct in question. 550 U.S. at 567; see also Iqbal,129 S. Ct. at 1951-52.

MMC is also correct that there are insufficient factual allegations to bridge the line between a non-litigable respondeat superior basis for 42 U.S.C. § 1983 liability and a tenable custom and policy or failure to train claim. See Rodriguez, 577 F.3d at 832 ("In his complaint, Mr. Rodriguez specifically mentions only the hospital as a defendant. As in the case of Plymouth and St. Agnes, however, there is no allegation that his alleged maltreatment was due to a policy of the institution or to a failure to train its personnel. There can be no respondeat superior liability for the actions of the staff members under section 1983."). Citing Paragraphs 99 and Paragraphs 103 through 105 of her amended complaint, the plaintiff states that the claims asserted against MMC are directly based on its own pattern or practice in the treatment of inmate patients. (Resp. Mot. Dismiss at 6.) The cited paragraphs come nowhere near establishing a

---

[9] With the stipulated dismissal of the state law claims, it of course remains to be seen whether or not Cady has tenable state law claims against this group of defendants. These negligence counts, not yet ripe for determination because of state medical malpractice screening procedures, seem much more in line with the factual footing of Cady's discontent with these defendants.

custom and practice claim against MMC; they all pertain to the particular care administered during Galambos's first two admissions. (2d Am. Compl. ¶¶ 99, 103-105.)[10] With respect to MMC alleged entanglements with CCJ and CMC these paragraphs fail to cross "the line between the conclusory and the factual," Twombly, 550 U.S. at 557 n. 5, with respect to holding these

---

[10] These paragraphs represent:
- MMC its affiliates, employees, and/or staff had an ethical and legal duty to contact others, aside from Galambos's family, including the Portland Police Department or the State of Maine Department of Health and Human Services when presented with a mentally and physically incompetent patient, with extensive injuries not adequately explained by his custodians reporting, and given the number of conflicting stories relayed by CMS and CCJ. MMC, its affiliates, employees and/or staff, deliberately chose to ignore the evidence of old and new injuries sustained, and disregarded the known inconsistencies in the versions of the events reported (especially where the explanations given would not readily explain the resultant T-1 or T-2 fracture in Galambos's neck), and refused to make further inquiry or request authorities to do so. The conscious disregard by MMC, its affiliates, employees and/ or staff, for Galambos's safety and the decision to release Galambos back to the environment in which he had sustained the serious injuries for which he was hospitalized -especially in light of the admission of the CCJ guards that they had been unable to prevent Galambos from harming himself all week- did in fact cause Galambos further injury, suffering and death.
- MMC's policy or custom of treating inmates such as Galambos foremost as an inmate, and secondarily as their patient, encouraged MMC to abdicate its responsibility to safeguard the welfare of their patient. By deferring critical decisions of custodial care to others and by looking the other way and failing to contact proper authorities to conduct investigations into criminal or illegal activity, MMC caused or contributed to the pain, suffering, and death of Galambos after his transfer back to CCJ on December 11, 2008.
- The policy or attitude that permeated MMC in consort with, or under the direct influence of CMS and CCJ, in its treatment of Galambos as an inmate, lead to a fatal outcome for Galambos. By not independently exercising its own judgment and control over the discharge plans from MMC to Riverview in the best interest of their patient, MMC became an accomplice to a plan that was cruelly indifferent in the short term as to the simple comfort of Galambos; and shortsightedly indifferent in the long run as to the better chance of survival for Galambos. Such a custom or policy of MMC that would defer their responsibility for the care of such a vulnerable patient to be re-exposed to the harsh conditions of the penal system, to sleep his last night on a thin mat on a concrete floor for just a matter of hours pending transfer to Riverview shocks the conscience.
- Galambos living hell, both real and imagined, and resultant loss of life could easily have been prevented by MMC, CMS and CCJ if they had implemented a coordinated assessment plan that overlapped in the treatment and follow-up care of Galambos as he moved from various units staffed by CCJ and CMS and various departments at MMC during the last week of his life. Each entity had a duty and responsibility to Galambos to properly and effectively communicate with one another to discuss and weigh the most beneficial options for his care and to prevent ongoing medical miscalculations and mistreatment. The coordinated policies of CMS, CCJ and MMC of failing to properly convey or illicit necessary information regarding Galambos's history, diagnoses, and care over the week of December 02 through December 12, 2008 was the cause of serious injury and the death of Galambos. There existed several opportunities from December 02 through December 12, 2008 among the three entities, acting alone or in a coordinated way among them, to prevent or minimize injury, pain, suffering, and death of Galambos. Rather, CCJ, CMS, and MMC each reacted, or inadequately attempted to react, or failed to react to Galambos's emergencies only when confronted with each mounting crisis and with each crisis failed Galambos in dereliction of their respective duties to protect and preserve Galambos's health and safety.

(2d Am. Compl. ¶¶ 99, 103-105.)

facially non-state actors liable for an Eighth Amendment violation of a pre-trial detainee's rights. The notion that these three entities had "plenty of time" between December 2, 2008, and December 12, 2008, to coordinate to minimize the medical tribulations of Galambos does not translate ipso facto into some sort of conclusion that the hospital defendants coordinated with the CCJ and CMS defendants to deprive him of constitutionally adequate medical care. See generally Farmer v. Brennan, 511 U.S. 825 (1994); Estelle v. Gamble, 429 U.S. 97 (1976). Medical negligence is not a federal constitutional claim. See Daniels v. Williams, 474 U.S. 327 (1986) (noting that 42 U.S.C. § 1983 provides a right of action for civil rights violations and cannot be used to sue correctional officials for negligence).

The complaint allegations as they relate to MMC, MMP, and the individual defendants associated with these entities is that the medical professionals involved were proactive with their communication to CCJ and that the same is not true of the communications by CMS and CCJ to the medical staff at the hospital.[11] On December 03, 2008, after Galambos's first release from MMC, at 12:08, CMS staff member, Sue Robshaw, noted that a physician's assistant from MMC called her to report on the neck x-ray taken the evening before which showed "punctate nodular densities; foreign body against soft tissue." She notes that she discussed the phone call with the physician assistant at CMS. (2d Am. Compl. ¶ 23.)

With regards to the care given after the December 10, 2008, transport, the allegation is that Galambos was taken by Medcu on a stretcher to MMC emergency room for evaluation by Defendant Dr. Carl Germann and that the Emergency Department Report at 22:54 relays as "History of Present Illness" that Galambos "jumped off the toilet with the suicidal intent. The patient landed on his head. The patient had only periods of combativeness after this event. He was given Ativan while in the

---

[11] I caution that this description of the communication lines between the moving and non-moving parties is not set in stone apropos any future attempts of the non-moving parties' potential attempts to seek judgment short of trial.

jail." Judy Sinclair, RN on the "Standard of Care For General Medical/Surgical Patient in the Emergency Department" enters under Primary Assessment" that Galambos "fell off toilet from jail cell (15:00) last time he was normal acting per guards…also threw himself against the cell door." The Interdisciplinary Trauma Evaluation entered by provider, Howard, at 21:27 states Galambos "ran into metal door headfirst today at 15:00. Per guard report patient received 'double dose' of Ativan." A Surgery Clinic record states that staff was told Galambos was given Ativan to sedate in order for transport. According to various other MMC notes of December 10, 2008, Galambos arrived sedated, with head trauma with loss of consciousness; multiple wounds, scrapes, and bruises in various stages of healing over his entire body including, a swollen right eye; a large healing ecchymosis around his right shoulder; large abrasion on right knee; both feet and hands with multiple scabbed, round lesions with reddened edges; responding to touch, but not voice; and moving all extremities. (Id. ¶ 45.)

Following results of several radiographic imaging tests, Galambos was admitted to the hospital as an inpatient at 22:15 with injuries beyond the physical and visible injuries noted above, including a T-1 closed fracture of the transverse process, multiple posterior closed rib fractures, scalp edema, head contusion, chest wall contusion, and a right pleural effusion. Galambos was admitted for observation and evaluation under the care of staff of Maine Medical Partners General Surgery, Trauma and Critical Care Department, David E. Clark, MD attending physician. A Surgery Clinic's form signed by Dr. Clark records that Galambos had been given "two shots of sedative at 17:00 (in jail)…Admit with close observation and guards in room; Symptomatic treatment when wakes up; follow up CXR; Transfer to medical ward in Augusta when awake and stable." (Id. ¶ 46.)

On December 10, 2008, at 21:21 Michael Juneau, PA-C ordered ankle to knee compression devices. On December 11, 2008, at 9:00 Galambos was given a prophylactic injection of Heparin as a precaution against the formation of blood clots. (Id. ¶ 47.)

12

MMC personnel note "there are conflicting stories by people reporting." Notes written by the attending physician at MMC, David Clark, reiterates that those reporting from CMS and CCJ state that Galambos, earlier that day, either ran into a metal door or possibly jumped or dived off a toilet, and Galambos was given Ativan to sedate him in order for transport. MMC nurse, Myra Brooker's focus note on December 11, 2008, at 8:00 states "Pt restrained x 3 limbs by guards. Integ with many abrasions and bruising, guards report that these injuries were self-inflicted over time, pt reportedly hits head and hurts self daily." (Id. ¶ 48.)

Galambos underwent medical and psychological observation, evaluation, and treatment throughout the evening of December 10 and into the early evening of December 11, 2008, in the MMC trauma department. David Clark, MD, with support from Catherine Lapointe, ANP, Michael P. Juneau, PA –C, Dawn Stapleton, RES-MD and Michael Watts, RES-MD and others, attended to Galambos. Nursing and other medical notes state he is shackled to the bed with handcuffs and leg cuffs throughout his stay. (Id. ¶ 49.)

A MMC record of medications taken prior to the admission on December 10, 2008, does not include either the 60 mg of Zyprexa nor the 2 mg of Ativan administered by Barbara Walsh and others on December 10, 2008, at or around 15:00. Only on December 11, 2008, at 11:00 does Leah Vosmus PMN, NPC, a nurse with MMC psychiatric department record that she was informed of the date and time of the administration of the high doses of Zyprexa and Ativan. This note reports Galambos was taken to the ER "after slamming his head into a steel cell door"; that he had been given 60 mg of Zydis at 15:00 on the day of admission as well as 2 mg of Loranzapam.

At noontime on December 11, 2008, Linda Williams, an employee of CMS, contacted Galambos's attorney, Robert Ruffner, explaining that Galambos was at MMC "after jumping head first on to a concrete floor, breaking bones in his neck." She explained that Galambos

13

needed to be transferred to Riverview, the State of Maine psychiatric hospital in Augusta, Maine for inpatient treatment. She stated that Ruffner would need to prepare a motion to amend Galambos's bail so that he could be transferred from MMC to Riverview on discharge from the hospital. Ruffner prepared the requested motion for the court which was signed by a judge at 15:42 on December 11, 2008. Ruffner then sent the signed order to Linda Williams at CCJ at 16:00. His motion states that "Ms. Williams is filing 'blue papers' and a transport order on Galambos to commit and transport, him to Riverview." (Id. ¶¶ 52, 53.) On two non-completed and undated forms, "Application for Emergency Involuntary Admission to Mental Hospital" and "Request for Endorsement to Transfer of a Patient Involuntarily Admitted to a Mental Hospital," Linda Williams describes Galambos's behaviors and medical issues writing, he "has done swan dive off fixtures in his cell twice. He is delusional and suffering from psychosis and states "I want to end the pain"… He has broken ribs and a transverse process fracture (cervical) from diving off furniture….shouting at the window, naked in his cell for 1 week, disinhibited inappropriate gesture, urinating on the floor-sitting in it….headbutting when officers attempted inspection of cell…disoriented, responding to inner stimuli, talking and shouting as if someone is there, crawling on the floor, climbing on the table, bizarre." The forms were not completed or sent to Riverview by CMS or CCJ prior to Galambos's death. (Id. ¶ 54.)

Linda Williams at 16:40 called Robert Ruffner's office leaving a message for him with his answering service that "she got the file she needed. Also Paul Galambos was released from the hospital and needs to be moved to another place. She said you did not have to call her back." (Id. ¶ 55.)

Catherine Lapointe, ANP, at 12:00 on December 11, 2008, completed a "tertiary survey" of Galambos's care. The tertiary survey was confirmed by Defendant Virgina A. Eddy, MD at

14:45 on December 11, 2008. It states Galambos slept overnight, was able to be aroused and was able to lift his head. The aspen collar was removed and he was put on activity as tolerated. (Id. ¶ 56.) A MMC psychiatric "Initial Assessment" prepared by Defendant Leah M. Vosmus, PMN NPC at 11:00 notes Galambos is paranoid, seeing things, hearing voices, and attempted to hurt himself to get away from torture, saying he "felt people trying to kill me" and he believed he was going to be tortured to death on 12/10. She notes, following investigation with CMS: "Review with Jail. Pt. had received 60 mg Zydis @ 15:00 on day of adm. and 2 mg. Lorazepam. Staff report that for past 5 days @ jail he has refused Abilify 10 mg disc, Geodon 80 mg Bid and Haldol Decanoate 100mg I.M on 12-2-08." Lapointe writes, as to "Level of Care Indicated," "inpatient psychiatric hospitalization/ arrangements per C.C. Jail." Her note at "Initial Treatment Plan" states "stabilize and provide a safe environment." (Id. ¶ 57.)

Galambos was discharged from MMC at 17:11 on December 11, 2008, back to CCJ over one hour after having been medically bailed out of CCJ for transfer to Riverview. Lapointe dictated a discharge summary at 16:13 on December 11, 2008. Her summary under "Principal Diagnosis" states "status post self-injurious behavior with his head running into a metal door. The patient has multiple contusions both old and new throughout his entire body. He has a T1 transverse process fracture that is not in need of bracing. He has a right shoulder contusion." The History of Present Illness/Hospital Course section of discharge summary provides in more detail that Galambos is, "an inmate with psychiatric disturbance and self-destructive behavior who ran into a metal door intentionally or possibly dived off a toilet. There are conflicting stories by the people reporting. The patient was given Ativan to sedate in order for transport. He was minimally responsive in the ED but was able to protect his airway. He had multiple old and new ecchymoses and he was responding to touch but not voice. He was moving all extremities, and

his CT findings are as noted. He had a chest x-ray that showed no hemo or pneumothorax or rib fractures, no mediastinal abnormality. There was a question of a right pleural effusion. On brain CT he had a normal intracranial image with no intracranial hemorrhage or skull fracture. A CT of his C-spine showed a T-1 transverse process fracture and possibly 2 ribs seen on the neck CT as fracture but no neck injury and his tox screen was negative. The patient was admitted for close observation and psychiatric evaluation. The patient slept overnight and was able to be aroused and reliable for exam to clear his neck in the morning. He is able to lift his head and perform a confrontational exam without positive findings. Aspen collar was removed and he was put on activity as tolerated. Psychiatry did come see patient and their recommendations were that the patient has schizophrenia with schizoaffective type by history and polysubstance abuse by history. He has had a brain injury in the past and is incarcerated. Their initial plan is to stabilize and provide a safer environment. They recommend Zyprexa 20 mg by mouth daily and for psychiatric and behavioral emergency Haldol 5 mg intramuscular along with Ativan 2 mg intramuscular and may repeat the Haldol every 30 minutes x2 only. A tertiary survey was performed on hospital day 1 and no other injuries were found. The patient was released back to the Cumberland County Jail with a guard present." Lapointe notes under 'Special Instructions': " I did have a conversation with nurse in the infirmary at Cumberland County and have been assured that the patient will have a guard with him at all times to maintain safety and that he will have ongoing psychiatric intervention." David Clark electronically signed the discharge report four days after death on December 16, 2008, at 8:25. This report makes no mention of the plan to transfer Galambos to Riverview. (Id. ¶ 58.)

According to the complaint, Barbara Walsh, the Director of Nursing for CMS, noted that Riverview could not accept Galambos that evening and that Dr. Steven Sherrets would need to

contact Riverview the next day. (2d Am. Compl. ¶ 61.) Cady states that Walsh <u>incorrectly</u> noted that Galambos was medically cleared by MMC and did not have a T-Transverse Process fracture. (<u>Id.</u> ¶ 63.)

I set these factual allegations pertinent to these defendants out at length because if you do a fair reading of this Second Amended Complaint allegations pertaining to these defendants it is hard to see how Cady thought she could name this group as responsible for a constitutional violation. Galambos was in the custody of the Cumberland County Jail not MMC. Cady faults these defendants for failing to address the inconsistencies in the information it received from the CCJ and CMS defendants during Galambos's second visit to MMC. However, the allegations of Cady's own complaint illustrate that the individuals involved in this hospital care made an effort to note the information they did receive about the source of his physical injuries, his self-destructive behavior, and his medications. Maybe the individual professional did not confer in-person to arrive at a consistent theory of how Galambos's received his injuries and what his precise medication history was but we are talking about a relatively short period of hospitalization (less than 24 hours) that demanded multiple responders who were probably responding to multiple other traumas. Per Cady's own allegations, these defendants did share the information they generated with the jail. It was not their <u>constitutional</u> obligation to oversee how CCJ and CMS followed through with the blue paper order of the court.[12] Indeed, as noted above,

---

[12] Cady thinks that there should have been some sort of report made to the police and/or the Department of Health and Human Services by the hospital given the extent of Galambos's old and new self-inflicted injuries. This borders on some sort of unpled and untenable failure to protect, substantive due process theory, <u>see</u> e.g., <u>DePoutot v. Raffaelly</u>, 424 F.3d 112, 118 (1st Cir.2005), or a claim pinned to a state law reporting requirement by a non-state actor, <u>see</u> <u>Rodriguez</u>, 577 F.3d at 831. The disconnect with regards to the Eighth Amendment deliberate indifference standard that guides the federal count and the events after his release from MMC on December 11, 2008, is that the recommendation (and expectation) of the hospital was for inpatient psychological hospitalization per the blue paper process. This did not happen immediately. This was not a consequence of anything these defendants did but because of communications between the jail and Riverview. Additionally, I find Cady's efforts to distinguish <u>Doe v. Raines County Independent School District</u>, 66 F.3d 1402 (5th Cir. 1995) from the alleged duty to report here unavailing.

17

Cady's theory is that CCJ had an overriding influence over the care of Galambos during the hospital stays that occurred from December 2, 2008, through December 12, 2008.[13] It was Linda Williams, an employee of CMS, who contacted Galambos's attorney to get the necessary forms to blue paper Galambos. I suppose, hypothetically, there could have been more coordination between CCJ and CMS and these defendants but this alleged lack of coordination, on the facts as pled, does not land 42 U.S.C. § 1983 liability in the lap of these non-state actors when it comes to a deliberate indifference constitutional inquiry.[14]

Finally, I credit Cady's factual assertion that she was listed as an emergency contact for the deceased during this early December 2008 period but was not notified as expected by these defendants during this crisis period. Commonsense would suggest that the jail or the hospital would have notified her of the need to seek emergency care. But commonsense (or even regulatory) obligations do not necessarily translate into constitutional obligations. Whatever right Cady may have had to notification and whatever right Galambos may have had that Cady be notified are elusive with regards to weighing if there is any connection between the failure to notify and a federal constitutional claim. I have seen my fair share of cases involving Maine state and county correctional facilities where the matrix of facts includes a relative's efforts to intervene on an inmate's behalf with respect to medical care complaints. It is possible that a record of such pre-injury communications could be material to a deliberate indifference claim as proof of actual awareness on the part of the defendants of the seriousness of the health issue. That is not the situation here as to these defendants.

---

[13] There really are no nonconclusory factual allegations that support this assertion. Lapointe allegedly noted that her recommendation was for inpatient psychiatric care and that the arrangements were going to be made by CCJ. This suggests that there was coordination of efforts made by Lapointe attempting to see this vision of care through.

[14] I make absolutely no judgment as to the prospects of holding these defendants liable on the state law counts that have been dismissed without prejudice.

## CONCLUSION

For these reasons I recommend that the Court grant both these motions to dismiss as to the federal claims in Count I against Defendants David E. Clark, M.D., Michael P. Juneau, PA-C, Leah M. Vosmus, PMN NPC, Catherine Lapointe, ANP-C, Virginia Eddy, M.D., Maine Medical Center, and Maine Medical Partners.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

June 28, 2011