UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| KATHERINE M. CADY, as Personal | ) | |
| Representative of the ESTATE OF | ) | |
| PAUL VICTOR GALAMBOS, III | ) | |
| Plaintiff | ) | |
| v. | ) | Docket No. 2:10-cv-00512-GZS |
| | ) | |
| CUMBERLAND COUNTY JAIL | ) | |
| KEVIN J. JOYCE, SHERIFF | ) | THIRD AMENDED COMPLAINT |
| MICHAEL STOTTS, C/O | ) | WITH DEMAND FOR |
| JASON HENDRICKSON,C/O | ) | JURY TRIAL |
| KEITH LOGAN, C/O | ) | |
| (FNU) MOORE, LT. | ) | |
| (FNU) GILPATRICK, CPL | ) | |
| | ) | |
| CORIZON, INC. (f/k/a CORRECTIONAL | ) | |
| MEDICAL SERVICES, INC.) | ) | |
| ALFONSO CORONA, MD | ) | |
| TODD TRITCH, MD | ) | |
| BARBARA WALSH, DON | ) | |
| LINDA WILLIAMS, LCSW | ) | |
| (FNU)  MCNALLY | ) | |
| EDITH L. WOODWARD, PA-C | ) | |
| MICHAEL TRUEWORTHY, CNP | ) | |
| | ) | |
| And | ) | |
| | ) | |
| UNKNOWN DEFENDANTS, employees | ) | |
| of Corizon, Cumberland County Jail. | ) | |
| Defendants | ) | |

NOW COMES Katherine M. Cady as Personal Representative of the Estate of

Paul Victor Galambos, III  ("Plaintiff") by and through counsel, amending in its entirety

the Amended Complaint filed pro se by Katherine M. Cady on December 13, 2010.

Katherine M. Cady is represented by counsel in this Third Amendment of the Complaint

and respectfully represents to this Honorable Court as follows:

JURISDICTION AND VENUE

1. Jurisdiction is conferred upon this Court by 42 U.S.C. § 1983 and pendent State

1

Claims set forth hereinafter. Federal question jurisdiction is premised on 28 U.S.C.

Section 1331 and 1343. Jurisdiction for supplemental State law claims is premised on 28

U.S.C. Section 1367.

PARTIES

2.   Plaintiff, Katherine M. Cady of West Buxton, Maine, is the duly-appointed, qualified,

and acting Personal Representative of the Estate of Paul Victor Galambos, III, deceased

(hereinafter GALAMBOS) who died on December 12,  2008.  Plaintiff brings this action

for the benefit of Decedent GALAMBOS' estate and for the benefit of Decedent

GALAMBOS' surviving heirs pursuant to 18-A M.R.S.A. § 3-715.

3.   Defendant Cumberland County Jail (hereafter CCJ) is a detention facility operated by

the Cumberland County Sheriff's Department in Portland, Maine housing pretrial

detainees charged with criminal offenses in Cumberland County, Maine. At all times

relevant to this Third amended complaint, as a department of the County of Cumberland,

CCJ was acting under color of State law; Defendant, Kevin J. Joyce is  the current Sheriff

of the Cumberland County Sheriff's Department who was serving as the Deputy Sheriff

at all times relative to this Third amended complaint.  Defendants, MICHAEL STOTTS,

JASON HENDRICKSON, and KEITH LOGAN were correctional officers and LT.

MOORE and CPL. GILPATRICK were officers all of whom were employed by CCJ at

all times relevant to this Third Amended Complaint. All above-named individual

Defendants in their representative capacities were acting under color of state law by

virtue of their employment.

4. Defendant, Corizon, Inc. (hereinafter "Corizon") is a  private corporation with a

principal place of business in St. Louis, Missouri that, at all times relevant to this Third

amended complaint, had contracted with the Cumberland County Sheriff's Department to provide medical and mental health services to inmates at the Cumberland County Jail. Due to this contractual relationship, at all times relevant to this complaint, CORIZON was acting under color of State law;

5. Defendant, ALFONSO CORONA, MD was a psychiatrist employed by CORIZON and treated GALAMBOS at the CCJ at all times relevant to this Third amended complaint;

6. Defendant, TODD TRITCH, MD was a medical doctor and medical director employed by CORIZON and treated GALAMBOS at the CCJ at all times relevant to this Third amended complaint;

7. Defendant BARBARA WALSH was director of nursing employed by CORIZON and treated GALAMBOS at the CCJ at all times relevant to this Third amended complaint;

8. .Defendant LORETTA HYNES was a registered nurse employed by CORIZON and treated GALAMBOS at the CCJ at all times relevant to this Third amended complaint;

9. Defendant LINDA WILLIAMS was a licensed clinical social worker employed by CORIZON and treated GALAMBOS at the CCJ at all times relevant to this Third amended complaint;

10. (FNU) MCNALLY was a medical provider employed by CORIZON and treated GALAMBOS at the CCJ at all times relevant to this Third amended complaint;

11. Defendant EDITH L. WOODWARD PA-C was a physician's assistant employed by CORIZON and treated GALAMBOS at the CCJ at all times relevant to this Third amended complaint;

All above-named individual Defendants in their representative capacities were acting

under color of state law by virtue of their employment.

12. Defendant, MICHAEL U. TRUEWORTHY, C.N.P. was a nurse-practitioner employed by CORIZON and treated GALAMBOS at the CCJ at all times relevant to this third amended complaint.

13. Certain UNKNOWN DEFENDANTS were those employees of CORIZON or of CCJ who were responsible for the care, custody and treatment of GALAMBOS at all times relevant to this Third amended complaint and also acted under color of state law.

FACTS

14. From August 03 until 08:00 on December 12, 2008, GALAMBOS was a pretrial detainee at CCJ in Portland, Maine. During this time, GALAMBOS was represented by Attorney Robert J. Ruffner.  Bail was set at $25,000 cash or $100,000 surety.

15. For several years prior to and throughout this period of incarceration, GALAMBOS had been diagnosed with various mental illnesses including bipolar disorder, manic depression, schizo-affective disorder, schizophrenia, and/or anti-social personality disorder.  One or more of these conditions had been treated more or less continuously with antipsychotic prescription drugs through Spring Harbor Hospital, and the ACCESS program prior to August 03, 2008 then by CORIZON while detained. Spring Harbor Hospital's ACCESS program continued to provide some services to GALAMBOS while detained.

16. On November 15, 2008, GALAMBOS signed a slip refusing to accept Zyprexa to treat his mental illness (due to weight gain).   On December 01, 2008 he sent a general request to "counseling" stating " I need to find out what meds will work for me". The

4

order for 20 mg daily Zyprexa was discontinued on December 01, 2008 as was a standing order of Benztropine Mesylate.

17. Between December 03 and December 12, 2008 GALAMBOS was on constant suicide watch at the CCJ either in the maximum security unit or the medical unit. The following chronology of events is taken from notes and records of CCJ, and CORIZON

18. All defendants named in this complaint knew of the risk of serious injuries and of serious injuries actually sustained by GALAMBOS from December 02, 2008 until December 12, 2008.  All defendants named herein knew that GALAMBOS was at continuing high risk of committing serious bodily injury, self-mutilation and/or suicide during this period.

**December 02 -03, 2008**

19**.** Linda Williams, LCSW  interviewed GALAMBOS  on December 02, 2008  at 13:00 in response to unexplained incident.  She discussed the fact that "suicide is no joke in corrections and his behavior was an inappropriate use of services".

20. On December 02, 2008 at about 17:30, GALAMBOS was taken by CCJ guards to the medical unit with a stab wound .  GALAMBOS was then taken by guards to Brighton First Care, in Portland, Maine, for evaluation and/ or treatment for a 1 cm wide and 2 cm deep neck laceration which GALAMBOS allegedly caused himself by sticking a pencil into his neck.  He was admitted to Maine Medical Center for a series of x-rays and CT scans to determine if there was injury to tissues and proximate structures underlying the laceration.

21. GALAMBOS was released from MMC back to the CCJ just after midnight on December 03, 2008 and was placed on the medical unit on suicide watch. MMC staff called CORIZON staff explaining there was a hematoma around the carotid artery that should resolve and that the attending physician wanted to admit GALAMBOS for exploratory surgery, but that the initial negative CT results indicated there was no need at that time.

22.  A Maine Medical Center nurse's note states that while she was placing the IV in the patient for the CT, the  patient was "talking about aliens, very manic, and unable to hold a conversation", which message was relayed to  CORIZON staff at the jail.

23.  On December 03, 2008 at 12:08,  CORIZON staff member, Sue Robshaw, noted that a physician's assistant from MMC called her to report on the neck  x-ray taken the evening before which showed "punctate nodular densities; foreign body against soft tissue".  She notes that she discussed the phone call with the physician assistant at CORIZON.

24. On December 03, 2008 at 12:30 Linda Williams notes GALAMBOS is "talking to himself. exhibiting regressed behavior/self awareness.  Asking for help unable to be taken at his word or contract."

25.  CCJ and CORIZON had listed Katherine M. Cady as the emergency and or family contact for GALAMBOS.  At no time during or after this emergency visit and hospitalization on December 02, 2008 at MMC did CCJ or CORIZON contact or attempt to contact Katherine M. Cady nor GALAMBOS' attorney, Robert Ruffner.

26. On December 03, 2008 at 12:30, Linda Williams notes that GALAMBOS was talking to himself, naked, and exhibiting regressed behavior and would remain on suicide watch.

On the same day at 15:00, Linda Williams notes that GALAMBOS wanted  Seroquil in the morning and evening and an antidepressant. He was giggling, had suicidal thoughts, felt threatened and taunted by others.  Linda Williams noted she would call Dr. Corona for a consult and that GALAMBOS discussed his need for meds.

27. On December 03, 2008 at 15:30, following a call to Dr. Corona by Linda Williams, Edith Woodward, PAC spoke to GALAMBOS and prescribed 10 mg Abilify, Congentin, and Benadryl for his psychosis. Woodward notes the need to follow up in 24 hours.


**December 04 – 07, 2008**

28. On December 04, 2008 (no time entered), Linda Williams notes that GALAMBOS stated he thought he swallowed a dime; that he was talking to someone not there; he agreed to take Abilify again and she would discuss dosing with the P.A. there.  There is no record of a personal consultation or evaluation of GALAMBOS  by Edith L. Woodward PA-C.

29. On December 05, 2008 (no time entered), Linda Williams notes that GALAMBOS stated he felt that someone stole his brain, reported being in pain, and still hearing voices. She noted that GALAMBOS was to see Dr. Corona on December 06, 2008.

30. On December 05, 2008, CCJ guards reported an incident at 15:20 wherein GALAMBOS refused to put his hands through a food chute to be handcuffed in order to perform a cell search.  The guards physically restrained GALAMBOS against a wall and then in an arm lock and held him on his bunk as they searched his cell.

 31. On December 06, 2008 at 09:30, Linda Williams notes that GALAMBOS continued to have "bizarre behavior" i.e. climbing and standing on the table, crawling on the floor,

talking to the wall. On December 06, 2008 at 16:00, Dr. Corona saw GALAMBOS.   His

progress note states that GALAMBOS, naked in his cell, "seems to be floridly psychotic;

Patient…unable to sit still, loosening of association, reacting to internal stimuli; his

judgment and insight are impaired at this time".   Dr.Corona noted GALAMBOS' risk

was compromised due to his state of psychosis and he prescribed to continue Abilify and

to add Geodon 80 mg. He notes that he explained briefly some of potential problems, but

GALAMBOS would have to be educated on potential risks and side effects of these

medications when he stabilized.

32. On December 07, 2008 at 09:40, Linda Williams notes GALAMBOS shouting about

refusing medications and unable to converse.


**December 08-09 2008**

33. On December 08, 2008 at 09:20, Linda Williams notes GALAMBOS stated "I am

freaked".  He was unresponsive, regressed, not able to have a conversation. The interview

ended when he got up, naked, and urinated in his toilet.

34. On December 08, 2008 at 15:00, GALAMBOS, still on suicide watch in the

maximum security unit, climbed on top of and stood on the metal table in his cell affixed

to the wall.   C/O Stotts, just outside the cell at 15:54 observed GALAMBOS standing on

the table in such a stance as if he was going to jump off it and had a blank stare at the

floor directly below him." Stotts recounts that twice he requested that GALAMBOS step

down off the table, but that GALAMBOS "refused to step off his table and would not

make eye contact with me or respond my orders".   GALAMBOS raised his arms

upward, leaned forward and propelled himself upward and outward performing a flip in

the air landing on his head and shoulders on the concrete floor striking his head and /or forehead and upper right back and shoulder with blunt force to end up lying on his back. Stotts and other guards and sub-control security camera watched as this occurred. After lying on his back for some time, GALAMBOS sat up and three guards entered the cell and escorted him to the medical unit.

35. There is no entry regarding this incident in CORIZON notes or records on December 08, 2008. There was no attempt by CCJ or CORIZON to contact Katherine M. Cady, nor his attorney regarding this incident on December 08, 2008.  There is no record that Dr. Corona or Dr. Tritch were contacted following the incident. GALAMBOS was not sent to a hospital for evaluation of his injuries, internal nor external.

36. On December 09, 2008 at 07:45, Linda Williams' note relates that GALAMBOS is back on the medical unit "after jumping from the table in a swan dive".

37. On December 09, 2008 at 13:60, a writer (signature undecipherable) on CORIZON "Interdisciplinary Progress Notes" noted bruised shoulders of GALAMBOS and that he was screaming early in the shift and slept in the afternoon.


**December 10-11, 2008**

38. On December 10, 2008 at 8:30, Linda Williams notes that GALAMBOS is lying on the floor, naked, with blood on his face, unresponsive to attempts to communicate; that a med tech attempted to give Geodon.  She states that GALAMBOS "is in poor physical condition, odiferous and regressed".  A note at 9:00 by Sue Robshaw also describes blood on GALAMBOS' face and a cut on his forehead.  She writes that GALAMBOS stated he had fallen off his toilet.

39. On December 10, 2008 at 14:23, C/O Hendrickson reported witnessing GALAMBOS "standing in front of his toilet with his hands at his sides. At this time he lurched forward and down, striking his nose and brow on the floor, making no attempt to break his fall". GALAMBOS was taken by guards to the medical unit.

40. At 14:30 on December 10, 2008, the CORIZON medical unit requested that corrections officers/officers Logan, Moore and Gilpatrick place GALAMBOS in a pro-restraint chair.  CCJ guards were advised that "Galambos had split his head open". Before GALAMBOS was moved from his cell (A004)  to the restraint chair he was given medication by the medical department.  The CCJ guards detail securing and pulling the straps tight against GALAMBOS' wrists, shoulders, waist, and ankles including his bruised right shoulder.  C/o Keith Logan writes "I was asked by Medical to assist with Paul Galambos.  When I arrived on medical I was told he had to go to the Pro-Restraint chair due to him committing self harm.  Galambos had visibly split his head open …Before Galambos was moved, he was given medication by the medical department. Galambos was asked to stand up which he did…Galambos was escorted to intake and placed in the restraint chair…I took the shoulder strap that went over I/M Galambos left shoulder and secured it. I then passed Cpl. Gilpatrick the shoulder strap that went over the right shoulder of I/M Galambos and pulled it tight once it was secured."

41. On December 10, 2008 between 14:45 and 15:00,  "prescriber" McNally prescribed and Barbara Walsh, DON  administered 60 mg of Zyprexa SL (three times GALAMBOS' standard dose) and 2 mg Ativan (double GALAMBOS' standard dose) to GALAMBOS, just before placing GALAMBOS in the pro-restraint chair. There is no record of how long GALAMBOS remained in the pro-restraint chair.

42. At 18:30,  a CORIZON nurse (name undecipherable), writes that a corrections officer requested assessment of GALAMBOS who was sweating profusely, incontinent of urine, had garbled speech and was very confused.

42. Dr. Todd Tritch, local medical director, was contacted  to assess GALAMBOS.  At 19:00, Dr. Tritch notes that GALAMBOS was "lying on the floor naked, incontinent of urine, barely able to sit up, incoherent speech, not obeying commands' confused, contusion to head and right frontal with fresh blood from abrasion, contusion to shoulder, moving arms and legs with difficulty; suspect head trauma."

43. CCJ or CORIZON called Medcu, the emergency ambulance service operated by the City of Portland, at or about 18:40 on December, 10, 2008 for transport of GALAMBOS to MMC.

44. Medcu, EMT-1, Caroline Harden, notes that on  December 10, 2008  "Jail nurse, Loretta Hines states male jumped off  toilet in cell with suicidal intention.  Nurse states male had altered mental state since 2:30 pm this afternoon. Unknown why EMS was not called sooner.  Nurse states bruise on shoulder is old from a previous fall.  Nurse gave 1 mg of Ativan at 6:00 pm and was unclear to why it was given.  Conflicting stories on patients event….  Arrived on scene to find obese, naked 26 YOM unresponsive in handcuffs.  On scene time delayed due to needing to call for engine company for lift assist.  Pt incontinent to urine Pt has scars all over body that were self-inflicted."

 45. GALAMBOS was taken by Medcu on a stretcher to MMC's emergency room for evaluation. Dr. Carl Germann in the Emergency Department Report at 22:54  relays as "History of Present Illness" that GALAMBOS "jumped off the toilet with the suicidal intent.  The patient landed on his head. The patient had only periods of combativeness

after this event.  He was given Ativan while in the jail."   Judy Sinclair, RN on the

"Standard of Care For General Medical/Surgical Patient in the Emergency Department"

enters under 'Primary Assessment' that GALAMBOS "fell off toilet from jail cell (15:00)

last time he was normal acting per guards…also threw himself against the cell door". The

Interdisciplinary Trauma Evaluation entered by provider, Howard, at 21:27 states

GALAMBOS "ran into metal door headfirst today at 15:00.  Per guard report patient

received 'double dose' of Ativan." A 'Surgery Clinic'  record states that staff was told

GALAMBOS was given Ativan to sedate in order for transport.   According to various

other MMC notes of December 10, 2008, GALAMBOS arrived, sedated, with head

trauma with loss of consciousness; multiple wounds, scrapes, and bruises in various

stages of  healing over his entire body including, a swollen right eye;  a large healing

ecchymosis around his right shoulder; large abrasion on right knee; both feet and hands

 with multiple scabbed, round lesions with reddened edges; responding to touch, but not

voice; and moving all extremities.

46.  Following results of several radiographic imaging tests,  GALAMBOS was admitted

to the hospital as an inpatient at 22:15 with injuries beyond the physical and visible

injuries noted above, including a T-1 closed fracture of the transverse process, multiple

posterior closed rib fractures,  scalp edema, head contusion, chest wall contusion, and a

right pleural effusion.  GALAMBOS was admitted for observation and evaluation with,

David E. Clark, MD as attending physician. A 'Surgery Clinic" form signed by Dr. Clark

records that GALAMBOS had been given "two shots of sedative at 17:00 (in

jail)…Admit with close observation and guards in room; Symptomatic treatment when

wakes up; follow up CXR; Transfer to medical ward in Augusta when awake and stable."

47. MMC personnel note "there are conflicting stories by people reporting".   Notes written by attending physician David Clark, reiterates that those reporting from CORIZON and CCJ state that GALAMBOS, earlier that day, either ran into a metal door or possibly jumped or dived off a toilet, and GALAMBOS was given Ativan to sedate him in order for transport. MMC nurse, Myra Brooker's focus note on December 11, 2008  at 8:00 states "Pt  restrained x 3 limbs by guards.  Integ with many abrasions and bruising, guards report that these injuries were self-inflicted over time, pt reportedly hits head and hurts self daily."

48. GALAMBOS underwent medical and psychological observation, evaluation, and treatment throughout the evening of December 10 and into the early evening of December 11, 2008 in the MMC trauma department.  Nursing and other medical notes state he was shackled to the bed with handcuffs and leg cuffs throughout his stay.

49. CCJ and CORIZON, and the respective staffs or employees failed to contact or attempt to contact Katherine M. Cady or GALAMBOS' attorney on December 10, 2008 to report the emergency hospitalizations and serious injuries diagnosed.  CORIZON did however enter on their 'Interdisciplinary Progress Notes' on December 10, 2008 at 22:30: "Corporate line notified."

50.  A MMC record of medications taken prior to the admission on December 10,  2008 does not include either the 60 mg of Zyprexa (aka "Zydis") nor the 2 mg of Ativan administered by Barbara Walsh and others on December 10, 2008 at or around 15:00. Only on December 11, 2008 at 11:00 does Leah Vosmus  PMN, NPC  a nurse with MMC psychiatric department  record that  she was informed of the date and time of the administration of the high doses of Zyprexa and Ativan.  This note reports GALAMBOS

was taken to the ER "after slamming his head into a steel cell door"; that he had been given 60 mg of Zydis at 15:00 on the day of admission as well as 2 mg of Loranzapam.

51. At noontime on December 11, 2008, Linda Williams contacted GALAMBOS' attorney, Robert Ruffner, explaining that GALAMBOS was at MMC "after jumping head first on to a concrete floor, breaking bones in his neck". She explained that GALAMBOS needed to be transferred to Riverview, the State of Maine psychiatric hospital in Augusta, Maine for inpatient treatment .  She stated that Ruffner would need to prepare a motion to amend GALAMBOS' bail so that he could be transferred from MMC to Riverview on discharge from the hospital.

 52. Attorney Robert Ruffner prepared the requested motion for the court which was signed by a judge at 15:42 on December 11, 2008. Ruffner then sent the signed order to Linda Williams at CCJ at 16:00. His motion states that "Ms. Williams is filing "blue papers" and a transport order on Galambos to commit and transport, him to Riverview".

53.  On  two non-completed and undated forms, 'Application for Emergency Involuntary Admission to Mental Hospital" and 'Request for Endorsement to Transfer of a Patient Involuntarily Admitted to a Mental Hospital',  Linda Wiliams describes  GALAMBOS' behaviors and medical issues writing, he "has done swan dive off fixtures in his cell twice. He is delusional and suffering from psychosis and states 'I want to end the pain'… He has broken ribs and a transverse process fracture (cervical) from diving off furniture….shouting at the window, naked in his cell for 1 week, disinhibited inappropriate gesture, urinating on the floor-sitting in it….headbutting when officers attempted inspection of cell…disoriented, responding to inner stimuli, talking and shouting as if someone is there, crawling on the floor, climbing on the table, bizarre."

The forms were not completed or sent to Riverview by CORIZON or CCJ prior to GALAMBOS death.

54.  Linda Williams at 16:40 called Robert Ruffner's office leaving a message for him with his answering service that "she got the file she needed. Also Paul Galambos was released from the hospital and needs to be moved to another place.  She said you did not have to call her back."

55. Catherine Lapointe, ANP, at 12:00 on December 11, 2008 completed a "tertiary survey" of GALAMBOS care.  The tertiary survey  was confirmed by Virgina A. Eddy, MD at 14:45 on December 11, 2008.  It states GALAMBOS slept overnight, was able to be aroused and was able to lift his head.  The aspen collar was removed and he was put on activity as tolerated.

56. A MMC psychiatric 'Initial Assessment' prepared by Leah M. Vosmus, PMN NPC at 11:00 notes GALAMBOS is paranoid, seeing things, hearing voices, and attempted to hurt himself to get away from torture, saying he "felt people trying to kill me" and he believed he was going to be tortured to death on 12/10.  She notes, following investigation with CORIZON: "Review with  Jail.  Pt. had received 60 mg Zydis @ 15:00 on day of adm. and 2 mg. Lorazepam.  Staff report that for past 5 days @ jail he has refused Abilify 10 mg disc , Geodon 80 mg Bid and Haldol Decanoate 100mg I.M on 12-2-08". She writes, as to 'Level of Care Indicated': "inpatient psychiatric hospitalization/ arrangements per C.C. Jail."  Her note at 'Initial Treatment Plan' states "stabilize and provide a safe environment."

57. GALAMBOS was discharged from MMC at 17:11 on December 11, 2008 back to CCJ over one hour after having been medically bailed out of CCJ for transfer to

Riverview. Catherine Lapointe ANP, dictated a discharge summary at 16:13 on

December 11, 2008. Her summary under 'Principal Diagnosis' states "status post self-

injurious behavior with his head running into a metal door. The patient has multiple

contusions both old and new throughout his entire body. He has a T1 transverse process

fracture that is not in need of bracing. He has a right shoulder contusion." The 'History

of Present Illness/Hospital Course' section of discharge summary provides in more detail

that GALAMBOS, "an inmate with psychiatric disturbance and self-destructive behavior

who ran into a metal door intentionally or possibly dived off a toilet. There are

conflicting stories by the people reporting. The patient was given Ativan to sedate in

order for transport. He was minimally responsive in the ED but was able to protect his

airway. He had multiple old and new ecchymoses and he was responding to touch but

not voice. He was moving all extremities, and his CT findings are as noted. He had a

chest x-ray that showed no hemo or pneumothorax or rib fractures, no mediastinal

abnormality. There was a question of a right pleural effusion. On brain CT he had a

normal intracranial image with no intracranial hemorrhage or skull fracture. A CT of his

C-spine showed a T-1 transverse process fracture and possibly 2 ribs seen on the neck CT

as fracture but no neck injury and his tox screen was negative. The patient was admitted

for close observation and psychiatric evaluation. The patient slept overnight and was

able to be aroused and reliable for exam to clear his neck in the morning. He is able to

lift his head and perform a confrontational exam without positive findings. Aspen collar

was removed and he was put on activity as tolerated. Psychiatry did come see patient and

their recommendations were that the patient has schizophrenia with schizoaffective type

by history and polysubstance abuse by history. He has had a brain injury in the past and

16

is incarcerated.  Their initial plan is to stabilize and provide a safer environment.  They recommend Zyprexa 20 mg by mouth daily and for psychiatric and behavioral emergency Haldol 5 mg intramuscular along with Ativan 2 mg intramuscular and may repeat the Haldol every 30 minutes x2 only.  A tertiary survey was performed on hospital day 1 and not other injuries were found.  The patient was released back to the Cumberland County Jail with a guard present." Catherine Lapointe notes under 'Special Instructions':  " I did have a conversation with nurse in the infirmary at Cumberland County and have been assured that the patient will have a guard with him at all times to maintain safety and that he will have ongoing psychiatric intervention." David Clark electronically signed the discharge report four days after death on December 16, 2008 at 8:25.  This report makes no mention of the plan to transfer GALAMBOS to Riverview.

58. No reports given by CORIZON or CCJ to GALAMBOS' medical providers from the time GALAMBOS was taken by Medcu on December 10, 2008 at 19:00 through his discharge from MMC on December 11, 2008 at 17:11, include an account of  the 'swan dive' off  his table at CCJ on December 08, 2008 at 15:00.

59. On December 11, 2008, at 16:00 Barbara Walsh, DON notes that Riverview could not accept GALAMBOS that evening  and that Dr. Steven Sherrets would need to contact Riverview the next day, December 12, 2008.

60. GALAMBOS returned to CCJ at 17:15 on December 11, 2008 to the medical unit under care of CORIZON and CCJ staff on one-on-one suicide watch status for the sole purpose of keeping him safe and presumably alive as he awaited his transport to Riverview the next day.

61.  Barbara Walsh, DON at 16:00 incorrectly noted that GALAMBOS was medically cleared from MMC with "no T. Transverse Process fracture on the Radiology Report per the NP @ MMC"; she also specifically writes:  No drug overdose per the NP at MMC." On December 11, 2008 at 16:07 Barbara Walsh received an email from Sharon Fisher a CORIZON RN supervisor offsite which summarized GALAMBOS' treatment at MMC on 12/11/2008 as resulting from "hitting head against metal door…Had CT scan, - T1 fx that does not need any bracing."  An entry at 17:15 by another CORIZON writer notes the return of GALAMBOS from MMC with no spinal fracture and no facial fracture, but with scalp edema and a paraspinal hematoma. The note finds GALAMBOS uncommunicative.

62. On December 11, 2008 at 22:45, the CCJ corrections officers' log notes that GALAMBOS is "with nurses".  The nurse's note documents that GALAMBOS is repeatedly banging his head off the door and walls and asked for Ibuprofen. GALAMBOS shoved a paper medicine cup up his nose which required removal with tweezers.  He continued to hit his head on the walls at which point he was given Haldol 5 mg per the discharge order.


**December 12-13, 2008**

63. On December 12, 2008 Nicole Mathieu, RN notes at 6:00  that GALAMBOS rested in naps during all shifts, but was awake yelling at times and would quiet down with verbal cues from the 1:1 officer.  "No attempts @ self harm this shift".

64. On December 12, 2008 at 7:00, a CORIZON writer (signature undecipherable) notes GALAMBOS was observed "receiving AM meal (Breakfast) When his tray arrived the

C/O spoke to him and told him "Breakfast Paul".  Paul immediately got up from the mat and came to the food door took his tray and ate his breakfast meal.  His gait coming to the food door was steady and the observer noted no issues with ambulation". This note is written out of order on the "Correctional Medical Services Interdisciplinary Progress Notes" and is the only entry on the sheet.

65. At 7:24 on December 12, 2008, the Medical Corrections officer, Donald Cousins called for assistance after GALAMBOS fell upon standing and the officer found no pulse. Medical staff administered CPR and chest compressions and called Medcu when they had no success reviving GALAMBOS. Medcu transported GALAMBOS to MMC.

66.The Medcu report of the transport to MMC on December 12, 2008 at 7:30  states: " Call to CCJ for a male who jumped or hit his head while falling to the floor.  Guards state he was at MMC and cleared for self-inflicted injuries yesterday.  Pt was returned to jail and was under direct 1-on-1 supervision.  Pt fell to the ground and was initially slightly responsive then went unresponsive.   Staff immediately started CPR and called 911.  Pt was discharged from MMC yesterday with a transverse process fracture of T-2 after jumping off a table at CCJ yesterday.  Pt was reported to have been causing self-inflicted injuries all week including ramming his body into his bed and ramming his head into a door.  It is unclear to EMS at this time which incident caused the T-2 fracture."

67. GALAMBOS was pronounced dead at MMC at 8:00 on December 12, 2008. Katherine M. Cady was not advised of the injuries or death of GALAMBOS until approximately 11:00 on December 12, 2008.  Her son called her at work once he learned from a neighbor that a Sheriff's Deputy had been at the Katherine Cady's home earlier.

Her son called the Sheriff's Department for information on the reason for the earlier visit to the home.

68.  On December 12, 2008 at 17:40 Barbara Walsh emailed a summary of her version of events from December 02 through December 12, 2008 to six of her CORIZON supervisors.  She claims that she was told by Catherine Lapointe that "there was no T1 transverse process fracture however, the Transfer Summary states otherwise."  She acknowledged therein that "there was some type of communication error and Riverview stated they could not receive (GALAMBOS) on 12/11/08."

69.  The Portland Police Department performed an initial investigation into the death of GALAMBOS at MMC and CCJ on December 12, 2008.  Evidence Technician, Victor Cote responded to a call from MMC on 12/12/08 at 9:15.  " I photographed the Mr. Galambos with a digital camera.  He was nude with a sheet partially covering his body.  I observed abrasions that appeared to be older on his forehead above the left eye, on the bridge of his nose, and on his stomach.  There were what appeared to be sores on his feet and right hand that had scabbed over and appeared older…I cleared the hospital and responded to the Cumberland County Jail, where I met with Det. Beaumont and Det. Dunham.  There were in the medical unit with jail staff and investigators.  I learned that Mr. Galambos had previously intentionally injured himself by throwing himself to the floor from the toilet in cell A0004.  He had been transported to MMC and treated on this occasion. He had also reportedly done other acts to injure himself including jumping from a table in cell A124 and stabbing himself in the neck with a pencil."

70.  A Portland Police Department Supplemental Report dictated by Det. Scott Dunham reported that on 12-12-08 he and Det. Rick Beaumont responded to the Cumberland

County Jail.  They met with Lieutenant Joel Barnes from CCJ "who apprised us of the known facts". The facts reported to them were that GALAMBOS "had made threats to harm himself in the past and on 12-10-08 had attempted to do that by throwing himself to the floor, possibly while standing on a toilet and apparently intentionally landing on his head and neck.  He was transported to the MMC at that time.  Initially it was believed he may have suffered a possible fracture of his T-1 vertabra but at the time of this report its unclear what the final diagnosis was…Lt. Barnes told me that he is in the process of attempting to obtain the video tape of today's incident as well as the incident from 12-10-08."

71. The body of GALAMBOS was transported to the State Medical Examiner's office for an autopsy which was performed on December 13, 2008 in the presence of Portland Police officers.  The preliminary report found the immediate cause of death was acute pulmonary thromboemboli, due to deep leg vein thrombosis, as a consequence of recent self-inflicted blunt force trauma.

72. The manner of death was not determined until May 19, 2009, five months after death. The determination by the Medical Examiner as to manner of death was suicide.

73. In the Investigative Report of the Medical Examiner dated May 19, 2009, the "Reported Circumstances of Death" as obtained from the CCJ , MMC and Medcu states: "On 12/10/08, (GALAMBOS) injured himself by intentionally jumping off an object in his cell, hitting head-first into the door and/or floor.  Initially, he was placed in a Pro-Restraint Chair to keep him from further injuring himself.  Several hours later, he was noted to have altered mental status and he was taken by ambulance to Maine Medical Center.  Hospital evaluation revealed many contusions and abrasions on multiple body

sites, including his head, and studies revealed transverse/posterior arch fractures of the 1st and 2nd thoracic vertebrae.  He returned to the jail on 12/11/2008. On 12/12 he suddenly collapsed in the Medical Unit of the Jail and died at the hospital."

74. The Medical Examiner's note following the finding of manner of death to be "suicide" reads: "Note: This death occurred on 12-12-2009, two days following intentional, self-inflicted trauma to the head (12-10-2009).  Hospital evaluation revealed fractures of the upper thoracic spine.  Upon his return on 12-11-2009, he remained in the infirmary of the jail on suicide watch.  The watch record showed a decreased level of activity after his return   He collapsed a few minutes after breakfast on the morning of 12-12-2009.  The terminal thromboemboli found at autopsy are most likely due to the decreased mobility following the injuries, resulting in venous stasis of the legs and subsequent development of deep vein thrombosis.  Because the death occurred days following the acute injury, it is considered a delayed death.  This does not change the manner of death. Because the thromboemboli are associated with the self-inflicted injuries described above, the manner of death is regarded as suicide." (note: there are obvious typos here, as all relevant dates occurred in 2008).

75. The Medical Examiner's report based on her inquiries at CCJ do not mention the "swan dive" from the table on December 08, 2008.


## COUNT I

### (42 U.S.C. SECTION 1983, EIGHTH AND 14th AMENDMENT)

76. The plaintiff repeats and reavers Paragraphs 1 through 77 of this Third Amended Complaint.

77. Defendant CORIZON, CCJ and through their employees as named or currently unknown ,in their individual and representative capacities, who attended to the care, treatment or supervision of GALAMBOS from December 02, 2008 through December 12, 2008, deprived GALAMBOS of his rights as a pretrial detainee as clearly established under the 8th Amendment to the US Constitution supplemented by the 14th Amendment. Those rights guaranteed GALAMBOS a safe environment and protection from  serious, life-threatening harm and injury, including  that incurred by self-harm or self-mutilation, and guaranteed him treatment of his medical and psychiatric illnesses or injuries.

78. Defendant CORIZON, by and through it's employee Michael U. Trueworthy, C.N.P, and Michael U. Trueworthy in his individual and representative capacities, denied GALAMBOS necessary medical care and treatment on or before December 01, 2008. On December 01, 2008, Practitioner Trueworthy met with GALAMBOS and ordered the discontinuance of two medications he had previously ordered: Zyprexa (an antipsychotic drug) and Benztropine Mesylate (or Cogentin).  Provider Trueworthy failed simultaneously to order a replacement medication for the discontinued drugs.  In failing to provide GALAMBOS with alternative medications on December 01, 2008, or earlier thereto,to treat his known mental illnesses, Trueworthy abdicated his professional responsibility to GALAMBOS in his role as mental health provider and counselor. Practioner Trueworthy had personally treated GALAMBOS during the period of his incarceration and had reviewed and knew his prior history at Spring Harbor Hospital which records were in the possession of CORIZON. Practitioner Trueworthy had referenced those records in his initial psychiatric evaluation of GALAMBOS for CORIZON on September 12, 2008 stating therein, " In addition, discharge summary from

Spring Harbor Hospital of this past summer was read and laboratory studies appeared to be within normal limits at that time."  CORIZON records during the incarceration included several requests by GALAMBOS for alternative drugs to treat his mental illness.  On December 01, 2008,  Practitioner Trueworthy recklessly failed to review such records in his possession, or he ignored them, or both.

79. As a result of this disregard, GALAMBOS suffered severe and rapid mental psychosis as of December 02, 2008 and thereafter.  The withdrawal of needed antipsychotic medications and the reckless failure to replace them, especially in light of GALAMBOS' repeated requests for some alternatives, caused a grave risk to GALAMBOS. It brought about abrupt and massive deterioration in GALAMBOS' mental state.  The consequent severe mental torment lead directly to dangerous self-injurious behaviors. On December 02, 2008, GALMBOS stabbed himself in the neck. Despite placement on 'suicide watch' status  after this injury and introduction of Abilify on the third with the  addition of Geodon on the sixth, for GALAMBOS, it was 'too little too late'.  It  amounted to treating a hemorrhage with a bandaid. GALAMBOS suffered continuing observed and documented mental regression for the following six days culminating in a self-propelled flip off a table onto his head and upper back on December 08, 2008.  These dangerous self-inflicted behaviors caused serious, life-threatening, physical injuries. GALAMBOS had made a final plea on a request slip to counseling dated December 01, 2008: "I need to find out what meds will work for me".   Practitioner Trueworthy's  intentional disregard on the very same day of this request in refusing to prescribe an alternative antipsychotic therapy was a primary cause of GALAMBOS' unnecessary mental and physical torment over ten days to a slow and painful death.

80. All such defendants are not protected by qualified immunity from suit under the circumstances as hereinafter alleged.

81. Defendants CORIZON and CCJ by and through their employees as named or as yet unknown,  violated the rights of GALAMBOS by acting individually and/or jointly with deliberate indifference to GALAMBOS' serious risk of self harm and injury due to his known mental illnesses and acted with deliberate indifference to evident injuries of GALAMBOS while on suicide watch between December 03 and December 12, 2008 at the CCJ. A summary of those acts and omissions follows.

82. Defendants CCJ and CORIZON acted with reckless and willful disregard for the health and safety of GALAMBOS in failing to take common sense precautions and/or obvious steps to address his escalating episodes of self-harm following December 02, 2008.  This willful disregard for GALAMBOS' safety is clearly manifested in the written records which document that defendants took no measures to sufficiently change his cell environment to remove or alter the known risks to his health and safety.  They neglected to consult with other professionals for advice and direction in response to his drastically changing specific psychiatric needs as his behaviors were becoming increasingly dangerous to himself. Despite the clear and known evidence that the adjustments to his medications were not effective, particularly as of December 08, 2008 at 15:00 when CCJ and CORIZON were on notice of his extreme self-injurious behavior they failed to act responsibly to prevent further harm.  That he was willing and able to jump in front of witnesses head first from a table demonstrates the lack of oversight and need for intervention to protect GALAMBOS.   According to multiple accounts, GALAMBOS after the head-first jump from a table continued to beat his body and head black and blue

and to sustain open wounds using his entire cell environment as a tool, including according to those reporting, a toilet, bed, metal door, bars, walls, and floor.  There was no real attempt to arrest his quest to self-harm and no proper evaluation of the consequences of the visible injuries he had sustained, until he lay comatose on December 10 at 18:30 and they had no option.  Ongoing, in-person medical consultation and in-person physical evaluation by the medical staff of CORIZON following changes in administration of medications to verify changes in GALAMBOS' behavior due to new medications or dosages was untimely, not done or grossly inadequate.  There is no record that he was seen by a doctor prior to administration of high doses of medication on December 10, 2008.

83. Maintaining the status quo in terms of suicide watch parameters as to location and equipment within the cell between December 03 and December 12, 2008 was reckless in light of the visible injuries to GALAMBOS' body as witnessed by all defendant employees of CORIZON and CCJ charged with GALAMBOS' care.

84. Watching daily escalation of self-injurious acts, observing increasing numbers of cuts, bruises, swelling, and lesions; omitting in the records the details of his physical injuries, except in vague terms such as "poor physical condition"; and failing to act to either move GALAMBOS  to a safer environment, such as a psychiatric hospital or a hospital housing a psychiatric unit such as MMC, or to make his environment more safe, with e.g. padding, evidences a willful blindness to GALAMBOS impending injury and suffering on the part of CORIZON and CCJ and their employees charged with his care.

85. CORIZON and CCJ and their employees wantonly disregarded the known serious risk of internal injury to GALAMBOS in the hours and days immediately following the

flip or swan dive from the table in his cell on December 08, 2008.

86. CCJ guards who observed the head-first jump on December 08, 2008, either outside of the cell or on the security camera that captured the details frame-by-frame did not take adequate steps to prevent GALAMBOS from climbing onto or jumping off his table in his cell although they had notice and the time to do so.  CCJ guards initiated no further notification, assessment or follow-up to their supervisors at CCJ  in the hours or days following the incident on December 08, 2008 despite witnessing thereafter daily incidents of self-abuse and the physical and mental deterioration of GALAMBOS.

87.  CORIZON and its employees failed to prevent GALAMBOS from climbing on his table despite witnessing him do so in the days before the December 08, 2008  jump.

88.  CORIZON and its employees failed to perform or to seek the necessary medical attention and examination indicated following a severe blow to the head, neck and back following the witnessed blunt force trauma to GALAMBOS.  CORIZON and its employees failed to send GALAMBOS to the hospital for evaluation and x-rays or other specialized examinations to determine the extent of internal injuries

89. The level of care given GALAMBOS in light of blunt force trauma to his head and back on December 08, 2008 was so significantly substandard that it amounted to a denial of treatment. There is no reasonable possibility that GALAMBOS would not have sustained serious and/or life-threatening injuries following a direct impact to the head and back from the forceful fall of a 300 lb. male onto a concrete floor from an elevated height.  Obvious risks included serious injury to internal organs;  broken or fractured bones anywhere in the body; head, brain and/or spinal chord injuries; and death either immediate, very soon thereafter, or delayed. The obvious risk of serious life threatening

injuries is magnified in this case, especially as the injuries were followed by inactivity-

due either to the shock and trauma of the injured body itself, and/or to significant

concurrent changes to mental status of GALAMBOS.

90.  Visible severe injuries and the noticeable decrease in physical abilities of

GALAMBOS also indicated a very high risk of blood clot formation which risk also went

unevaluated or ignored by CORIZON.  A competent medical provider, corrections or

otherwise, would have known that such an incident would require extensive and

specialized testing which could not be undertaken at the CCJ facilities on December 08,

2008;  No competent medical provider that had any concern for the welfare of his patient.

would ignore the medical urgency from such a fall, whether the jump and fall was

intentional or accidental.

91.  CORIZON and its employees acted with reckless and wanton disregard for

GALAMBOS' health in light of the known physical evidence of his fall and visible

resultant external injuries.  They consciously chose to ignore and not to further assess the

serious health risks to GALAMBOS likely to have resulted therefrom, which deliberate

decisions did in fact cause continuing pain, suffering, and the death of GALAMBOS.

92. CORIZON and its employees, (FNU) McNally,  Barbara Walsh, prescriber

MCNALLY, and others exhibited a total lack of concern for and reckless disregard of

GALAMBOS' welfare by prescribing and/or administering medications (including a

triple dose of 60 mg of Zyprexa and a double dose of 2 mg of Ativan) on or after 14:23

December 10, 2008 in order to render him immobile and/or  unconscious without concern

for the consequences to GALAMBOS' health. They reacted in contravention to accepted

standards of medical practice, without applying medical judgment or precaution, to serve

their own selfish purposes of not having to actually address  his deteriorating physical

and mental health.  The decision to sedate GALAMBOS, used as an immediate medical

restraint, was the easiest method to halt  his voluntary or involuntary behaviors resulting

in self-harm.  There existed more humane and more effective methods available that

could easily have been implemented to protect him, and that would not have put

GALAMBOS' health and safety in harm's way.

 93. CORIZON and CCJ and their employees acted with reckless disregard for

GALAMBOS' welfare by ordering and authorizing, and placing  GALAMBOS in a pro-

restraint chair in order to prohibit any activity or movement and to punish GALAMBOS

for his state of severe psychosis which was clearly beginning to test their patience.  This

was particularly egregious in light of CORIZON and CCJ  awareness of the blunt force

trauma incurred by GALAMBOS on December 08, 2008 and in light of the visible

bruising, swelling, cuts, and lesions all over his naked body.

94. CORIZON and CCJ and their employees, with wanton disregard for GALMBOS'

welfare, deliberately and tortiously interfered with GALAMBOS' medical treatment in

knowingly withholding information and/or knowingly providing false information to the

Medcu attendants and the MMC doctors and nurses who treated GALAMBOS following

the alleged fall from or onto or near his toilet on December 10, 2008. To cover up their

severe neglect in GALMABOS' treatment after the jump from the table on December 08,

2008, they purposefully did not disclose the 'swan dive' incident from the cell table on

December 08, 2008.   The severity of the known, witnessed, and videotaped traumatic

incident of December 08, 2008 far surpasses the 'falling' incidents of  December 10,

2008. CORIZON notes  GALAMBOS himself reported an (unwitnessed) fall off a toilet

in the morning with resultant blood on his face. In the afternoon, C/O Hendrickson
witnessed GALAMBOS lurch and fall forward standing in front of his toilet striking his
nose and brow.  Neither incident, as described, would be likely to cause a T-1 or T-2
fracture and multiple posterior rib fractures. Neither incident, as described, sounds
intentional, but rather, involuntary. The information relayed to Robert Ruffner by Linda
Williams for preparation of the motion to amend bail on December 11, 2008 specifically
referred to the swan dive off  a table as to what she attributed the broken bones in
GALAMBOS' neck.  There exist, to date, no corroborating videotape provided to
Plaintiff of either fall of GALAMBOS on December 10, 2008. The deceitful cover-up of
the December 08, 2008 trauma caused staff at MMC to be unable to properly evaluate,
assess and to effectively treat GALAMBOS based on the inaccurate patient history as to a
crucial element in order to provide life-saving care.

95. CORIZON and CCJ and their employees deliberately failed to  disclose on December
10, 2008 to Medcu and MMC doctors and nurses that GALAMBOS had been given 60
mg of Zyprexa as well as 2 mg of Ativan a few hours before he was rushed  comatose to
MMC on December 10, 2008.  They deliberately attempted to shift any responsibility for
the condition of GALAMBOS, who had been in a severely compromised physical and
mental state for several days, from themselves to GALAMBOS and to thereby suggest
his comatose condition resulted from an intentional fall involving a toilet instead of from
the intentional, deliberate and grossly indifferent decision of CORIZON to overdose
medication to an inmate with existing severe injuries.

96. CORIZON and CCJ and their employees, by purposely withholding critical medical
information from attending physicians at MMC,  mislead MMC doctors and nurses in

their ability to evaluate and treat GALAMBOS for blood clots that may already have

formed in his body. Due to the high likelihood of fractures and/or internal injuries as a

result of the impact to GALAMBOS body on December 08, 2008, this deliberate

misinformation dissuaded or distracted MMC and its attending  staff from evaluating for

clots already formed in GALAMBOS' body.

97.  The deliberate withholding of an accurate and complete recent patient history by

CORIZON and CCJ and their employees lead MMC and its staff to be unable to

cautiously assess or foresee the consequence of applying ankle to knee compression

devices to GALAMBOS' legs as ordered on December 10, 2008.  Such devices are

routinely applied following injuries to prevent new blood clots from forming.   One risk

from compression devices is that the pressure from the devices can actually cause blood

clots that have already formed in the body to break loose and travel throughout the blood

stream.   Blood clots were highly likely to have been formed by GALAMBOS' body

prior to GALAMBOS admission to MMC on December 10, 2008 due to the traumatic

injuries of December 08, 2008 followed by prolonged inactivity.   Failure to test for

existing clots was the result of willful withholding of critical information by CORIZON

and CCJ and their employees. Any existing clots were susceptible to breaking loose from

the veins or arteries of GALAMBOS  due to the compression devices which were meant

to prevent formation of new clots following injuries on December 10, 2008 as had been

reported to MMC staff as the only incident of severe trauma.

98. CORIZON ,CCJ, and their employees owed a duty to GALAMBOS to contact his

designated emergency and/or familial contact in the event of a healthcare emergency.

CCJ and CORIZON were deliberately indifferent to the health and welfare of

GALAMBOS , a pretrial detainee, in failing to contact his mother, Katherine M. Cady, his designated emergency/familial contact to inform her of GALAMBOS' serious psychosis, injuries and medical emergencies at any time from December 02 through December 12, 2008 until approximately three hours after his pronounced death. The failure by all defendants to advise anyone outside of CCJ or CORIZON, prior to December 11, 2008 of the injuries and hospitalizations of GALAMBOS denied GALAMBOS' family the opportunity to facilitate a move to a safe environment and to seek needed medical and mental health care and to thereby prevent his ensuing pain, suffering and death. The air of secrecy that pervaded the three organizations surrounding the care of GALAMBOS between December 02 and December 11, 2008 appears collusive.

### Governmental Policies or Customs

99. CCJ, as a governmental entity and CORIZON through its contract with CCJ, violated the constitutional right of GALALMBOS to be protected from a safe environment, physical and mental harm, injury, suffering, and death by allowing or instituting a coordinated implementation of a suicide-watch policy and/or practice that failed to individually assess and reassess conditions of the suicide watch plan and monitor changes to in a detainee's behaviors to determine whether and what specific changes to such plan could minimize risk of harm to GALAMBOS or any other  pretrial detainee.

100. The custom of managing psychosis in a mentally ill inmates by tweaking  psychotic medications alone to effect change in the level of psychosis of GALAMBOS, or any other  severely mentally ill inmate, in lieu of  a comprehensive review of all conditions of

an inmate at serious risk of injury was an underlying cause of the injuries, suffering, and death of GALAMBOS.  The lack of a policy of a day-by-day adjustment or intervention in the environment or surroundings specifically tailored to  GALAMBOS' observed behaviors as a first line of defense and protection for him was the underlying cause of the serious injuries to GALAMBOS.  It was clear that by December 08, 2008 at 15:00 that the standard policy of increased or changed meds and increased observation and notation alone did not effect any positive change in GALAMBOS'  behavior, but indeed exacerbated it. CORIZON and CCJ needed a policy in place that could immediately address the failures to thereby prevent further serious injury to GALAMBOS.

101. The continued daily non-response by CORIZON and CCJ to the changing conditions and changing specific behaviors of GALAMBOS was the actual cause or moving force behind the increasing level of psychosis and increasingly more severe injuries that GALAMBOS was willing, able, indeed forced, to cause himself.   The hard walls, beds, tables, toilets steel doors and floors which surrounded GALAMBOS, which he had demonstrated on several occasions, were his implements of choice to harm himself remained available to him. The lack of a coordinated meaningful inquiry within and between the two organizations, or the ineffective line of communication in which to bring  inquiries as to what needed to be changed, aside from medications, was an underlying cause of GALAMBOS' pain, suffering, and death.

102.  GALAMBOS' living hell, both real and imagined, and resultant loss of life could easily have been prevented by CORIZON and CCJ if they had implemented a coordinated assessment plan that overlapped in the treatment and follow-up care of GALAMBOS as he moved from various units staffed by CCJ and CORIZON  and

various departments at MMC during the last week of his life. Each Defendant had a duty and responsibility to GALAMBOS to properly and effectively communicate with one another and medical providers to discuss and weigh the most beneficial options for his care and to prevent ongoing medical miscalculations and mistreatment.  The coordinated policies of CORIZON and CCJ of failing to properly convey or illicit necessary information regarding GALAMBOS' history, diagnoses, and care over the week of December 02 through December 12, 2008 was the cause of serious injury and the death of GALAMBOS.  There existed several opportunities from December 02 through December 12, 2008 among the Defendants, acting alone or in a coordinated way among them, to prevent or minimize injury, pain, suffering, and death of GALAMBOS.  Rather, CCJ and CORIZON  each reacted, or inadequately attempted to react, or failed to react to GALAMBOS' emergencies only when confronted with each mounting crisis and with each crisis failed GALAMBOS in dereliction of their respective duties to protect and preserve GALAMBOS' health and safety.


## COUNT II

## MAINE TORT CLAIMS ACT

### (TITLE 14 M.R.S.A. SECTON 8102 et seq )

103. Plaintiff reapeats and reavers Paragraphs 1 through 105 of this Third Amended Complaint.

104. Defendant CCJ and its employees are not entitled to immunity or qualified immunity from suit under the Maine Tort Claims Act as they acted intentionally, negligently, grossly negligently, recklessly, and with deliberate indifference to the welfare and rights

of GALAMBOS and thereby did cause GALAMBOS severe personal emotional and
bodily injury and death.

105. The actions and omissions of defendant CCJ by and through it employees presently
unknown, in withholding pertinent medical information from physicians and nurses at
MMC, tortiously interfered with rights of GALAMBOS, were perpetrated in bad faith
and thereby such defendants are not immune from suit under the statute.

COUNT III

STATE OF MAINE CIVIL RIGHTS ACT

(TITLE 5, M.R.S.A. SECTION 4682)


106. The Plaintiff repeats and reavers Paragraphs 1 though 108 of this Third Amended
Complaint.

107. The Defendant CCJ ant its employees, jointly, severally, individually, and in their
representative capacities, acting under color of State Law, as previously stated herein,
deprived GALAMBOS of his rights, privileges, and immunities under the laws and
Constitutions of the State of Maine and the United States and in particular the right to
medical and mental health care and his right to not be punished cruelly nor unusually in
violation of the Maine Civil Rights Act.

108. The deprivations of GALAMBOS' rights were a direct cause of the injuries, pain,
suffering, and death of GALAMBOS.


COUNT IV

35

WRONGFUL DEATH

(TITLE 18-A M.R.S.A. SECTION 2-802)

109.  The Plaintiff repeats and reavers Paragraphs 1 though 111 of this Third Amended Complaint.

110. The Defendant CCJ ant its employees, jointly, severally, individually, and in their representative capacities by their wrongful, intentional, negligent, grossly negligent and/or reckless actions and omissions, as previously stated herein, deprived GALAMBOS of his civil rights secured to him by the 14th Amendment to the United States Constitution while acting under color of state law in violation of  42 U.S.C. Section 1983.

111. As a direct and proximate cause of the joint and several wrongful actions and omissions of the Defendants, jointly, severally, individually, and in their representative capacities, GALAMBOS suffered wrongful death and the Plaintiff is thereby entitled to statutory damages.


COUNT V

CONSCIOUS PAIN AND SUFFERING

(TITLE 18-A M.R.S.A. SECTION 2-801 et seq.)

112. The Plaintiff repeats and reavers Paragraphs 1 though 114 of this Third Amended Complaint.

113. The Defendant CCJ ant its employees, jointly, severally, individually, and in their representative capacities as a direct result of their wrongful conduct, caused Paul Victor Galambos, III to endure severe and conscious pain and suffering prior to his death.

36

WHEREFORE, the Plaintiff, KATHERINE M. CADY as Personal Representative of the Estate of Paul Victor Galambos, III requests judgment on each count of this Third Amended Complaint, and cumulatively to all counts, against Defendants jointly, severally, individually, and in their representative capacities as follows:

1. That Defendants pay to Plaintiff and the Estate of Paul Victor Galambos, III damages including damages for violations of State and Federal constitutional rights, for negligence, tortious interference, deprivation of medical needs, loss of comfort, society and companionship, for conscious pain and suffering, infliction of emotional distress, as well as for actual expenses for injuries, all medical expenses, and expenses of funeral and other expenses of the last illness of Paul Victor Galambos, III which sum shall be ascertained at the time of trial.

2. That the Defendants be required to pay to the Estate of Paul Victor Galambos, III special damages, including but not limited to medical expenses and attorney's fees in a sum to be determined.

3. That the Defendants be required to pay to the Estate of Paul Victor Galambos, III exemplary and punitive damages in a sum to be ascertained and determined.

4. With respect to all claims, that the Defendants be required to pay to the Estate of Paul Victor Galambos, III all attorney's fees pursuant to 42 U.S.C. Section 1988 and Title 5 M.R.S.A. Section 4681 et seq.

5. That the Defendants be required to pay to the Estate of Paul Victor Galambos, III the costs of suit, with interest thereon, herein incurred, and;

6. That the Defendants be required to pay to the Estate of Paul Victor Galambos, III

all damages, including but not limited to damages pursuant to Title 18-A

M.R.S.A. Section 2-804 for personal injuries resulting in conscious pain and

suffering and death, plus interest and costs thereon.


Dated at Biddeford, Maine this 9th day of January, 2012.


\_\_/s/\_\_ Chris A. Nielsen, Esq.\_\_\_\_
Chris A. Nielsen, Esq.
The Nielsen Group
Attorney for the Plaintiff

The Nielsen Group
P.O. Box 351
Biddeford, ME 04005-0351
(207) 571-8555


\_\_/s/\_ Linda L. Cady, Esq.\_\_\_\_
Linda L. Cady, Esq.
Attorney for Plaintiff

305 Main St.
Yarmouth, ME 04096
207-846-6757
cady@maine.rr.com


DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trail by Jury pursuant to Rule 38 of the Federal Rules of Civil

Procedure.

Dated at Biddeford, Maine this 9th day of January, 2012.


\_\_/s/\_\_ Chris A. Nielsen, Esq.\_\_\_\_
Chris A. Nielsen, Esq.
The Nielsen Group

Attorney for the Plaintiff

The Nielsen Group
P.O. Box 351
Biddeford, ME 04005-0351
(207) 571-8555


__/s/_  Linda L. Cady, Esq.____
Linda L. Cady, Esq.
Attorney for Plaintiff

305 Main St.
Yarmouth, ME 04096
207-846-6757
cady@maine.rr.com




### CERTIFICATE OF SERVICE

I, Chris A. Nielsen, Esq. hereby certify that the foregoing **Plaintiff's Third Amended**

**Complaint with Demand for Jury Trial** has been electronically sent to:

Peter Marchesi, Esq.
Cassandra Shaffer, Esq.

27 Temple Street
P.O. Box 376
Waterville, ME 04903


Michael Saucier, Esq.
Robert Hatch, Esq.

Thomson & Bowie
3 Canal Plaza
P.O. Box 4630
Portland ME 04112-4630

Christopher C. Taintor, Esq.

Norman, Hanson & DeTroy
415 Congress Street
P.O. Box 4600 DTS
Portland, ME 04112

on the 9th day of January, 2012, through the court's ECF System, and to counsel of

record.

Dated at Biddeford, Maine this 9th day of January, 2012.


__/s/__ Chris A. Nielsen, Esq.____
Chris A. Nielsen, Esq.
The Nielsen Group
Attorney for the Plaintiff

The Nielsen Group
P.O. Box 351
Biddeford, ME 04005-0351
(207) 571-8555


__/s/__ Linda L. Cady, Esq.____
Linda L. Cady, Esq.
Attorney for Plaintiff

305 Main St.
Yarmouth, ME 04096
207-846-6757
cady@maine.rr.com