UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| KATHERINE M. CADY, *as Personal Representative of the Estate of Paul Victor Galambos III,* | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | )          2:10-cv-00512-NT ) |
| CUMBERLAND COUNTY JAIL, *et al.*, | ) ) |
| Defendants | ) |

**RECOMMENDED DECISION ON DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Katherine M. Cady, as Personal Representative of the Estate of Paul Victor Galambos,

her son, pursues this action on account of her son's death from self-inflicted injuries he suffered

while a pretrial detainee at the Cumberland County Jail.  The focus of Cady's case is a claim

under 42 U.S.C. § 1983 alleging that her son's death arose because of the defendants' deliberate

indifference to his serious medical needs.  The defendants are in two groups, one comprised of

Cumberland County and county-employed defendants and the other comprised of Corizon, Inc.,

and Corizon-employed defendants.  Now before the court are multiple motions for summary

judgment filed on behalf of all of the defendants against all of Cady's claims.  The court referred

these motions (ECF Nos. 101, 103, 104, 105, and 106) for report and recommended decision.

For reasons that follow, I recommend that the Court grant the county defendants' motion (ECF

No. 101), but deny the Corizon defendants' several motions.

## FACTS

For purposes of summary judgment, in this District the facts of the case are established by means of competing statements of material facts which must be supported with citations to evidentiary sources.  D. Me. Loc. R. 56(b), (c);  Fed. R. Civ. P. 56(c)(1)(A).  The facts for purposes of the defendants' motions are set forth in seven documents:

1.  Stipulated Statement of Facts (ECF No. 89);

2.  Defendants Cumberland County, Keith Logan, Lt. Moore, and Cpl. Gilpatrick's Statement of Material Facts (ECF No. 102);

3.  Corizon Defendants' Statement of Material Facts (ECF No. 107);

4.  Plaintiff's [Consolidated] Opposing Statement of Material Facts and Statement of Additional Material Facts (ECF No. 123);

5.  Plaintiff's Unopposed Supplemental Record Citations Supplementing Plaintiff's Statement of Additional Material Facts (ECF No. 133);

6.  Defendants Cumberland County, Keith Logan, Lt. Moore, and Cpl. Gilpatrick's Reply Statement of Material Facts and Request to Strike (ECF No. 140).

7.  Corizon Defendants' Reply to Plaintiff's Responses to Corizon's Statement of Material Facts and Responses to Plaintiff's Additional Facts (ECF No. 146).

For purposes of the following narration, citations to "Corizon Statement" refer to both the Corizon defendants' statement (ECF No. 107) and Cady's opposing statement (ECF No. 123/133).  Citations to "County Statement" refer to both the county defendants' statement (ECF No. 102) and Cady's opposing statement (ECF No. 123/133).  Because Cady's opposing statement reproduces all of the defendants' statements and citations, the court need only reference Cady's opposing statement.  Citations to "Additional Statement" will refer to both the plaintiff's additional statement (also found at ECF No. 123/133) and the defendants' reply

statements (ECF Nos. 140 & 146).  The stipulated facts (ECF No. 89) are cited simply as "Stipulations."

This narration is not comprehensive of every single factual statement introduced by the parties, but focuses on the facts that are material to the disputes raised in the parties' other motion papers.  The court will note that I have not exhaustively ruled on every objection and request to strike.  The parties are free to object to any fact omission or inclusion they consider erroneous in an objection to this recommended decision.[1]

**The plaintiff**

Plaintiff Katherine M. Cady is the mother of Paul Victor Galambos, III, and serves as personal representative of his estate.  (Stipulations ¶ 1.)  Galambos was a pretrial detainee at the Cumberland County Jail (CCJ) from August 3 to December 12, 2008.  (Id. ¶ 2.)  Cady was identified as Galambos's emergency contact in paperwork held at the CCJ.  (Id. ¶ 3.)

**Cumberland County defendants**

The Cumberland County Sheriff's Office is a department of Cumberland County.  The Cumberland County Jail is a division of the Cumberland County Sheriff's Office.  Mark Dion was sheriff in 2008 and his chief deputy was Kevin Joyce.  The administrator of CCJ in 2008 was Major Francine Breton.  Francine Breton worked closely with Corizon's health services administrator in 2008 and had approved of Corizon's policies and procedures in effect in the medical unit at the Jail in 2008.  (Id. ¶ 46.)  None of these individuals (Dion, Joyce, and Breton) is a named defendant in this action.  The named county defendants are as follows.

---

[1]    There are two things I would note about the Corizon defendants' Local Rule statements.  First, they inappropriately replied to Cady's responses.  (Reply Statement at 3-13.)  This practice is not permitted by the Local Rule.  Second, they have objected to what they describe as Cady's attempt to alter facts she stipulated to by offering additional facts in which she "has implicated facts previously stipulated."  (Reply Statement at 3, ¶ 4.)  Frankly, both Cady and the Corizon defendants are guilty of this offense.  I have not stricken any such statements on this ground.  Nor have I necessarily included all such statements.  In each instance it depends on the materiality of the wording and the quality of the record evidence underlying it.

*Keith Logan*

Keith Logan began working at CCJ on May 21, 2007.  (Id. ¶ 47.)  Logan's training

includes the required basic corrections course, which he completed in 2007, and he has received

additional training on a yearly basis, including training on suicide prevention and training to

maintain his first aid certification.  (Id. ¶¶ 48-50.)  Logan also received training in 2007 on

policy D-244 and the "pro-restraint chair."

*David Moore*

David Moore began working as a correctional officer at CCJ in March 1993.  (Id.  ¶ 52.)

Moore was a lieutenant at CCJ in 2008.  (Id. ¶ 53.)  Moore has received multiple training

sessions on the use of the pro-restraint chair, suicide prevention, basic medical situations, and

first aid.  (Id. ¶¶ 54-56.)  He also received training on mental health issues and the recognition of

psychological problems.  (Id. ¶ 57.)

*Corey Gilpatrick*

Corey Gilpatrick began working at CCJ on February 11, 2000, and was promoted to

corporal on October 30, 2005.  (Id. ¶ 60.)  Gilpatrick has received multiple training sessions on

suicide prevention, basic medical situations, first aid, mental health issues, and the use of the

pro-restraint chair.  (Id. ¶¶ 61-65.)  In addition, Gilpatrick has received maximum security

training, which included training on policy D-243 concerning special management inmates, and

policy D-242, concerning supervision of all categories of inmates.  (Id. ¶ 66.)

**Corizon, Inc.'s medical staff at CCJ**

Corizon, formerly known as Correctional Medical Services in 2008 (hereafter "Corizon"

or "CMS"), is an independent contractor that provided health care services to inmates at the

Cumberland County Jail pursuant to a health services agreement effective January 1, 2007,

through December 31, 2009 ("the contract").  (Id. ¶ 8 & Health Services Agreement, Stip. Ex. A,

ECF No. 92.)  Among other things, the contract called for 24 hour, 365 day nursing coverage at

CCJ.  (Stipulations ¶ 25.)  Corizon has no authority relating to inmate housing decisions made by

jail staff.  (Id. ¶ 29.)

*Diane North, Health Services Administrator* [2]

During 2008, Diane North was CMS's health services administrator (HSA) at CCJ.  (Id. ¶

9.)  HSA North is a registered nurse licensed in the State of Maine and was responsible for

contract compliance.  (Id. ¶ 10.)  North had general oversight of all medical and ancillary

services provided at CCJ.  (Id. ¶ 11.)  As part of her job, North was required to work with CCJ

administrator, Francine Breton.  (Id. ¶ 12.)  North was Director of Nursing BarbaraWalsh's

immediate supervisor.  (Id. ¶ 37.)  North supervised all Corizon medical and mental health staff

at CCJ.  (Additional Statement ¶ 23.)

The contract required monthly meetings, which North oversaw.  North and Director

Walsh compiled a list of issues to discuss at each staff meeting.  (Stipulations ¶ 13.)  North had

responsibility in 2008 to see that policies discussed at the monthly staff meetings were

implemented and she maintained contact with CMS/Corizon corporate regional personnel.  One

purpose of the CMS policies was to assure that CCJ facility met the National Association of

Correctional Healthcare standards for accreditation.  (Id. ¶ 14.)

*Barbara Walsh, Director of Nursing*

Barbara Walsh is a registered nurse licensed in the State of Maine.  She became director

of nursing for CMS in 2006.  (Id. ¶ 36; Corizon Statement ¶¶ 25, 27.)  Her training and

experience includes anesthesia and emergency room work.  (Corizon Statement ¶ 26.)  In her

---

[2]      North is not a defendant.  Cady sought leave to file a fourth amended complaint that would have named
North a defendant, but the motion was denied.  (Order on Motion to Amend, ECF No. 86.)

director role, Walsh was in charge of the infirmary and the nursing staff and was part of the medical treatment team available at CCJ.  (Stipulations ¶ 37;  Corizon Statement ¶ 28.)  Walsh has described CCJ as "chaotically busy" on a daily basis and indicates that she is constantly called in multiple different directions.  (Corizon Statement ¶ 29.)  She oversaw the day-to-day operations of the infirmary and supervised all clinical staff.  (Stipulations ¶ 26.)  Based on her account of her duties she appears to work primarily as an administrator.  (Corizon Statement ¶ 29.)  Walsh's affidavit indicates that she frequently calls inmates' attorneys concerning medical care, but she never placed such a call for Galambos, allegedly because Galambos did not ask her to.  (Additional Statement ¶ 36.)

Walsh directed nursing staff to contact her at any time, even when she was not on duty at CCJ, to triage before sending inmates out to the emergency room.  She indicated that the excuse that their nursing licenses might be at risk was not an acceptable basis for a decision to send an inmate out to the ER.  (Stipulations ¶ 39.)  Walsh saw and spoke to Galambos frequently during the period between December 8 and December 12, 2008.  Walsh performed "walk through" assessments of Galambos as she saw him in the facility but did not document anything in CMS records.  Walsh visually observed Galambos many times a day in the medical unit.  Walsh would ask Galambos if she could have CCJ staff call anyone for him.  When she asked him this, Walsh understood that Galambos was very compromised.  (Id. ¶ 40.)

*Alfonso Corona, MD* [3]

Alfonso Corona, MD served as a contract psychiatrist for CMS in 2008, including the relevant period between August and December 12, 2008.  Dr. Corona came to the jail one day

---

[3]      Cady has stipulated the dismissal of her claims against Dr. Corona.  (Joint Stipulation of Dismissal, ECF No. 85.)

per week to see patient inmates.  Dr. Corona was always on call for emergency consultations pursuant to the contract.  (Id. ¶ 23.)

### Todd Tritch, MD [4]

Dr. Todd Tritch, MD was the medical director for CMS.  Dr. Tritch was both an employee and an independent contractor at CCJ during the period of August 3 through December 12, 2008.  Dr. Tritch was always on call for emergency consultations pursuant to the contract. (Id. ¶ 24.)

### Michael Trueworthy, PNP

Michael Trueworthy is a licensed psychiatric nurse practitioner.  (Id. ¶ 30;  Corizon Statement  ¶ 17.)  Trueworthy was employed in this capacity as a per diem employee of Corizon from August through December 2008.  (Stipulations ¶ 31.)  Trueworthy reported to Dr. Corona, Corizon's psychiatrist for the CCJ.  (Id. ¶ 32.)  As part of his duties, Trueworthy would see CCJ inmates for medication evaluation and medication management.  (Id. ¶ 33.)  Trueworthy would also renew psychiatric medications for inmates who were prescribed those medications.  (Id. ¶ 34.)  Trueworthy was the only person that held his position at the CCJ.  (Id. ¶ 35.)  Trueworthy worked per diem and was never on-call during his employment.  (Corizon Statement ¶ 19.)  He was not present in the jail for every emergency.  (Id. ¶ 20.)  Generally, social workers at the jail would flag matters for Trueworthy to address during his hours and would prepare lists of inmates for him to attend to.  (Id. ¶ 22.)

### Linda Williams, LCSW

During the time period relevant to this case, Linda Williams was employed by CMS and was licensed by the State of Maine as a clinical social worker.  (Stipulations ¶ 41;  Corizon

---

[4]      Cady also has stipulated the dismissal of her claims against Dr. Tritch.  (Joint Stipulation of Dismissal, ECF No. 85.)

Statement ¶ 30.)  Williams previously performed a clinical rotation and worked full-time at Riverview Psychiatric Hospital in Augusta.  (Corizon Statement ¶ 32.)  Williams has delineated her many duties and indicates that roughly half of her time involves inmate counseling sessions.  (Id. ¶ 34(d).)  Roughly thirty percent of the inmates she sees have a mental crisis, most often involving stress and anxiety.  (Id. ¶ 34(e).)  Williams's role was to assess an inmates' current mental health status for orientation to person, place, time, eye contact, coherence of speech, thought content, visual or auditory hallucinations, mental status and ability to engage with the examiner.  (Stipulations ¶ 42.)  Williams would also assess if the inmate was taking medications.  Her mental health assessments took place from outside the inmate's cell.  Williams never entered Galambos's cell to assess him.  (Id. ¶ 43.)  Williams does not know how many times she met with Galambos from August through November 30, 2008.  However, she does recall meeting with him.  Williams reviewed Galambos's Spring Harbor and ACCESS[5] medical records following his arrest in August 2008.  (Id. ¶ 44.)  From December 2, 2008, through December 11, 2008, Williams either met with or visually observed Galambos each day for mental health assessments.  (Id. ¶ 45.)

*Additional Corizon-related stipulations*

The CMS policies in effect at CCJ were approved by both HSA North and the CCJ administrator, Francine Breton.  (Id. ¶ 26.)   North was responsible for overseeing LCSW Linda Williams's activities.  North considered Galambos a significant issue in the facility during December 2008 and she worked with Williams on arranging an inpatient transfer to Riverview Psychiatric Center (Riverview).  North's direct interaction with Galambos was as she would go from room to room and might see him on his mattress in the cell in the medical unit.  (Id. ¶ 27.)  North discussed Galambos as a cause of concern with Jail Administrator Francine Breton and

---

[5]        ACCESS is a program administered by the Spring Harbor Hospital.

indicated that the mental health department was working on trying to place him in Riverview. Though this fact is stipulated, it is also noted that these discussions were not documented in CMS or CCJ records.  (Id. ¶ 28.)

In a May 2008 staff meeting, nursing staff was directed to use free samples of Zyprexa that they had on hand.  It was a cost savings to CCJ to use free samples of medication rather than to prescribe different medication from the Corizon pharmacy.  (Id. ¶ 15.)  During staff meetings on September 23 and 25, 2008, and December 16 and 18, 2008, there was discussion about emergency send-outs.  (Id. ¶ 16.)  Part of the overall discussion concerned the cost of having MEDCU (ambulance) come to the facility and the cost of sending a patient to the hospital. Discussions included ER trips, hospitalizations, and pharmacy costs.  Corizon Corporate was involved in the discussions.  North, Walsh and the nursing staff were involved as well.  (Id. ¶ 17.)  There was constant discussion among the Corizon staff regarding emergency room send-outs.  The concern about send-outs carried on through December 2008.  Whether the concern about ER send-outs was being discussed or not, it was always "kind of on the table."  The costs of an ambulance from CCJ to MMC had risen dramatically.  It cost close to $3,000.00 to have an inmate transported from CCJ to the MMC by an ambulance.  (Id. ¶ 18.)  Another reason for concern voiced by Director Walsh was that paramedics would question the purpose of being summoned to CCJ if there was no foundation for an emergency send-out.  (Id. ¶ 19.)  Yet another concern about emergency send-outs was that Corizon wanted to assure that nurses were doing what was medically necessary as opposed to taking unnecessary actions.  (Id. ¶ 20.)  A September 2008 staff meeting focused on the "extraordinary amount" of send-outs in one weekend, which required three hospital details requiring six correctional officers.  (Id. ¶ 21.) The particular concern over the number of correctional officers needed to cover hospital send-

outs came from Francine Breton.  (Additional Statement ¶ 14;  Walsh Dep. at 13, ECF No. 135.)

CMS/Corizon also flagged its CCJ operation as having excessive "casual overtime," which was

considered "a huge problem for corporate."  (Additional Statement ¶ 16.)

**The decedent**

Throughout the period of his incarceration Galambos was a pretrial detainee.

(Stipulations ¶ 69.)  Galambos had a six-year history of mental illness and substance abuse,

including several in-patient treatments and a history of suicide attempts.  (Id. ¶ 4.)  One of

Galambos's diagnoses was schizoaffective disorder.  (Additional Statement ¶ 56.)  Galambos had

a history of being non-compliant with medication according to treatment records maintained by

Spring Harbor/ACCESS.  (Stipulations ¶ 5.)  During his detention at the CCJ, Galambos had not

been declared incompetent by any Court and had not been placed under the guardianship of any

other individual.  (Id. ¶ 6.)  Galambos's emergency contact and his closest kin, his mother, was

not contacted by CMS or CCJ staff following the incidents of December 2, 2008, through

December 11, 2008, to report on Galambos's severe mental illness and decompensation after

December 1, 2008, or on his suicide attempts, self-injurious behavior, or hospitalizations and

emergency room visits.  (Id. ¶ 7.)

**August to November 2008**

Galambos came to CCJ on August 3, 2008, after an arrest for robbery, refusal to submit

to arrest, and violation of bail conditions.  (Id. ¶ 67.)  On arrival at CCJ, Galambos resisted being

fingerprinted and head butted the intake officer on his nose and upper lip before being restrained

and escorted to intake.  (Id. ¶ 70.)  Galambos's condition could fairly be described as "actively

psychotic."  (Additional Statement ¶ 59.)  Galambos was placed on suicide watch and initially

refused his medications.  (Stipulations ¶ 71.)  As a matter of course on intake at the jail, the

Corizon staff obtains records relating to the latest psychiatric evaluation performed on an inmate and the inmate's medication list.  (Id. ¶ 72.)  An inmate's current medications are continued for 30 days after incarceration at which time the Corizon staff assesses the inmate.  (Id. ¶ 73.)

LCSW Williams learned of Galambos's pre-incarceration history from reviewing external records collected by Corizon that included records from Spring Harbor/ACCESS.  (Id. ¶ 74.)  Williams also offers affidavit testimony stating that Galambos and his history of mental health "concerns" was known to staff due to prior arrests.  (Corizon Statement ¶ 36.)  In addition, Williams communicated directly with Steve Fearing, Galambos's primary case worker with ACCESS, who was treating Galambos at the time of the arrest.  (Stipulations ¶ 75.)  Galambos had a history of being non-compliant with medication according to Spring Harbor/ACCESS records.  (Id. ¶ 5.)  During this communication, Williams and Fearing discussed the psychiatric medication regimen.  (Id. ¶ 76.)  Williams learned that Galambos was due for a haldekonate injection when he came into jail.  Haldekonate is a long lasting injectable.  (Id. ¶ 77.)  Corizon offered Galambos a haldekonate injection but he refused.  Galambos did agree to take oral Haldolon on August 6.  (Id. ¶ 78.)  Galambos was stepped down to "psych" watch by Williams on August 6 after an agreement to take Haldol.  (Id. ¶ 79.)  Galambos was cleared off "psych" watch on August 10 by LCSW Cathy Kemps and was reported to be "pleasant, cooperative and easily engaged."  (Id. ¶ 80.)

In the month of September Galambos underwent an additional mental health assessment and a psychiatric evaluation that resulted in a medication recommendation.  These measures were attended to by CMS staff.  (Id. ¶¶ 81-84.)  In particular, Michael Trueworthy offered the following recommendation and plan on September 12:

> 1. Cogentin is continued as previously prescribed for potential side effects to Zyprexa.

11

2.  Zyprexa is continued as previously prescribed for psychosis.

3.  The inmate was encouraged to seek counseling by the substance abuse and the mental health team or to seek spiritual guidance from the Cumberland County Jail Chaplin as appropriate for the inmate's self-report in claustrophobia.

4.  The inmate agreed to seek assistance from the corrections' officers should the inmate start to consider any self-harming behavior or behavior dangerous to the inmate or others.

5.  The inmate was reminded how to activate the sick call process to address medical and mental health needs.

6.  The inmate agreed to contact the medical or mental health staff if the inmate has a side effect to medication, symptoms seem to be worsening, or the inmate has a psychiatric need.

7.  The inmate is to return to the clinic as needed for his mental health needs.  He was encouraged to contact the mental health team should claustrophobia or high anxiety levels occur once he transfers to a pod where he will be on a less restricted status than his maximum security status permits.

(Id. ¶ 84;  Corizon Statement ¶¶ 37-38, 40;  Trueworthy Aff. Ex. A, ECF No. 107-4.)

Trueworthy had access to Galambos's discharge summary from Spring Harbor Hospital and Galambos's medical regimen came from Spring Harbor records.  (Stipulations ¶ 86;  Corizon Statement ¶ 38.)  Trueworthy understood that Galambos had a history of suicide attempts.  (Additional Statement ¶ 68.)  Trueworthy assessed Galambos as "logical and involved" even though there is an indication Galambos was actively psychotic on September 8.  (Corizon Statement ¶ 40.)  Trueworthy asserts by affidavit that because Galambos was logical and involved as of September 12, he did not feel the need to alter Galambos's medication or see him regularly.  (Id. ¶ 45.)  Trueworthy agreed that "psychotic disorder" was an appropriate diagnosis for Galambos.  (Additional Statement ¶ 63;  Trueworthy Aff. ¶ 7, ECF No. 107-3.)  Trueworthy assessed that Galambos's prognosis was poor without medication management.  (Additional Statement ¶ 70.)  Plaintiff's expert, Dr. Grassian, opines that Trueworthy did not exercise any

professional judgment on September 12 and violated a standard of care. (Additional Statement ¶¶ 116-117.)

As it turns out, Galambos's medication was not well managed, particularly starting in November 2008. Williams has asserted by affidavit that Galambos showed a pattern of irregular acceptance of his medication, but she also asserts that medication cannot be forced on any inmate and that is something of a theme in the Corizon defendants' motions. (Corizon Statement ¶¶ 48, 49.)[6]

One of the prescribed medications, Zyprexa, was not on the medication formulary maintained by Corizon. However, Galambos received the drug for a spell due to the availability of free samples that Corizon had in abundance. (Stipulations ¶ 85; Additional Statement ¶ 111.) As of September 24, Galambos reported to Williams that his medications were working well for him. (Stipulations ¶ 87.) Galambos resided in the general population at CCJ throughout October and November. (Id. ¶ 88.) As will be told, Galambos sought a change in medication (Seroquel) in November. However, at staff meetings on October 21 and 23, CMS staff was instructed not to order patient-specific medication for what was in stock. CMS was working to keep pharmacy expenses low. (Additional Statement ¶¶ 109, 110.) Although Seroquel was on Corizon's formulary, Trueworthy did not order it for Galambos. (Id. ¶ 112.) Trueworthy and Dr. Corona maintain that Seroquel is not a suitable drug to "routinely" prescribe in the correctional setting, though it was in the CMS formulary at the time. (Stipulation ¶ 106; Corizon Statement ¶ 87.)

---

[6]     Cady routinely objects to statements supported by affidavits on the ground that the statements and affidavits were drafted for the purpose of supporting a motion for summary judgment. This is not a valid objection. However, it does not necessarily follow that the statement in question is material or that it must be accepted by the court. For example, the question of whether medication can be forcibly administered is an issue that Williams's affidavit testimony is not going to resolve. (See Corizon Statement ¶ 49.) Indeed, the facts reflect that Galambos was administered medication regardless of his lack of consent on certain occasions, albeit not consistently.

On November 5, the state court denied a motion to amend Galambos's bail to permit him to enter a supervised group home pending trial.  (Stipulations ¶ 90.)  Galambos understood that the earliest he would be released was March 2009.  (Id. ¶ 93.)  On November 6, Galambos submitted a medical request form stating that he had not taken his medications in two weeks and that he wanted alternative medication.  (Additional Statement ¶¶ 71-72.)  On November 8, Galambos refused his medication both in the morning and in the evening and he submitted another medical request slip requesting to have Seroquel instead of Zyprexa.  (Id. ¶ 91; Additional Statement ¶¶ 74, 76, 77.)  He also told a correctional officer that he felt he was "going crazy."  (Additional Statement ¶ 75.)  On November 8, Galambos was placed in maximum security after assaulting another inmate and remained there until November 12.  (Stipulations ¶ 89.)  The correctional officer who placed him there noted that Galambos had stopped taking his medications.  (Id.)  During his five-day stay in maximum security, Galambos submitted another request for a medication consultation, asking both for Seroquel and to see the psychiatrist.  (Additional Statement ¶ 80.)  There is no evidence of any counseling prior to November 11.

A licensed clinical social worker on Galambos's ACCESS team (Konieczko) visited him on November 11.  She reported that Galambos displayed psychomotor agitation, was difficult to interrupt and perseverant about his lawyer, and was worried about false accusations by inmates who described him as a pedophile.  (Stipulations ¶ 94.)  The ACCESS social worker spoke with an unidentified LCSW in the jail, but the CMS social worker then reported that she did not observe the agitation reported by the ACCESS social worker.  (Id. ¶ 95.)

On November 13, LCSW Cathy Kemps of CMS met with Galambos.  Galambos complained of feeling sedated in the morning and unable to sleep at night and asked to switch to Seroquel from Zyprexa.  (Additional Statement ¶¶ 82-84.)  Kemps said she would discuss it with

the psychiatrist.  (Id. ¶ 84.)  Galambos also submitted a request for a change of housing due to anxiety.  (Id. ¶ 86.)

On November 15, Corizon personnel accepted from Galambos a release of responsibility form permitting Galambos to refuse his Zyprexa medication.  (Id. ¶ 96.)  The form provided:  "I acknowledge I have been fully informed of and understand the above treatments or recommendations and the risk(s) involved in refusing.  I hereby release and agree to hold harmless Correctional Medical Systems, its employees and agents from all responsibility and ill effect which may result from this action."  (Id.)  On November 17, Galambos requested to see a psychiatrist for a change in medication and he also sought a change of housing, reporting that other inmates were threatening to kill him.  (Id. ¶ 97.)  Also on November 17, Trueworthy renewed Galambos's Zyprexa and Cogentin.  (Id. ¶ 98.)

Galambos had a visit from his mother and from his attorney on Thanksgiving.  (Id. ¶ 99.) Cady has not offered any statements related to her observations and the stipulations suggest the visit was uneventful.  A log entry on November 30 states that Galambos reported being in fear and having received threats.  (Id. ¶ 100.)  Galambos wrote a letter to Cady asking her not to visit again because he was being called a "mommy's boy" by other inmates.  (Corizon Statement ¶ 54.)

**December 1-3, 2008**

Galambos's chart indicates that he completed a December 1 request slip seeking mental health services.  In his comments on the slip Galambos wrote: "I need to find out what meds will work for me."  (Stipulations ¶ 102.)  Trueworthy met with him that day and Galambos stated that he did not want Zyprexa because he felt it was making him gain a lot of weight, but otherwise reported that he was "doing OK now [and] my defense depends on not being criminally

responsible." (Id. ¶ 104.) Galambos told Trueworthy that he had not taken his Zyprexa for a week. Galambos told Trueworthy that he would let him know if he needed anything and he agreed to contact the mental health team as needed. (Id.) It is stipulated that Galambos requested Seroquel previously, but Trueworthy did not discuss with Galambos any substitution of medication on December 1. (Id. ¶ 105.) Seroquel was on the CMS formulary, unlike Zyprexa, but the parties tell us that Trueworthy and Dr. Corona had safety concerns about prescribing Seroquel in a correctional setting. (Id. ¶ 106.)

Trueworthy understood that Galambos had stopped taking his Zyprexa and it is stipulated that "this did not concern" Trueworthy because he "believed that Galambos would already have had problems since he had not been taking Zyprexa for a while." (Id. ¶ 107.) In fact, Trueworthy ordered the discontinuance of all of Galambos's psychiatric medications as of this meeting. (Id. ¶ 108; Corizon Statement ¶ 61.) To hear Trueworthy tell it, he "bopped over to max" to see the inmate who signed the release of responsibility and figured that there was no issue because the inmate had not been taking his medications for so long that problems would have happened long before if they were going to happen.[7] (Trueworthy Dep. at 21, ECF No. 149.) This account by Trueworthy responded to a question asking whether Trueworthy addressed with Galambos the issues that could result from discontinuing his medications. (Id.) A reasonable inference is that Trueworthy did not address any issues with Galambos prior to discontinuing the medications.

Trueworthy maintains that he did not discuss any substitution of medication because that was not why he went to see Galambos and because Galambos did not bring it up himself. (Corizon Statement ¶ 62.) In his deposition testimony Trueworthy states: "It was probably

---

[7]     But recall that there is evidence Galambos had psychotic episodes in August when he arrived and also on September 8. He also assaulted an inmate on November 8 and was regarded on November 11 to be displaying psychomotor agitation and other symptoms.

Diane North who handed me the chart to go see him so that—because otherwise the nurses have to keep offering him the medication and he kept refusing." (Trueworthy Dep. at 26.) Galambos had submitted a medical request slip that very day stating he wanted to find out what meds would work for him, but Trueworthy did not see the slip that day. (Stipulations ¶ 102; Corizon Statement ¶ 75.) Trueworthy offers multiple additional averments about jail "protocol" when it comes to sorting and distributing medical requests slips, all of which statements are designed to support the assertion that he never saw Galambos's slip even after December 1. (Corizon Statement ¶¶ 77-86.) He states that protocol must not have been followed because a social worker should have seen the slip and brought it to his attention the next day. (Id. ¶ 84.) Of course, he had just issued an order discontinuing all of Galambos's medications, and the health services administrator had handed him a chart to take care of the problem of Galambos refusing medications. A reasonable inference is that there was a connection between these measures and the failure of a social worker to pass the December 1 request slip to Trueworthy the next day. There is also a stipulation that Galambos made requests in November for a substitution of Seroquel. (Stipulations ¶ 91.) Trueworthy has anticipated that the November slips could be relevant to this issue because he offers a statement that Seroquel is not "routinely" given to inmates because there is a potential for abuse. (Corizon Statement ¶ 87.)

According to HSA North, it is the nurse practitioner's decision whether to have a discontinued medication replaced with something else. (Stipulations ¶ 110.) Trueworthy was the only nurse practitioner at the CCJ. (Id. ¶¶ 30, 35.) North also testified at her deposition that a provider should leave a medication order standing regardless of the inmate's wishes, if the provider felt that medication was needed, unless there was a reasonable agreement about a change of medication. (Corizon Statement ¶ 53; North Dep. at 27-28, ECF No. 107-14.)

17

Trueworthy's affidavit testimony is that he "was not asked to see and did not see Mr. Galambos" again, and that he felt Galambos would know what channels to go through to get his medication restarted.  (Corizon Statement ¶¶ 57, 64.)  He also asserts that Galambos "was not known to have an acute psychiatric problem at that time."  (Id. ¶ 66.)  As a consequence of Trueworthy's December 1 order, Galambos no longer would be offered his daily medications.  (Stipulations ¶ 109.)

Sometime in the next 24 hours, Galambos verbally threatened suicide to a correctional officer and Williams met with him on December 2 to discuss the matter.[8]  (Id. ¶ 111.)  Galambos told her he was not serious and simply wanted to change his housing assignment to avoid another inmate and get out of a pod used for inmates assigned to protective custody including sex offenders.  (Id. ¶¶ 112, 113.)  Williams cleared Galambos of all watches and cleared him "to go back to his pod."  (Id. ¶ 116.)  She denies having had concern that he was suicidal because he said he was not suicidal.  (Id. ¶ 116.)  Dr. Grassian opines that this assessment by Williams was a violation "of any standard of care."  (Additional Statement ¶ 117.)  The Corizon defendants admit that Williams made a "grossly inadequate assessment" of Galambos's suicide threat (id. ¶ 120), but they deny that Williams placed Galambos at serious risk.  (Id. ¶ 122.)

On the evening of December 2, a correctional officer going through the pod at mealtime observed that Galambos was bleeding from his neck.  Galambos said he cut himself shaving and also reported that he was off his medications.  The officer escorted Galambos to medical and returned to search his cell, where he discovered a bloody pencil under Galambos's blankets.  (Stipulations ¶ 117.)  It appears to be undisputed that Galambos's wound was a self-inflicted stab wound.  Galambos was sent to Brighton First Care[9] for certain medical services, including x-rays

---

[8]        Williams saw 24 inmates on December 2.  (Corizon Statement ¶ 89.)
[9]        Brighton First Care is affiliated with the Maine Medical Center.

and CT scans.  (Id. ¶¶ 118-120.)  According to Williams, this was the first incident of self-harm during Galambos's incarceration at CCJ.  (Id. ¶ 122.)  Upon return to CCJ on December 3, Galambos was placed on suicide watch in a cell in the medical unit.  (Id. ¶¶ 121, 123.)  A nurse who observed him at that time (Nurse Brooke) characterized his behavior as "very manic."  (Id. ¶ 123.)  Williams observed Galambos later in the morning of December 3 and saw that he was talking to himself, laughing, and standing naked in front of the window, signs of regressed behavior and self-awareness.  Galambos was not responsive to Williams's attempts to engage him in conversation.  (Id. ¶ 125.)  At some point he was able to voice a desire for Seroquel, however.  (Id. ¶ 126.)  Williams recognized that Galambos needed psychiatric medication.  (Id.)  She did not, however, consider transfer to a psychiatric facility or even discuss the possibility on that day.  (Additional Statement ¶ 126.)  She did at least call Dr. Corona, who made a recommendation concerning medication (Abilify) that Galambos was willing to take.  (Id.)  Physician's Assistant Edith Woodward assessed psychosis and her plan was to administer Abilify 10 mg, Cogentin 1 mg, and Benadryl 50 mg.  (Id. ¶ 127.)  Williams made a notation, unexplained by the parties, that Galambos "will remain on suicide watch [and] that there were no meds on the board."  (Id. ¶ 129.)  That afternoon, Galambos was transferred to maximum security on suicide watch.  (Id. ¶ 130.)

**December 4-7, 2008**

On December 4, Williams saw Galambos once more and thought that Galambos was talking to someone who was not there and was unable to have a congruent thought.  (Id. ¶ 131.)  She did not notice an improvement in his behavior.  (Id.)  Galambos said he had taken his Abilify and that it helped and that he would take it again.  (Id.)  There is no indication that he received a dose on that day, however.

On December 5, Galambos reported to LCSW Williams that he felt like someone had "stolen his brain" and that he was hearing voices.  Galambos had not been dosed with Abilify at this time.  (Id. ¶ 133.)  Williams scheduled a visit with Dr. Corona for December 6.  (Id. ¶ 135.)  Later that day, correctional officers conducted a cell search and restrained Galambos to make it possible.  (Id. ¶ 136.)  Cady clarifies that Galambos became aggressive and tried to attack two correctional officers who entered his cell.  (Additional Statement ¶ 130.)

On December 6, Williams observed and reported that Galambos was standing on the table in his cell, talking to the wall.  (Stipulations ¶ 137.)  Dr. Corona examined Galambos on December 6 for approximately 20-30 minutes.  He described Galambos as seeming to be "floridly psychotic," with a global assessment of functioning score of 40, reflecting major impairment in thinking, judgment, mood, and insight.  (Id. ¶¶ 140-41.)  Dr. Corona recommended that Galambos remain on suicide watch and he prescribed a continuation of Abilify with the addition of Geodon, 80 mg.  (Id. ¶ 142.)  These medications were administered on December 6 and Dr. Corona believed they would adequately address the psychotic issues if Galambos took them as prescribed.  (Id.; Corizon Statement ¶ 95.)  Dr. Corona believed that Galambos was in the safest level of care within CCJ and that Galambos would likely improve if he used the prescribed medication.  (Stipulations ¶ 143.)

Dr. Corona's judgment is that Seroquel would not have been an appropriate substitute medication for Zyprexa because it is sedating,[10] causes weight gain, and has been associated with inmate drug abuse in the correctional officer setting.  (Corizon Statement ¶¶ 91-94.)  He opines that "mental health staff," i.e., Trueworthy, acted appropriately in not providing Galambos with

---

[10]     Zyprexa is also sedating and, according to Cady's expert, one cannot make a sweeping generalization about the effects of drugs, but must particularize how the drug impacts a particular individual.  (Corizon Statement ¶¶ 92-93.)  Zyprexa causes many to experience unbearable hunger.  (Grassian Dep. at 69, ECF No. 123-7.)

Seroquel (though Trueworthy has testified that he did not even consider Galambos's requests for alternative medication).  (<u>Id.</u> ¶ 91.)

On December 7, Galambos refused his medications and was unable to converse.  He stood on his table and remained on suicide watch.  (<u>Id.</u> ¶¶ 144-45.)  Williams observed Galambos standing on the table in his cell, but did not note it in writing.  (<u>Id.</u> ¶ 144.)  A decision was made to shut off the water to Galambos's sink because he tried to fill his sink and inhale the water.  (<u>Id.</u> ¶ 146.)  Galambos remained on suicide watch.  (<u>Id.</u> ¶ 145.)  Dr. Corona was not contacted about these developments.  Nor was he contacted at any other point subsequent to December 6. (Additional Statement ¶ 132.)

**December 8**

On December 8, Williams once more observed Galambos as unresponsive and regressed. Galambos continued to refuse his medication.  (Stipulations ¶ 149.)  The stipulation is that Galambos "remained on suicide watch in cell A124 in maximum security" and continued to refuse the prescribed medication.  (<u>Id.</u> ¶¶ 148-149.)  That afternoon, Galambos once more climbed naked onto his table, but stood there in a stance that suggested an intent to jump.  A correctional officer named Stotts attempted to talk him down, but Galambos jumped into the air and spun around to land on his upper back and shoulders (and possibly the back of his head) on the cement floor.  (<u>Id.</u> ¶ 150.)  While Galambos was on the floor, another officer named Sampson was on a call to medical getting their assessment of what should be done.  Sampson described the fall to medical and related his concern about possible injuries.  After a couple of minutes lying on the floor motionless, Galambos sat up on his own as three officers entered his cell.  They escorted him out of the cell and to the medical unit because medical declined to come down to

the cell.  (Id. ¶¶ 150-54;  see also North Deposition Exhibit 4, CCJ Video dated 12/8/08, data disc on file.)

According to Stotts, it was obvious that Galambos would need emergency medical attention.  (Id. ¶ 151.)  In his view, he would expect such a jump could result in serious injuries or even death.  (Additional Statement ¶ 148;  Stotts Dep. at 40, ECF No. 123-12.)  Sampson helped to escort Galambos to medical and he related his concern about possible injuries to Hope Gordon, RN, who was on duty in the medical unit.  (Stipulations ¶¶ 155-57.)  The officers explained that Galambos had taken a "swan dive" off the table in his cell and landed on his shoulder, upper back, and possibly his head.  (Id. ¶ 157.)[11]

Director Walsh came to the medical unit and she performed a "walk through" assessment of Galambos, but did not document any assessment in the medical records.  (Id. ¶ 158.) Galambos was placed in a cell in the medical unit and was not admitted to the medical infirmary, where he would have received a medical evaluation by a doctor.  (Id. ¶ 160.)  In fact, no doctor was contacted at all, not even Dr. Corona who had prescribed psychotropic medication for the purpose of getting Galambos's symptoms under control.  (Additional Statement ¶ 132.)  In this new cell assignment, a correctional officer was detailed to observe Galambos one-on-one. (Stipulations ¶ 161.)  The Corizon defendants assert that Nurse Gordon tried to make a "more

---

[11]     Director Walsh has offered an affidavit in support of multiple statements describing the jump from the table.  She has watched the video and would testify that Galambos executed "a roll" rather than "a dive" and that Galambos did not strike his head on the floor.  She also emphasizes that Galambos was able to push himself up from the floor and states that these abilities coupled with the absence of bleeding or "apparent fracture" are inconsistent with someone having "injuries."  (Corizon Statement ¶¶ 96-103.)  Cady's objection that Walsh has not been designated to offer medical opinions is sustained.  I also agree with Cady that the video speaks for itself and does not require characterization by Walsh.  The video is available in the Clerk's Office for the court's review.  I also agree that Walsh's assessment of the video is immaterial because she did not watch it on December 8.  She only watched it in connection with this litigation.  (Additional Statement ¶ 38.)  It is evident that Walsh's testimony is offered because she is seeking to explain her failure to conduct any physical examination following the incident. (See id. ¶ 110 (indicating that she did not "see" him favoring any particular part of his body).)  In fact, she states that she did not consider the incident to present an emergency situation;  merely "aberrant behavior" that did not amount to a "serious suicide attempt."  (Id. ¶¶ 104-105.)  Walsh did not consider a send-out to be necessary between December 8 and December 10.  (Id. ¶ 40.)

detailed" assessment but could not because Galambos did not "cooperate."  (Corizon Statement ¶

113.)  Of course, he was having a psychotic episode, as Cady notes.  Gordon is willing to testify,

based on her affidavit, that she did not believe Galambos needed further medical attention.  (Id. ¶

117.)  Gordon's affidavit states that she did not make any notation in his chart because "his

examination was unremarkable."  (Id. ¶ 119.)  However, she did "watch for signs concerning his

neurologic status."  (Id. ¶ 123.)  Galambos ate a meal during Gordon's shift.  (Id. ¶ 122.)  Gordon

says Galambos was "responsive to inquiries" but does not state that he was coherent.  (Id. ¶ 124.)

She had "no acute medical concerns" as of the end of her shift at 11 p.m.  (Id. ¶ 125.)  The

Corizon defendants further assert that there was no emergency send out on December 8 because

it was "the judgment of CMS staff" that it was unnecessary.  (Id. ¶ 126.)  They support the

statement with a citation to HSA North's deposition.  (Id.)  Cady references Williams's

deposition testimony, where she stated that she did not notify Dr. Corona "because we just made

a referral to an in-patient place waiting for a response."  (Additional Statement ¶ 133;  Williams

Dep. at 87, ECF No. 126-1.)  The deposition testimony does not make it clear what referral she

might have meant.  Presumably, Williams meant the decision made on December 9 to seek a

transfer to the Riverview Psychiatric Hospital.

Walsh testified at her deposition that a referral to the ER could have been arranged for the

December 8 fall, but queried, "Why would we send him out?  We have x-ray, we have doctors,

we have mental health."  (Additional Statement ¶¶ 144, 159;  Walsh Dep. at 57, ECF No. 135.)

Walsh could not recall any x-ray being administered in the medical unit on December 8 of after.

(Walsh Dep. at 57.)  North testified at her deposition that the December 8 fall should have

occasioned an assessment for emergency services but she cannot conclude from the records

available to her that such an assessment was performed.  (Additional Statement ¶¶ 145-146;

North Dep. at 72-73, ECF No. 136.)  It is fair to say that Galambos did not receive any treatment for his psychiatric or physical health on December 8, either in-house or by referral.  (Additional Statement ¶¶ 164-165;  Stipulations ¶ 160.)

**December 9**

On December 9, Galambos remained in a cell.  He continued to refuse his medications and neither medical staff or correctional staff called Dr. Corona for consultation.  (Stipulations ¶ 164.)  Plaintiff's expert, Dr. Grassian, is of the opinion that an emergent[12] transfer was called for because Corizon had proved unable to stabilize Galambos.  (Additional Statement ¶ 169.) Williams was not familiar with that process at the time and did not believe it would have been possible to make a psychiatric referral to Maine Medical Center.  (Id. ¶ 170.)  In any event, according to North's deposition testimony, CMS policy required a referral to a psychiatrist (such as Dr. Corona) if an inmate continued to engage in self-injurious behaviors.  (Id. ¶ 173.)  Walsh's deposition testimony reflects that no psychiatrist was consulted for assistance pending transfer. (Id.; Walsh Dep. at 57.)

Based on the "swan dive" incident, Williams, Walsh, and North concluded that Galambos should be transferred to the state-run psychiatric facility, Riverview Psychiatric Center, and Williams started the process in motion.  (Stipulations ¶¶ 166-67.)  Paperwork prepared by Williams included the following information:

"swan dive off the table affixed to the wall in Max-hit shoulder, refusing all antipsychotic medications";

"shouting at the window, naked in his cell 1 week- disinhibited inappropriate gestures urinating on the floor-sitting in it";

head-butting officers who attempted inspection of cell;  and

---

[12]     The parties use the term "emergent" rather than emergency.  There is no indication that the meaning is any different.

> "responding to inner stimuli, talking and shouting as if someone is there, crawling on the floor and climbing on the table-generally bizarre."

(Id. ¶ 168.)  Packets of information for Riverview were faxed between 9:47 a.m. and 9:56 a.m.

(Id. ¶ 169.)  A Riverview staff member responded to the request that morning, stating that Riverview did not have the capacity to accept Galambos at that time or in the near future and that the Spring Harbor private hospital might serve as an alternative.  (Id. ¶¶ 169-71.)  Williams attests that a transfer to a psychiatric facility can take anywhere from two weeks to two months. (Corizon Statement ¶ 127.)  Dr. Corona was not contacted for advice or intervention. (Additional Statement ¶ 132.)

**December 10**

On December 10, at 8:30 a.m., Williams "found" Galambos lying on the floor of his cell with blood on his face.  Galambos was unresponsive to Williams's attempts to communicate. Williams saw that Galambos was in poor physical condition, odiferous, and regressed. (Stipulations ¶ 172.)  An RN attended to Galambos at 9:00 a.m. and cleaned and bandaged his wounds.  Galambos told her that he fell off the toilet and was suicidal.  (Id. ¶¶ 176-77.)  The RN "attempted to offer Galambos Geodon," which he was allowed to refuse.  (Id. ¶ 178.)  Still no call was placed to a physician or psychiatrist.  (Additional Statement ¶ 175.)

Williams called the Maine Attorney General's Office to ask what else she could do to affect a more expeditious transfer of Galambos to Riverview.  The advice she received was to instruct Galambos's attorney to file a motion to amend bail conditions and to fill out a State of Maine "Blue Paper" form.  (Id. ¶ 179.)  Meanwhile, hours passed and at 2:23 p.m. a correctional officer observed as Galambos lurched forward and down, making no attempt to break his fall, hitting his nose and brow on the floor.  (Id. ¶ 182.)  The correctional officer notified medical and North and Walsh both arrived on the scene to address the matter.  (Id. ¶ 184.)  Walsh asked if she

could give Galambos some medication either in a shot or in pill form and Galambos stated after several requests that he would "take anything at this point" and wanted to stop the noise in his head.  (Id. ¶ 185.)  Walsh obtained an order from Jane McNally, DO, for emergency psychotropic medication to be administered to Galambos while in his cell as a "clinical restraint" meant to address Galambos's safety.  Walsh explained to McNally that Galambos was "out of control."  (Id. ¶ 186.)  Dr. McNally's prescription order was for 60 mg of Zyprexa Zydis and 2 mg of Ativan.  (Id. ¶ 187.)  This was a very heavy dose.  (Corizon Statement ¶¶ 143-144.)

Lt. David Moore was called to the medical unit and arrived at approximately 2:30 p.m.  Moore was the officer in charge. When he arrived, Walsh and North were with Galambos and Galambos was conscious.  (Stipulations ¶ 190.)  North and Walsh were discussing the use of restraints to deal with Galambos's medical/psychiatric condition when Moore arrived in the medical unit.  (Id. ¶ 191.)  North opined that a short-term security restraint was called for.  (Id. ¶ 192.)  Corporal Gilpatrick arrived next.  (Id. ¶ 193.)  Sometime shortly thereafter, Officer Logan responded to a request for additional assistance.  When Logan arrived, Galambos was conscious and sitting on the floor and Moore, Gilpatrick, Walsh, and North were standing in the cell with Galambos.  (Id. ¶ 194.)  On instructions from Moore, Logan placed Galambos in the chair.  (Id. ¶ 195.)  Logan observed medication being given to Galambos before strapping Galambos to the chair, at which time Galambos was calm and cooperating, not injuring himself or hitting himself or banging his head.  (Id. ¶ 196.)  Gilpatrick assisted Logan in this process and Galambos was secured in the chair at approximately 2:40 p.m.  (Id. ¶ 199.)  After being secured, Galambos started yelling and Walsh advised him that he would be released when he calmed down and stopped yelling.  (Id. ¶ 200.)  Galambos's upset and yelling could be heard by everyone in the medical unit at 2:45 p.m.  (Id. ¶ 188.)

Dr. McNally understood from Walsh that Galambos was being taken to the pro-restraint chair in the medical unit because he was out of control and other approaches to prevent his self-injury had not been effective.  (Id. ¶ 189.)  The use of restraints in the medical unit is uncommon. North recalls only one other incident in a ten-year period.  (Corizon Statement ¶¶ 148-149.) Cady states that the applicable policy governing the use of restraints for mental health reasons makes the decision the responsibility of the medical staff and that North was "the person responsible for deciding" whether to use restraints for mental health reasons.  (Additional Statement ¶¶ 27-28.)  Cady also states that placing an inmate in restraints is permitted if the inmate presents a present danger to himself or others.  (Id. ¶ 184.)  According to Walsh, the "crisis" that justified the use of the restraint chair was "his actions and if he was doing any self-harm and being completely undressed and urinating if anybody speaks to him and yelling."  (Id. ¶ 197;  Additional Statement ¶ 42;  Walsh Dep. at 68, ECF No. 102-6.)  She also testified:  "It would be for his own self-protection would be the reason" and that the chair would not be used just because someone was urinating.  (Walsh Dep. at 68.)

So secured, medical personnel attended to Galambos's most recent injury, a bleeding abrasion on Galambos's head.  (Id. ¶¶ 175, 201-205;  Additional Statement ¶ 183.)  The nurse who attended to Galambos's head injury (Tom Soucier) also checked for blood flow and to ensure that the restraints were not too tight.  He noted good blood flow with excellent capillary refill.  (Stipulations ¶ 204.)  At 4:00 p.m., Lt. Moore released Galambos from the pro-restraint chair as Galambos was calm and medicated.  In making that decision, Moore consulted with medical staff.  (Id. ¶ 206.)  They then returned Galambos to a suicide observation cell, where Galambos went on his own power.  (Id. ¶¶ 206-207.)  Nurse Loretta Hynes recalls that Galambos

had significant bruising to his right shoulder prior to his placement in the restraint chair.  (Id. ¶ 209.)

By 6:00 p.m. that evening, Galambos was pacing his cell and banging his head off the wall.  (Id. ¶ 210.)  At approximately 6:10, Hynes administered an intramuscular injection of Ativan while officers restrained Galambos.  In her first attempt, the needle broke off after she had depressed the plunger about half way.  Hynes removed the needle from Galambos's arm and went for more medication.  She returned with a full syringe and injected its contents into Galambos's arm at roughly 6:20.  (Id. ¶ 211.)  By 6:30 p.m., the officer observing Galambos saw that he was lying in his cell, profusely sweating, was unresponsive with garbled speech, and was incontinent of urine.  (Id. ¶ 212.)  Hynes called Dr. Tritch to evaluate.  Upon physical observation, he found contusions to the right front of the head with fresh blood from abrasion and a contusion to the right shoulder.  (Id. ¶ 214.)  Dr. Tritch recommended a transfer to the ER at Maine Medical Center and an ambulance was summoned.  (Id. ¶ 215.)  Hynes relayed information to the EMTs, but this information was limited to the nature of the immediate or presenting problem and did not include the fact that Galambos had somersaulted from a height onto a concrete floor two days earlier.  (Id. ¶¶ 216-217;  Corizon Statement ¶ 150.)  According to Walsh, there was no need to advise the Medical Center about the jump on December 8.  (Additional Statement ¶ 41.)  At 10:15 p.m. Hynes received the diagnosis from the medical center that Galambos was being admitted with fractures of the transverse process and multiple rib fractures.  At 10:30 p.m. Hynes notified "the corporate line."  (Stipulations ¶ 219.)  Galambos remained at the medical center overnight for observation and further testing which revealed a possible right pleural effusion.  (Id. ¶ 220.)

**December 11**

On December 11, LCSW Williams contacted Galambos's defense attorney in the early afternoon to begin the process of obtaining a civil commitment through bail, ideally to facilitate a direct transfer to Riverview from Maine Medical Center.  Williams told counsel that Galambos had broken bones in his neck.  (Id. ¶ 222.)  The bail order issued in the mid-afternoon and permitted personal recognizance so long as Galambos was civilly committed to Riverview.  (Id. ¶ 223.)  However, Riverview indicated that the transfer would have to take place the following day and Galambos was being released from Maine Medical Center that day.  (Id. ¶¶ 224, 230.)  Williams called counsel to inform him that Galambos needed to be moved to another place.  (Id. ¶ 224.)  Williams partially completed the "Application for Emergency Transfer (Blue Paper)" form that afternoon and also a fax cover sheet post-dated December 12 so that the process of physically transferring Galambos could begin on her arrival on the morning of December 12, after signing by a physician and a court official.  (Id. ¶ 225.)  Williams entered counsel's name in that part of the form seeking the name of a guardian, parent, or like relation.  (Id. ¶ 227.)  Williams described Galambos's history of breaking ribs and cervical fracture from "diving off furniture," his history of impulsivity and physical assault, his regression, and the fact that he was refusing antipsychotic medications.  (Id. ¶ 228.)

Maine Medical Center cleared Galambos for return to CCJ on December 11, 2008, at 5:11 p.m.  (Id. ¶ 231.)  Its providers did not give instruction concerning care for deep vein thrombosis.  (Corizon Statement ¶¶ 155-156.)  The discharge medications included Tylenol 325 mg, two by mouth every six hours for pain, Zyprexa 20 mg, one by mouth daily, and Haldol 5 mg intramuscular, "may repeat x2 every 30 minutes for behavioral emergency along with Ativan 2 mg intramuscular."  (Id. ¶ 154.)  Additional instructions called for having a guard with

Galambos at all times and that he have ongoing psychiatric intervention.  (Id.)  Upon the return of Galambos for his last evening at CCJ, Walsh spoke to CCJ Major Francine Breton to arrange for one-to-one correctional supervision in the negative pressure room because it is the easiest location for one-to-one coverage.  (Stipulations ¶ 230.)  When Galambos returned from the hospital he was placed in cell A002[13] on suicide watch observation under the responsibility of CCJ staff with a one-to-one officer on duty.  The "one-on-one" watch required CCJ to have a correctional officer available to keep constant visual contact on Galambos at all times.  The cell did not have a security camera.  (Id. ¶ 231.)

That evening Galambos complained to correctional officers Patton and Adams about being in pain.  Amy Baker, RN, entered the cell and provided Galambos with ibuprofen.  Galambos swallowed the ibuprofen and then shoved the paper medication cup into his left nostril.  With assistance from correctional officers, Baker was able to remove the cup with tweezers.  (Id. ¶ 233.)  Baker also administered Haldol 5 mg IM per Maine Medical Center orders "for a psychiatric or behavioral emergency."  (Id. ¶ 234.)

**December 12**

On December 12, at approximately 7:20 a.m., correctional officer Donald Cousins was serving as watch officer when Galambos got up and then fell face down onto the floor.  Cousins immediately opened the door and asked Galambos if he was alright.  Galambos got up and fell again, striking the back of his head against the wall.  Cousins asked correctional officer Cheryl Dyer to call for some spare rovers to assist.  Within a few minutes Deputy Purinton and Officer Foster arrived and they entered Galambos's cell with the medical staff.  Dep. Purinton and Cousins then moved Galambos and realized that Galambos was not responsive, was not breathing, and had no pulse.  They were unable to resuscitate Galambos using CPR and an

---

[13]    It is unclear whether cell A002 is in the negative pressure room or whether that is material to the case.

automatec external defibrillator and Galambos died that morning.  (Id. ¶ 237.)  The cause of death was later diagnosed as acute pulmonary thromboemboli, caused by deep leg vein thrombosis, caused in turn by self-inflicted blunt force trauma.  (Id. ¶ 244.)

An overdose of medication on December 10 and immobilization from placement in the restraint chair were likely contributing factors for the pulmonary emboli that killed Galambos, according to Stuart Grassian, M.D., and Liudvikas Jagminas, M.D., because such factors (sedation and immobilization) significantly increase the risk of thrombosis.[14]  (Additional Statement ¶¶ 197, 208;  Grassian Dep. at 88, ECF No. 123-7;  Jagminas Dep. at 163-64, ECF No. 123-8.)  One reasonable inference is that the occurrence of significant physical trauma on December 8 is a material factor that a care provider would want to understand in connection with a decision whether to immobilize someone and whether to sedate someone to the extent of the sedation that occurred December 10.  (Additional Statement ¶ 206.)  Additionally, Dr. Jagminas would testify that placement in a restraint chair would cause substantial pain to someone with multiple rib fractures.  (Additional Statement ¶ 207.)

On December 12, Walsh drafted an e-mail following a conference call with CMS corporate personnel regarding Galambos's death.  The purpose of the email was to provide a series of events leading to death.  (Id. ¶ 241.)

**Corizon's Contract**

The contract between CMS and Cumberland County called for the provision of medical services in publicly owned facilities.  (Corizon Statement ¶¶ 1-2.)  It was entered into with the

---

[14]    The Corizon defendants request that the court strike all statements supported with citations to either Dr. Grassian or Dr. Jagminas because they did not research standards of mental health care for inmates and are relying on a malpractice standard of care, among other reasons.  (Reply Statement at 2-3, ¶¶ 2-3.)  I have overruled this objection to the extent I have incorporated statements dependent on either doctor's deposition testimony.  Needless to say, I have not conducted an exhaustive Rule 702 analysis based on a three sentence objection to expert testimony.

understanding that the provision of health care services to the prison population entails both statutory and constitutional duties.  (Id. ¶ 3.)  It provided that CMS would contract with certain health care professionals as independent contractors, but that CMS would remain liable and responsible for the overall management and direction of such professionals notwithstanding their status as independent contractors.  (Id. ¶ 6;  ECF No. 136-1 at 2 ¶ E.)

        In exchange for its services to the County, CMS/Corizon received a management fee. (Corizon Statement ¶ 8.)  Expenses for healthcare services under the contract were ultimately paid by CCJ, but it appears to be a reasonable inference that the contract imposed a burden on Corizon to front these expenditures.  (Id. ¶ 10.)  It likewise appears that the denial of a service to an inmate does not result in a corresponding "profit" for Corizon, but rather avoids a budgetary expense that eventually would be reimbursed by the County.  (Id. ¶ 11.)[15]  CMS was required to regularly confer with the Sheriff or his designee concerning existing healthcare related procedures and problems for the purpose of making changes.  (Id. ¶ 14.)[16]

        The Cumberland County Sheriff's Office and Corizon had a medical audit committee that met monthly and included North, Walsh, and Breton among its members.  On January 9, 2009,

_____

[15]        Neither party's statements inspire complete confidence concerning financial matters under the contract. What can be said with some confidence is that there is a desire to avoid unnecessary expenditures and that there is an expectation or goal of staying within a defined budget.  (Additional Statement ¶ 3.)  The fact that the contract calls for an annual adjustment in the management fee based on, among other things, financial performance in the prior year (ECF No. 136-1 at 1) does not necessarily mean that the contract envisions a possible *decrease* in the management fee, though, presumably, abysmal performance could result in the loss of a government contract. (There is no evidence in this record that management fees have ever decreased from year to year or any demonstration of how send-out expenses have factored into annual discussions about the appropriate management fee.  Nor is there any evidence concerning CMS/Corizon's medical claims-related account(s).)  Ultimately, it is reasonable to conclude that Corizon has an incentive to demonstrate to the County that it is a capable outfit that does not need to rely overmuch on emergency room send-outs, that Corizon has a financial incentive to avoid any unnecessary expenses associated with send-outs even if it can obtain reimbursement from the County, that Corizon has a contract-renewal incentive to keep beyond-budget requests for reimbursement low, and that Corizon would prefer to avoid imposing unnecessary burdens on jail administrators based on the fact that correctional officers must be detailed to attend to inmates when they are sent to outside facilities.  (Additional Statement ¶¶ 1-9; see also North Dep. at 22-23, ECF No. 136;  Policy J-D-05 at 8 (Bates 1157), ECF No. 94-18.)

[16]        Corizon offers statements related to the average duration of incarceration and the percentage of inmates with medical needs.  (Corizon Statement ¶¶ 15-16.)  I do not understand the materiality of these statements.  They do not explain why Galambos's treatment was as it was.  Nor are these facts, or many other facts, discussed in the memoranda filed on behalf of the Corizon defendants.

the committee reviewed Galambos's death, among other issues.  One topic of discussion that day was that there were seven hospitalizations in the past quarter and a total of 135 "hospital days for 2008," of which CCJ/CMS were "responsible for only 20 . . . due to Maine care or coverage by another agency."  (Id. ¶ 10.)  Among other concerns, there was the concern that Maine Medical Center over performed procedures for financial gain.  (Id. ¶ 11;  North Dep. at 33-34, ECF No. 107-14.)  For example, in staff meetings held after Galambos's death, it was observed that the Medical Center's emergency room department had requested to "explore" the pencil puncture wound after clearing Galambos based on an x-ray and that "the type of care has increased exponentially," and questioned whether this approach had "anything to do with the opening of the new ER Department."  (Additional Statement ¶ 18;  ECF No. 136 at 32, ¶ 12.)

## Policies[17]

### CMS policies

Among the policies pertinent to the events described herein are the following policies found in CMS's Health Services Policy & Procedures Manual:

Policy J-D-02.12, Monitoring of Medication for Refusals, ECF No. 94-17;

Policy J-D-05, Hospital and Specialty Care, ECF No. 94-18;

Policy J-D-05.01, Transfer to Inpatient Psychiatric Setting, ECF No. 94-19;

Policy J-G-05-01, Management of Potentially Suicidal Inmates, ECF No. 94-25;

Policy J-I-01.01, Use of Clinical (Therapeutic) Restraints, ECF No. 94-27;  and

Policy J-I-02, Emergency Psychotropic Medication, ECF No. 94-29.

(Stipulations ¶¶ 255-285.)  Policy J-D-02.12 calls for counseling prior to the discontinuation of medications.  Policy J-I-02 is meant to "ensure that health services staff follow policies

---

[17]    The parties have liberally supplied the Court with CMS and CCJ policies, though they have provided little in the way of discussion or analysis of the policies in their briefs.  I have not identified every policy uploaded to the court's docket because most are not even mentioned in the briefs.

developed for the emergency use of forced psychotropic medications as governed by the laws applicable in the jurisdiction" and calls for emergency forced medication to be administered at the local emergency room rather than in the jail setting.

*CCJ policies*

The Cumberland County Sheriff's Office Corrections Division Policy and Procedure Manual contains the official policies and procedures of CCJ.  This manual is available for staff to review on the computer.  Staff is required to review and be knowledgeable and conversant with the policies in the manual.  (Stipulations ¶ 245.)  The polices include:

> Policy D-244, Use of Restraints in the Facility, ECF No. 89-9;
>
> Policy F-310, Medical Services, ECF No. 89-1;
>
> Policy F-320, Mental Health Services, ECF No. 89-5; and
>
> Policy F-321, Emergency Mental Health Services, ECF No. 89-6.

(Id.  ¶ 246.)

Policy F-310 provides that "all medical and dental matters involving medical judgment are the sole province of the responsible physician and dentist respectively."  (Id. ¶ 248.)  Policies F-310 and F-320 provide that "no non-medical staff will diagnose or treat an inmate's illness. Medication and treatment will be administered only as directed by the proper medical authorities."  (Id. ¶ 249.)  Policy F-320 provides that "all psychiatric matters involving medical judgment are the sole province of the responsible psychiatrist."  (Id. ¶ 250.)  Policy F-321 provides for, among other things, suicide watch.  This policy requires that an inmate on suicide watch be seen by medical and mental health staff on a daily basis and behaviors will be charted in the inmate's health file.  The policy also requires that the pod officer conduct and document 15-minute checks.  (Id. ¶ 251.)  Policy D-242 provides that "when suicidal inmates are housed in

maximum security the same protocol will be followed as in medical."  In maximum security,
suicidal inmates will be housed in cells that are equipped with cameras.  (Id. ¶ 253.)  Policy D-
244 specifies requirements and criteria for authorizing the placement of an inmate in a four/five
point restraint (both arms head, and legs secured).  (Id. ¶ 254.)

Cady states that the applicable policy governing the use of restraints for mental health
reasons makes the decision the responsibility of the medical staff and that North was "the person
responsible for deciding" whether to use restraints for mental health reasons.  (Additional
Statement ¶¶ 27-28.)  The county defendants admit these facts but offer a qualifying statement
that someone other than North could also make this decision.  (Id. ¶ 28.)  CCJ policies give the
shift lieutenant, here Moore, authority to approve the use of restraints for security purposes.  (Id.
¶¶ 53-54.)  Cady also states that placing an inmate in restraints is permitted if the inmate presents
a present danger to himself or others.  (Id. ¶ 184.)

**Additional statements concerning Moore, Gilpatrick, and Logan**

With respect to Moore, Gilpatrick, and Logan, Cady's contention is that these
correctional officers essentially subjected Galambos to abuse or punishment on December 10,
2008, because they complied with the request of North and Walsh that they secure Galambos in
the pro-restraint chair and Galambos had multiple spinal fractures and broken ribs at the time.
Additionally, Cady says that Policy D-244 (ECF No. 89-9) placed responsibility for the use of
restraints on the shift supervisor, which on the day in question was Lieutenant Moore.  Cady
asserts this because, in her view, it means Moore was the County's "final decision-making"
authority on the date in question.  (Additional Statement ¶ 53.)

Moore testified that he was not sure of the reason for placing Galambos in the restraint
chair but that he told his officers to do it "because the two leaders of the medical department

asked [him] to do it." (Moore Dep. at 46, ECF No. 127-1.)  Moore acknowledged that doing so

would not prevent Galambos from injuring himself by falling down after his release from the

chair. (Id.)  Moore also testified that he was told that Galambos had self-injurious behavior and

that he (Moore) had not witnessed the behavior, but was aware that Galambos had taken a dive

from the table in his cell. (Id. at 58.)  In effect, Moore complied with the wishes of the medical

authorities who were on the scene. (Id. at 42.)  Logan's testimony was consistent.  He

understood that Galambos had hit his head and that there was "something about the sink," but

had no personal knowledge of what Galambos had been through. (Logan Dep. at 38-39, ECF

No. 123-11.)  Cady also relies on testimony that Galambos was compliant and calm when they

put him in the chair. (Id. at 50; see also Additional Statement ¶¶ 180-181.)

**Statements concerning the County's liability**

The Sheriff of Cumberland County has final decision making authority with respect to all

policy and operational matters at the Cumberland County Jail. (County Statement ¶ 1.)  Cady

qualifies this statement with an assertion that Joyce denies total familiarity with the details of jail

policy and that he has delegated certain responsibilities at CCJ to the jail administrator and/or the

command staff under her direction. (Id.)   Joyce was not the sheriff in 2008, but the chief

deputy. (Joyce Dep. at 8, ECF No. 139.)  The jail administrator generally oversees correctional

officer training. (Additional Statement ¶ 52.)  Since becoming sheriff, Joyce has told the media

that money spent on suicide prevention is "money well spent, but we'd prefer not to spend it

also." (Additional Statement ¶ 51; Joyce Dep. Ex. 53, ECF No. 139-2.)

CMS was permitted to provide health care services within the jail as CMS determined

was reasonably necessary. (County Statement ¶ 2.)  At CCJ, decisions regarding medical and

psychiatric matters involving medical judgment were deferred to the responsible physician and psychiatrist, respectively, pursuant to Policy F-310 and Policy F-320.  (Id.)

Cady's statements reflect that transfers of inmates for emergency care in other facilities is a concern for both Corizon and Cumberland County not merely because of costs but also because send-outs require officer details to watch over the inmates.  (Additional Statement ¶¶ 12-15.) This issue was "always on the table," according to Walsh.  (Id. ¶ 17.)  The particular concern over the number of correctional officers needed to cover hospital send-outs came directly from Francine Breton, says Walsh.  (Id. ¶ 14;  Walsh Dep. at 13, ECF No. 135.)

The Maine County Commissioners Association Self-Funded Risk Management Pool (Risk Pool) is a public self-funded pool established pursuant to 30-A M.R.S.A. ch. 117. (County Statement ¶ 11.)  Cumberland County is a Named Member of the Risk Pool and is provided with insurance-type coverage pursuant to a document entitled "Maine County Commissioners Association Self-Funded Risk Management Pool Coverage Document" ("coverage document").  (Id. ¶ 12.)  The coverage document specifically excludes any coverage for any cause of action seeking tort damages for which the County is immune pursuant to the Tort Claims Act, and limits coverage to those areas for which governmental immunity is expressly waived by the Tort Claims Act.  (Id. ¶ 13.)  Other than the insurance-type coverage provided to Cumberland County under the coverage document, Cumberland County has not procured insurance against liability for any claim against the County or its employees for which immunity is not otherwise waived under the Maine Tort Claims Act.  (Id. ¶ 14.)

## DISCUSSION

The Corizon defendants are Corizon, Inc., Michael Trueworthy, Barbara Walsh, and Linda Williams.  Each defendant has filed a separate motion for summary judgment, though they

have filed one statement of material facts.  For reasons that follow, I recommend that the court

deny the Corizon defendants' motions.  The county defendants consist of Cumberland County,

David Moore, Corey Gilpatrick, and Keith Logan.  These four defendants have filed a motion for

judgment on the pleadings against count II and for summary judgment against all claims.  For

reasons that follow, I recommend that the Court grant the county defendants' motion for

summary judgment.

**A.      Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The court reviews the factual record in the light most favorable to the non-

moving party, resolving evidentiary conflicts and drawing reasonable inferences in her favor.

Hannon v. Beard, 645 F.3d 45, 47-48 (1st Cir. 2011).  If the Court's review of the record reveals

evidence sufficient to support a judgment in favor of the non-moving party on one or more of her

claims, then there is a trial-worthy controversy and summary judgment must be denied to the

extent there are supported claims.  Unsupported claims are properly dismissed.  Celotex Corp. v.

Catrett, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment

rule is to isolate and dispose of factually unsupported claims or defenses.").

**B.      The Pleadings**

Cady's operative pleading is her third amended complaint (ECF No. 59).  The first count

is asserted under 42 U.S.C. § 1983.  In it Cady alleges violations of Galambos's Eighth

Amendment and Fourteenth Amendment rights to a "safe environment and protection from

serious, life-threatening harm and injury, including that incurred by self-harm or self-mutilation,

and . . . treatment of his medical and psychiatric illnesses or injuries."  (Id. ¶ 77.)  Cady also

alleges in her first count deliberate indifference to Galambos's serious medical needs.  (Id. ¶ 81.)

Cady's second count is labeled "Maine Tort Claims Act."  (Id. at 34.)  The second count does not

include a claim against Corizon or its employees, only against the county defendants.  (Id. ¶¶

103-105.)  In her third count Cady asserts a violation of Galambos's civil rights under the Maine

Constitution and Maine Civil Rights Act.  (Id. ¶ 107.)  Cady's fourth count asserts a state law

wrongful death claim under 18-A M.R.S. § 2-802.  (Id. at 36.)  Cady's fifth count is captioned

"Conscious Pain and Suffering," and includes a citation of 18-A M.R.S. § 2-801.  (Id.)  As

drawn, Cady's fourth and fifth counts do not run against the Corizon defendants.  Instead, she

recites that the claims run against "[t]he Defendant CCJ and its employees, jointly, severally,

individually, and in their representative capacities."  (Id. ¶¶ 110, 113.)  Because there is no

mention of the Corizon defendants in counts two, four, and five, Cady's claim against the

Corizon defendants is restricted to the civil rights claims found in counts I and III.

Concerning the county defendants, Cady indicated during the Local Rule 56(h) pre-filing

conference the following:

> 1.  That the entity claim against the County is based on the actions of Lt. Moore
> and CMS, through its relationship with Francine Breton,[18] the jail administrator.
> The particular focus of the claim relates to the use/misuse of the restraint chair.
>
> 2.  That the entity being sued is Cumberland County and that [Cady] would move
> to substitute that entity for the jail and/or Sheriff Joyce in his official position (she
> has stipulated the dismissal of Sheriff Joyce on claims of supervisory liability).[19]

(Report of Pre-Filing Conference of August 27, 2012, ECF No. 82.)  (See also Stipulation of

Dismissal, ECF No. 85 (dismissing "all claims against" Sheriff Joyce in counts I through IV).)

Despite these representations, I construe Cady's civil rights claims to include a claim against the

---

[18]     Breton's name appears twice in Cady's opposing statement and statement of additional material facts and
neither time is the mention of her name associated with the use of the restraint chair.  (ECF No. 123, ¶¶ 14, 37.)

[19]     I cannot locate on the docket a motion to substitute Cumberland County or the Cumberland County
Sheriff's Office for the Cumberland County Jail.  The county defendants have not taken issue with this concern and
they describe the County as one of the movant's in their motion.

County for deliberate indifference grounded on the entire course of treatment received by Galambos during his stay in CCJ.

## C.     The Corizon Defendants' Motions

The Corizon defendants argue that they are entitled to summary judgment because medical staff "engaged with [Galambos] throughout the last days of his life";  because they are not required to "suicide-proof" a jail;  and because they cannot fairly be judged based on "a 20-20 hindsight focus."  (Corizon Motion at 15, ECF No. 103.)  Additionally, Corizon the corporate entity insists that it cannot be subject to liability for deprivations imposed by its local employees unless those deprivations were caused by a company policy, custom, or practice.  (Id. at 15-18.) Corizon maintains that the evidence is insufficient to show a causal connection between a company policy, custom, or practice and the alleged deprivations associated with Galambos's treatment.  (Id. at 18.)  Each of the individual Corizon defendants argues that his or her performance did not fall so low as to evince deliberate indifference, whether because his involvement with Galambos occurred before Galambos could fairly be regarded as psychotic (Trueworthy Motion at 9-10, ECF No. 104), or because she took reasonable measures to attend to Galambos's condition and timely sought a transfer to a psychiatric hospital when that need became apparent (Williams Motion at 7, ECF No. 106), or because the decision in question was one that a reasonable care provider could make (Walsh Motion at 7-8, ECF No. 105 (concerning use of the restraint chair)).

    **1.**    *Federal and State Deliberate Indifference Claims (counts I and III)*[20]

Section 1983 of the Civil Rights Act confers upon every United States citizen a right to redress against any person who, acting under color of state law,[21] causes a deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  Section 1983 provides a vehicle for a plaintiff to obtain federal court jurisdiction, but it does not provide any substantive rights independent of those otherwise granted under federal law or the United States Constitution.  Roman-Oliveras v. Puerto Rico Elec. Power Auth., 655 F.3d 43, 47 (1st Cir. 2011).  Maine law also authorizes aggrieved persons to bring a civil action for the violation of constitutional rights.  5 M.R.S. § 4682(1-A).  Claims based on the Maine Civil Rights Act generally are analyzed co-extensively with the federal constitutional claims.  Dimmitt v. Ockenfels, 220 F.R.D. 116, 123 (D. Me. 2004) ("A conclusion that the defendants are not liable under 42 U.S.C. § 1983 also disposes of the plaintiff's claims under 5 M.R.S.A. § 4682[.]").  Here, Cady has not suggested that the Maine Constitution calls for an inquiry that is any different than what unfolds under the United States Constitution.  What Cady contends is that the defendants violated Galambos's rights by demonstrating deliberate indifference to his

---

[20]    Fairly construed, Cady's complaint pursues civil rights claims against all of the Corizon defendants.  This is an interpretation of the complaint.  Actually, Cady alleges that "Defendants CORIZON and CCJ by and through their employees" or "Defendants CORIZON, CCJ, and through their employees" violated Galambos's rights.  (Third Amended Complaint ¶¶ 77, 81.)  However, because Cady has named so many individual defendants it is apparent that she is advancing these claims against every named defendant whom she has not otherwise stipulated dismissal of.

[21]    Although the Corizon defendants are not governmental employees, they do not contest that they qualify as "state actors" for purposes of section 1983, nor would such an argument avail them.  See, generally, Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484 (1st Cir. 2011) (holding, without discussing the issue, that a trial-worthy section 1983 claim existed against the private contract medical provider who served the Maine State Prison);  see also West v. Atkins, 487 U.S. 42, 54 (1988) ("Respondent, as a physician employed by North Carolina to provide medical services to state prison inmates, acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury.");  Rice v. Corr. Med. Servs., 675 F.3d 650, 670 (7th Cir. 2012) (addressing issue); Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 5 (1st Cir. 2005) (describing the operative tests for deciding when private actors become state actors).

serious medical and safety needs.  This is a Fourteenth Amendment claim under federal law. Elliott v. Cheshire Cnty., 940 F.2d 7, 10 & n.1 (1st Cir. 1991).

"A state and its subdivisions are under a substantive obligation imposed by the Due Process Clause of the Fourteenth Amendment to refrain at least from treating a pretrial detainee with deliberate indifference to a substantial risk of serious harm to health," Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011), or with "deliberate indifference to serious medical needs." Feeney v. Corr. Med. Servs., 464 F.3d 158, 161 (1st Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 105-106 (1976)).  It has been said that deliberate indifference requires "the complainant [to] prove that the defendants had a culpable state of mind and intended wantonly to inflict pain . . . or actual knowledge [or wilful blindness] of impending harm, easily preventable." DeRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991) (citations omitted).  It has also been said that the concept of deliberate indifference is akin to criminal recklessness, "requiring actual knowledge of impending harm, easily preventable," Feeney, 464 F.3d at 162 (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)).  More recently, however, the Court of Appeals has described the deliberate indifference standard in less rigorous terms, *when it comes to pretrial detainees*, saying only that it requires "a showing of greater culpability than negligence but less than a purpose to do harm." Coscia, 659 F.3d at 39 (Souter, J.).[22]  The focus of this inquiry "is on what the jailers knew and what they did in response." Burrell v. Hampshire Cnty., 307 F.3d 1, 8 (1st Cir. 2002).  In the prison suicide context, a threshold question is whether the jailers "knew, or reasonably should have known, of the detainee's suicidal tendencies," and the risk must be substantial. Elliott, 940 F.2d at 10-11.  In this case, knowledge of a substantial risk of

---

[22]     Unlike convicted inmates, pretrial detainees have not been convicted of a crime and therefore are not subject to punishment. Bell v. Wolfish, 441 U.S. 520, 538-39 (1979).  This distinction may be the source behind the idea that the deliberate indifference standard is somewhat lower where pretrial detainees are concerned.  In Coscia, the panel opined that deliberate indifference "may consist of showing a conscious failure to provide medical services where they would be reasonably appropriate." Coscia, 659 F.3d at 39 (involving a pretrial detainee).

suicide is demonstrated with respect to all of the defendants.  Moreover, defendants have not

raised a lack of knowledge in their arguments in favor of summary judgment.[23]  Thus, the

discussion proceeds to the deliberate indifference question.

A trial-worthy claim requires that the plaintiff "satisfy both a subjective and objective

inquiry."  Leavitt v. Corr. Med. Servs., 645 F.3d 484, 497 (1st Cir. 2011).  The subjective inquiry

calls for evidence that a defendant possessed a culpable state of mind amounting to "deliberate

indifference to an inmate's health or safety."  Farmer v. Brennan, 511 U.S. 825, 834 (1994)

(internal quotation marks omitted).   The objective inquiry concerns the harm or need in

question, which must involve "a sufficiently substantial 'risk of serious damage to [the inmate's]

future health.'"  Id. at 843 (quoting Helling v. McKinney, 509 U.S. 25, 35 (1993)).  See also

Burrell, 307 F.3d at 8 ("[T]he deprivation alleged must be, objectively, sufficiently serious.").

A medical need is "serious" if it has been diagnosed by a physician as mandating treatment, or is

so obvious that even a lay person would recognize a need for medical intervention.  Leavitt, 645

F.3d at 497;  Gaudreault v. Mun. of Salem, 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500

U.S. 956 (1991)).  These two inquiries generally overlap and depend on similar evidence.

Leavitt, 645 F.3d at 498.

### 2.      Michael Trueworthy's Motion (ECF No. 104)

In his factual recital, Trueworthy asserts that he reasonably continued Galambos's pre-

incarceration medication regimen in September and asserts that it is to his credit that medications

continued to be offered even after he had Galambos sign a release of responsibility form on

November 15.  (Trueworthy Motion at 3-4.)  He then states that he had a "discussion with

Galambos regarding the discontinuance of his medication" on December 1, but "did not discuss

---

[23]      Trueworthy concedes knowledge.  (Trueworthy Reply at 2, ECF No. 144.)  Walsh and Williams personally
addressed suicidal episodes.

. . . substitute medications because the topic did not come up." (Id. at 4.)  He states that when he ordered on December 1 to stop issuing medications for Galambos he was not concerned because he understood that Galambos had not been taking his medications for some time, yet was non-psychotic and lucid at the time, was able to make a reference to his criminal defense theory, and was in the general population. (Id. at 5, 9-10.)  Trueworthy says he believed Galambos would know the proper channels to go through to get his medication restarted and maintains that he did not know that Galambos had made any request for a change of medication. (Id.)

Trueworthy states that the treatment he provided and the actions he took on September 12 and December 1 "were done exercising professional judgment based on [his] interviews with Mr. Galambos." (Id. at 6.)  He says that he cannot be regarded as deliberately indifferent for these reasons and because Galambos did not have a serious medical need during his visit with Galambos on December 1. (Id. at 10.)  He further contends that Cady cannot show that any action on his part was a "substantial factor in bringing about the harm" and that the court must direct a verdict in his favor because the evidence of causation is entirely speculative or conjectural. (Id. at 8-9.)  As for cutting off Galambos's medication, Trueworthy asserts that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment, including the unwanted administration of antipsychotic drugs. (Id. at 8, citing Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 278 (1990), and Washington v. Harper, 494 U.S. 210, 221 (1990).)  Should these arguments fail, Trueworthy requests that he be given qualified immunity. (Id. at 11-14.)

In response, Cady argues that the evidence demonstrates the existence of a serious medical need even as early as September because Galambos's psychiatric condition was diagnosed and even a layperson could appreciate the need for treatment. (Response to

Trueworthy Motion at 3, ECF No. 120.)  She asserts that Trueworthy engaged in deliberate

indifference because he made elections that exposed Galambos to a serious risk of future harm.

(Id. at 3.)  She rejects Trueworthy's suggestion that his liability somehow turns on whether or not

he saw Galambos's December 1 request slip and instead focuses on the complete picture,

asserting that Trueworthy failed to "effectively manage" Galambos's medication to protect him

from "the known dangers associated with his condition," knowing "the effect that a lack of

medication would have on that condition."  (Id. at 6.)  She emphasizes Trueworthy's

acknowledged failure to offer any medication counseling to Galambos followed by an order

stopping all medication, even though Trueworthy knew of a history and risk of suicide attempt,

had diagnosed a psychotic disorder, and had concluded that the prognosis was poor without

effective medication management.  (Id. at 7-9.)  On the issue of causation, Cady discusses facts

suggesting that Galambos was decompensating in mid-November, which facts tend to erode

Trueworthy's assertion that he need not be concerned because Galambos was "lucid" as of

December 1.  Cady argues that Trueworthy's failure to treat effectively furthered Galambos's

regression and could be regarded as a proximate cause of harm.  (Id. at 10-11.)

 The record is sufficient to permit a reasonable finder of fact to conclude that Trueworthy

knew or should have known that Galambos's psychotic condition reflected an extremely serious

medical need that, if left untreated, would generate a substantial risk of serious harm to his health

and safety;  that the decision to order a stop to the offering of prescribed medications on

December 1 (with or without counseling)[24] was an act of deliberate indifference that satisfies

---

[24] A reasonable juror could consider the absence of counseling to be further evidence of deliberate
indifference.  Trueworthy notes that Corizon policies called for counseling at the time, but he says there is no
evidence that counseling did not occur, even if he did not do the counseling himself.  (Trueworthy Reply at 4.)  He
also raises his per diem employment as an excuse.  (Id.)  Trueworthy was the only licensed psychiatric nurse
practitioner in Corizon's employ at CCJ.  He was squarely in the position to evaluate the hazard posed by letting
Galambos go unmedicated and he has acknowledged that he recognized Galambos was properly diagnosed as
psychotic.  Trueworthy could also be regarded as having rejected the Seroquel request.  Although he and Dr. Corona

both the subjective and objective standards; and that the deliberate indifference was a substantial

factor in bringing about Galambos's rapid regression and decompensation in the following

days.[25]   Although it is correct that individuals have a liberty interest that restricts the state's

authority to administer psychotropic medications against their will, if anything <u>Washington v.</u>

<u>Harper</u> and the Washington state procedure addressed therein reflect that the serious hazard of

having untreated psychosis in the prison setting (even in the absence of suicidal ideation) calls

for attentiveness and an administrative process designed to ensure the appropriate provision of

medication, regardless of the inmate's wishes, not for an order directing the cessation of all

medication upon request.[26]   The facts and circumstances in this case raise a genuine issue

whether Cady can meet the deliberate indifference standard.

---

have indicated that Seroquel is problematic and therefore not "routinely" prescribed in the jail setting, it was on the formulary and this was no "routine" situation.

[25]       Trueworthy will likely object that causation cannot be established because Dr. Corona interceded on December 6 and Dr. Corona believed his orders on that date should have addressed Galambos's regression if Galambos took the medication as ordered. This is a complicated causation picture given the nature of psychosis and medication, but in my view a reasonable juror could conclude that an ounce of prevention could have been worth a pound of cure. Moreover, by December 6, Galambos was "floridly psychotic" and that condition could reasonably be regarded as causally connected to Trueworthy's order to discontinue all medications. Cady does not need to prove that Trueworthy's deliberate indifference caused Galambos's death. A prisoner can prove deliberate indifference based on serious medical needs, not just life-threatening medical needs. <u>Gamble</u>, 429 U.S. at 106. Here, there is enough to support a finding of "more than ordinary lack of due care for the prisoner's interests or safety." <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986).

[26]       In <u>Harper</u>, the Court considered whether a Washington procedure for involuntarily medicating inmates with mental disorders that present a likelihood of serious harm violated the due process clause because the procedure did not require judicial oversight or call for representation by counsel. 494 U.S. at 213, 215. The Court held that an administrative pre-deprivation process is required but that the pre-deprivation process does not require judicial involvement or the involvement of counsel. <u>Id.</u> at 236; <u>See</u> also <u>Massey v. Rufo</u>, No. 92-1380, 1994 U.S. App. Lexis 6202, *4-6, 1994 WL 12326, *1-2 (1st Cir. Jan. 14, 1994) (per curiam) (discussing <u>Harper</u>). The Court also held that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." <u>Id.</u> at 227.

It is clear that involuntary medication implicates an inmate's constitutional right to liberty under the Due Process Clause, <u>Sell v. United States</u>, 539 U.S. 166, 178 (2003). One might argue that it cannot be deliberately indifferent to refrain from taking steps that would deprive an inmate of a liberty interest. However, the Fourteenth Amendment also prohibits incarceration under conditions posing a substantial risk of serious harm, <u>Farmer</u>, 511 U.S. at 834. Under the circumstances of this case, where the inmate in question was allowed to slip into a suicidal psychosis, these two constitutional rights are pressed on opposite sides of the same coin. Because the record permits a finding of deliberate indifference to a substantial risk of serious harm, summary judgment for the defendants is not appropriate.

Trueworthy's request for qualified immunity will be considered in section C.5, below, alongside the request of the other individual defendants.

### 3.    *Barbara Walsh's Motion (ECF No. 105)*

In her factual recital, Walsh emphasizes that she "was exceedingly busy on a daily basis." (Walsh Motion at 1-2.)  She also says that Galambos did not have any serious medical needs prior to December 8 and that she "visually observed" him after his flip from the table just as she had on other days.  (Id. at 2-3.)  She could see that Galambos was "walking around" without "favoring any particular part of his body" and on that basis felt that he did not need any medical attention.  (Id. at 3.)  Although she was part of the medical treatment team and was knowledgeable about and involved in Galambos's care, Walsh does not suggest that she even considered the need for a change in approach toward Galambos's medication management.  Her focus in her factual account, up to December 8, is solely on whether she might reasonably have concluded that Galambos had not seriously injured himself physically.  (Id.)  Otherwise, she says that her "most significant contact" with Galambos came on December 10, when he fell to the ground face-first without breaking his fall.  (Id.)  Only at that point did she "brief" a physician, in part because Galambos only then indicated a willingness to take some medication.  (Id. at 4.)  On that date she opined that a restraint chair was needed because Galambos was in crisis and was "having a bad time."  (Id.)  She says she did not have any further "significant contact" with Galambos until December 12, when she and others tried to revive him.  (Id. at 5.)

In her legal argument, Walsh first asserts that Cady has failed to allege a supervisory liability claim against her and therefore waived any such claim.  Alternatively, she contends that there is no evidence that she imposed a practice on subordinates that lead to a constitutional violation involving deliberate indifference.  (Id. at 5-7.)  On the question of deliberate

indifference, Walsh says that Cady "has apparently limited [her] presence to those events of December 10 and the placement in the restraint chair." (Id. at 7.) As for that measure, Walsh says it was a "collective decision" and emphasizes that "Galambos had been refusing to take medication prescribed by Dr. Corona on December 6, which he had a right to do," even though he "continued to inflict harm on himself." (Id. at 8.) On the question of causation, Walsh states that Cady "has nothing but unacceptable speculation and conclusory allegations." (Id. at 8.) She also requests qualified immunity, referencing the legal argument made in Trueworthy's motion for summary judgment. (Id. at 8-9.)

In her response, Cady says that Walsh is liable for her own deliberate indifference and not based exclusively on her supervisory role. (Response to Walsh Motion at 9, ECF No. 118.) Cady does not restrict her claim to December 10, but rather contends that Walsh made grossly inadequate "assessments" of Galambos throughout his decompensation and "in a disturbingly arrogant manner" continued to deny the need for stepped-up intervention at each progressively worse stage. (Id. at 9-10.) Cady itemizes several facts that I do not repeat at length here, before "submit[ting] that this evidence demonstrates a shocking disregard on the part of Ms. Walsh for Mr. Galambos's condition, a patently inappropriate use of restraint for retributive purposes (because he was yelling and urinating), and an arrogant assumption that her assessment of Mr. Galambos trumped the physical evidence of his injuries." (Id. at 12.) Cady also contends that Walsh's dismissive testimony concerning the seriousness of the December 8 flip from the table, even when presented with proof of serious internal injuries, could well be regarded by the jury as evidence of a deliberately indifferent state of mind. (Id. at 12-13.) Cady says that evidence of proximate cause is established by her expert's testimony that the restraint chair would have caused significant pain and served as an aggravating factor for the thromboembolic disease that

48

killed Galambos.  (Id. at 14.)   On the supervisory front, Cady argues that Walsh was

"deliberately indifferent to the staff's . . . deficient performance" and should have known that the

lack of attention to Galambos's condition would lead to a civil rights deprivation.  (Id. at 15-16.)

Cady states that Walsh reviewed Williams's notes and assessments, knew that Galambos was

severely regressed and actively psychotic as of December 1, but did nothing to ensure that

Galambos received a proper intervention or transfer to a safer environment, and did not instruct

her staff to ensure that Maine Medical Center received notification of the December 8 incident

when Galambos was sent for treatment on December 10.  (Id. at 16.)

       The record is sufficient to permit a reasonable finder of fact to conclude, based on the

evidence and permissible inferences therefrom, that Walsh knew or should have known that

Galambos's psychotic condition reflected an extremely serious medical need that generated a

substantial risk of serious harm to his health and safety;  that Walsh was part of the medical team

that treated Galambos and would have been directly involved based on her demand that she be

called to triage in significant cases;  that Walsh knew that Galambos was regressing into

psychosis;  that Galambos's psychosis had ripened into an extremely serious risk to his physical

safety by at least December 8, if not earlier;  that the December 8 jump from the table deserved

an emergency response by both physical and mental health practitioners;  that the December 8

jump, at the latest, demonstrated a need to change the permissive approach to Galambos's refusal

to take medication;  that the failure to send Galambos out on December 8 likely related to the

fact that he had been sent out on December 2 for the pencil wound and Walsh's insistence that

loss of a nursing license was no good excuse for a send-out;  that the December 10 incident was

a foreseeable consequence of a deliberately indifferent approach to medical care;  that the use of

the restraint chair occurred because of the earlier, deliberately indifferent approach to medical

care;  that the deliberate indifference satisfies both the subjective and objective standards;  that the deliberate indifference involved supervisory acquiescence and participation directly related to the deprivation[27];  and that the deliberate indifference was a substantial factor in bringing about Galambos's rapid regression, decompensation, and death.

As for Galambos's right to refuse medication, as stated with respect to Trueworthy, psychosis in the prison setting (even in the absence of suicidal ideation) calls for attentiveness and an administrative process designed to ensure the appropriate provision of medication, regardless of the inmate's wishes, not for a bystander approach to medical care.  In her reply, Walsh argues that she "had no role in the mental health aspects of the treatment of Mr. Galambos while LSCW Williams['s] daily assessments were in the chart[.]  HSA North, not DON Walsh, had supervisory authority over the mental health staff."  (Walsh Reply at 1, ECF No. 142.)  The record sources Walsh cites do not establish that she had "no role" in regard to mental health care.  A reasonable finder of fact could reject this suggestion based on Walsh's status as the director of all nursing staff.  Moreover, Walsh maintains that she concurred in the assessment that restraints were appropriate to address a mental health crisis and her judgment in this regard illustrates that her office called for her to assess mental health concerns and not purely physical health concerns.

Walsh also says she is backed up by a Dr. Wilcox and by Nurse Gordon who say that there was no need for emergent care after the "stunt man role."  (Id. at 2.)  The subjective viewpoints of Walsh, Dr. Wilcox, and Nurse Gordon are not controlling.  There obviously was no simple way to overcome the mental and behavioral challenges to performing a physical examination in this context, but that does not preclude a finding that there was an obvious need

---

[27]     In other words, Walsh could be found liable based on her own actions and not merely based on the actions of subordinates under a theory of respondeat superior.  See Leavitt, 645 F.3d at 502.  Walsh seemingly wishes to be regarded as a supervisor with no direct involvement, but in fact she was a participant in Galambos's care and her acts and omissions could support a finding that she was deliberately indifferent to a serious medical need that she was fully cognizant of.

for something more involved than continued incarceration without intervention.  Walsh also argues that there is no evidence of a retributive purpose behind the restraint chair.  (Id. at 3.)  Regardless of whether that is an accurate statement or not, there is sufficient evidence to support a finding that Walsh was deliberately indifferent to the severe medical emergency presented by Galambos's psychosis and suicidal behavior in the prison setting.  That finding is not required, but it is not ruled out on this evidence.  This case bears little resemblance to Torraco v. Maloney, 923 F.2d 231 (1st Cir. 1991), which Walsh cites in her reply, as a finder of fact could conclude that this case involves more than a mere dispute over two equally reasonable courses of treatment.  The balance of Walsh's reply memorandum repeats points already addressed.

### 4. Linda Williams's Motion (ECF No. 106)

In her factual recital, Williams highlights her experience, including within Riverview, and the fact that she "had an extremely heavy workload at CCJ."  (Williams Motion at 1-2.)  Of the defendants, Williams was the most involved with Galambos.  She followed the course of his regression into what Dr. Corona described as florid psychosis and she arranged for a visit by Dr. Corona on December 6.  Williams assessed not only that Galambos was not improved the day after Dr. Corona's visit but also that he was refusing the medication Dr. Corona prescribed.  (Id. at 2-4.)  She fails to indicate in her narrative that she took any new action on December 7 or on December 8.  Then, on December 9, Williams started what she understood would be a two-week or longer process of arranging a transfer to Riverview.  (Id. at 4.)  Only after Galambos's further self-destructive conduct on December 10 was there an effort at achieving a more immediate emergency transfer.  (Id. at 4-5.)

Williams argues that it is difficult to understand what she is alleged to have done wrong or failed to do that would amount to deliberate indifference.  She says it is not enough to merely

allege that she failed to act to move Galambos or to make his environment more safe.  (Id. at 6-7.)  She says she recognized that there was a concern about the ability to house Galambos at CCJ, but only after his dive off the table on December 8.  (Id. at 7.)  She says she pursued an expedited transfer after she learned that Galambos was thirteenth on the waiting list[28] and had it set up to occur on December 12.  (Id.)  She argues that there is no foundation in fact to conclude that she had any causal role in Galambos's death.  (Id.)  She says she cannot be considered deliberately indifferent because she was "continuously attentive" and did what she could in relation to getting medication to Galambos when he requested it and seeking Dr. Corona's involvement when it was called for.  (Id. at 8.)  She, too, requests qualified immunity as an alternative basis for summary judgment in her favor.  (Id. at 8-9.)

In her response, Cady starts with the observation that Williams does not contest the fact that she knew that Galambos had a serious medical need, which is a fair assessment.  (Response to Williams Motion at 2, ECF No. 119.)  On the question of deliberate indifference, Cady says that it was not enough to take steps toward a transfer on December 9 because there had already been two suicide attempts.  (Id. at 3.)  Her view is that Williams recognized a suicide risk and failed to make a thorough or adequate assessment of the danger involved.  (Id. at 4.)  Cady relies on her expert's assessment of gross inadequacies in Williams's evaluative methods.  (Id. at 4-5.)  Cady explains that Williams knew of Galambos's history of suicide attempts, knew he had threatened to kill himself, knew he had been off his medications, and yet credited Galambos's statement that he was just kidding.  (Id. at 6.)  Cady describes Williams as being "cavalier" toward such a grave risk, without even calling for a suicide watch prior to the December 2 attempted suicide.  (Id. at 6-7.)  Cady also faults Williams for not pursuing a transfer sooner,

---

[28]     The facts could support a finding that Williams undertook these additional measures only after the December 10 incident, not as soon as she learned there would be a delay in the transfer.

even though she assessed that Galambos could not have a coherent thought and was standing on the table talking to the wall by December 6.  (Id. at 7.)

It is conceivable that Williams could be viewed as a more sympathetic defendant than the other Corizon defendants.  Her position and duties gave her a front seat to Galambos's evolving psychosis under circumstances in which Trueworthy, the only daily-present person with authority to manage medications, had cut off all medications, and Walsh, with management-level authority,[29] pressured nurses not to make referrals for emergency services even if they thought their credentials were on the line.  However, Williams has presented a united front with the other defendants and has not even suggested that she questioned anyone else concerning Galambos's treatment at CCJ or advocated for a different approach.

Ultimately, the record concerning Williams is sufficient to permit a reasonable finder of fact to conclude, based on the evidence and permissible inferences therefrom, that Williams knew or should have known that Galambos's psychotic condition reflected an extremely serious medical need that generated a substantial risk of serious harm to his health and safety;  that Williams was the closest thing to a counselor or advocate that Galambos had in the prison;  that she knew that Galambos was gradually regressing into psychosis because of an irrational refusal to take medication;  that she agreed with the failure to intervene to force medication;  that the need for either forced medication or an emergency transfer to a psychiatric facility was evident prior to Galambos's jump from the table on December 8;  that the December 8 jump from the table deserved an emergency response by both physical and mental health practitioners;  that the December 8 jump, at the latest, demonstrated a need to change the permissive approach to

---

[29]     I understand that the Corizon defendants would not describe Walsh as Williams's supervisor, but it remains a fair inference that Walsh's statements reflect the climate within Corizon's ranks at CCJ.  Note that the stipulations indicate that Walsh was consulted and concurred in the decision to pursue a transfer to Riverview as of December 9. (Stipulations ¶¶ 166-67.)  If her authority did not extend to mental health matters, it is strange that she would be consulted concerning a transfer to a psychiatric hospital.

Galambos's refusal to take medication;  that the failure to send Galambos out on December 8 likely related to the fact that he had been sent out on December 2 for the pencil wound and supervisory pressure discouraging send-outs;  that the December 10 incident was a foreseeable consequence of the earlier failures in treatment;  that these acts or omissions reflect deliberate indifference that satisfies both the subjective and objective standards;  and that the deliberate indifference was a substantial factor in bringing about Galambos's rapid regression, decompensation, and death.[30]

The arguments in Williams's reply memorandum do not support a contrary conclusion. Although Williams did something or assessed something at each new stage of Galambos's slide into psychosis (Williams Reply at 1-2, ECF No. 143), it does not follow that she is insulated from liability on that basis.  Nor is it appropriate at summary judgment for Williams to expect the court to view the pencil stab incident as superficial or a mere gesture, let alone to color the entire course of events based on an evaluation of the significance of that one incident.  (Id. at 2.) That event, which a reasonable finder of fact could regard as a serious suicide attempt, occurred more than a week before Galambos's death and the change in medication recommendation did not change the fact that Galambos continued to reject medication and continued to slide deeper into psychosis.  While it is true that Williams is not responsible for Galambos's refusal to take his medications or for the existence of a table in his cell (id. at 3), what is of concern here is the nature of her response in light of these and other facts known to her at the time.  One possible finding on this record is that Williams's acts and omissions demonstrated deliberate indifference to serious medical needs and a substantial risk of serious harm.

---

[30]       Cady argues that it was a constitutional injury to allow Galambos to slip into and remain for days in a psychotic state and that death is not required to establish a constitutional deprivation involving medical care.  This is a legitimate point.  Denial of medical care is sufficient if it amounts to deliberate indifference concerning a substantial risk of serious harm or serious medical needs.  Coscia, 659 F.3d at 39;  Feeney, 464 F.3d at 161.

### 5.     *Qualified immunity*

All of the individual Corizon defendants argue that they are entitled to qualified

immunity because the conduct that underlies this action "cannot be seriously argued as violating

any clearly established constitutional rights of the Plaintiff."  (Trueworthy Motion at 14;  Walsh

Motion at 8 (adopting Trueworthy's argument);  Williams Motion at 8 (adopting Trueworthy

argument).)[31]  As Trueworthy's motion acknowledges, there is a preliminary issue whether

employees of private corporations performing state functions are entitled to the protections of the

qualified immunity doctrine.  Based on the Supreme Court's holding in Richardson v. McKnight,

521 U.S. 299 (1997), I believe that these defendants are not protected by the doctrine of qualified

immunity.  However, there is contrary First Circuit precedent that predates Richardson, so I have

also included an alternative recommendation that assumes that these defendants are entitled to

qualified immunity.

In Richardson v. McKnight, 521 U.S. 399 (1997), the Supreme Court held that prison

guards employed by a private company were not entitled to qualified immunity against section

1983 actions brought by prisoners.  Id. at 401.  To arrive at this holding the Court considered

both common law tradition and special policy concerns related to suing government officials.  Id.

at 404 (discussing a legal framework established in Wyatt v. Cole, 504 U.S. 158 (1992)).  The

Court observed that "history does *not* reveal a 'firmly rooted' tradition of immunity applicable to

privately employed prison guards," id., even though history does reveal instances of privately

operated prisons and heavy involvement by private contractors in prison management, id. at 405.

Here, the Corizon defendants have made no attempt to address common law antecedents related

---

[31]     Williams also makes an argument about there being no clearly established right to a "padded prison cell."  I
have not analyzed this case narrowly in terms of a need for padding in a jail cell, but in terms of whether there is a
sufficient factual basis to establish deliberate indifference to a serious medical need or substantial risk of serious
harm.

to immunity for private jail operators in connection with decisions related to medical needs. Instead, they suggest that "an analysis based on historical antecedents" will only lead to "incongruous results."  (Trueworthy Motion at 13 n.5 (citing McCullum v. Tepe, 693 F.3d 696 (6th Cir. 2012) as an exemplar of incongruity).)[32]

As for policy concerns, the Supreme Court reiterated that qualified immunity protects the public interest because talented candidates for public office will not be deterred from seeking or remaining in public office by the threat of damages suits.  Id. at 407-408.  The Court concluded in Richardson that quite unlike government agencies, private jailers are driven by "competitive market pressures" that motivate them to seek a middle ground between being "too aggressive" and facing damages actions versus being "too timid" and facing replacement by other companies that are more safe and effectual.  Id. at 409-410.  Given that private employees operate in this "*different* system," the Court reasoned that there is no "*special* immunity-related need to encourage vigorous performance."  Id. at 410-11 (emphasis in original).  The Court discussed additional factors as well, but the gist of its policy assessment suggests that there is an uphill battle for the Corizon defendants.  The Court narrowed the context of its holding with language that further challenges the Corizon defendants because it seems to adequately describe Corizon itself:

> That context is one in which a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms.

Id. at 413.

---

[32]      I do not mean to suggest that the defendants be faulted for failing to find common law cases involving psychotropic medications, but I suspect there are common law cases addressed to private jailers denying medical intervention.  I decline to shoulder this research burden for them.

The defendants argue that Corizon's relationship to CCJ is different from the relationship that the private jailer had to the State of Tennessee in Richardson v. McKnight. This is a fair statement because the State of Maine has not privatized corrections to the extent that Tennessee has, there are county policy makers involved in the operation of CCJ, the Corizon defendants work alongside county-employed correctional officers, and there is consultation and collaboration between Corizon and the County on operational and financial matters.[33] However, I am not persuaded that these differences justify extending the doctrine of qualified immunity to Corizon's employees because there has been no showing that this result is supported by legal tradition and because it appears that private market forces will influence Corizon as much as they do other private companies serving this market. See, e.g., Cook v. Martin, 148 Fed. Appx. 327, 339-42 (6th Cir. 2005) (not recommended for full-text publication) (collecting cases). Nothing in Filarsky v. Delia, 132 S. Ct. 1657 (2012) (extending qualified immunity to a private attorney specially retained by the government to assist with an investigation), or Burke v. Town of Walpole, 405 F.3d 66 (1st Cir. 2005) (extending qualified immunity to physicians on contract with the state to perform forensic investigative services), cited by defendants, contradicts this assessment.

The facts demonstrate a relationship between the government and the private service provider that is much more like the relationship in Richardson v. McKnight. Cumberland County has contracted with Corizon to assume the day-to-day responsibility of managing the delivery of medical care in CCJ and Corizon has undertaken that task for profit. Pursuant to the contract, Corizon has insured itself against prisoner claims. (Health Services Agreement ¶ 14, ECF No. 92.) There is governmental oversight, but Cumberland County's policy-makers and jail

---

[33]    The Corizon defendants included a number of statements addressed to these differences in paragraphs one through fourteen of their statement of material facts, not all of which are incorporated into this recommended decision.

administrator do not oversee or direct the day-to-day provision of medical care by Corizon employees.  Additionally, Corizon has developed its own policies and procedures concerning the provision of medical services.  Given these factors and the defendants' failure to identify a tradition of immunity in this context, I conclude that qualified immunity is not available to the individual Corizon defendants.

Notwithstanding this conclusion, the court needs to be aware of a case not cited by the individual Corizon defendants,  Frazier v. Bailey, 957 F.2d 920 (1st Cir. 1992).  The First Circuit decided Frazier prior to the Supreme Court's decisions in Richardson and Wyatt, and held that a privately employed social worker who conducted child abuse counseling was entitled to qualified immunity because her employer was "under contract to perform the duties statutorily required of the state," the idea being that she was "compelled" to perform this function and therefore deserved qualified immunity for being the "functional equivalent" of a state actor.  Id. at 928-29 (citing DeVargas v. Mason & Hanger-Silas Mason Co., 844 F.2d 714, 721-22 (10th Cir. 1988)).  Adherence to Frazier would call for application of the qualified immunity standard because the Corizon defendants were under contract to perform duties statutorily assigned to the state.

Richardson would appear to supplant Frazier because it prescribes a different test than the "functional equivalence" standard stated in Frazier.  Additionally, Richardson is more closely on point because Frazier concerned a private party conducting child abuse counseling or investigations, whereas Richardson concerned private parties providing the state with jail services, as is the case here.  Unfortunately, although the First Circuit has cited Frazier subsequent to Richardson, it has not done so in support of giving qualified immunity to private actors and has never discussed Richardson (or Wyatt) in the context of giving qualified immunity to private actors.

Despite my reservations about the binding force of <u>Frazier</u>, "[u]ntil a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority." <u>Eulitt v. Me. Dep't of Educ.</u>, 386 F.3d 344, 349 (1st Cir. 2004). This court may ultimately decide that Frazier is "unmistakably cast into disrepute," but for purposes of providing a complete recommendation, qualified immunity is considered here.

Qualified immunity protects government actors "who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct." <u>Camilo-Robles v. Zapata</u>, 175 F.3d 41, 43 (1st Cir. 1999). With respect to the extent of the protection conferred by the doctrine of qualified immunity, it has been said that "the doctrine of qualified immunity leaves 'ample room for mistaken judgments' and protects 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Berthiaume v. Caron</u>, 142 F.3d 12, 15 (1st Cir. 1998) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1st Cir. 1986)).

The qualified immunity inquiry has two parts. First, the court must decide whether the plaintiff has made out a violation of a constitutional right and, second, whether the right was clearly established at the time of the violation. <u>Drumgold v. Callahan</u>, 707 F.3d 28, 42 (1st Cir. 2013). The "clearly established" inquiry "has two aspects." <u>Id.</u> One "focuses on the clarity of the law at the time of the violation" and the other "focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights." <u>Id.</u>

The plaintiff has made out the necessary underlying violations. Moreover, it has long been clearly established that deliberate indifference to a prisoner's serious medical needs or to a

substantial risk of serious harm amounts to a constitutional violation.  For the same reasons I

have itemized in support of a finding of deliberate indifference (viewing the record in the light

most favorable to the plaintiff and drawing all reasonable factual inferences in favor of the

plaintiff), a reasonable person in the shoes of the individual Corizon defendants would have

understood that his or her conduct violated Galambos's constitutional rights.

### 6.      *Corizon, Inc.'s Motion (ECF No. 103)*

Corizon maintains that Cady's claims against it "are largely based on respondeat

superior."  (Corizon Motion at 15.)  It says there is no failure to hire, train, or supervise claim

against it and that the only basis for entity liability is, therefore, policy, custom, or practice.  (<u>Id.</u>

at 16.)  Corizon otherwise argues that all of its policies are based on national standards.  (<u>Id.</u> at

18.)

> Cady says that Corizon's policies and customs caused:
>
> (1) a prolonged failure and refusal to provide necessary medication and medical
> and mental health treatment to Mr. Galambos;  (2) inadequate monitoring and
> grossly inadequate response to Mr. Galambos's developing and emergent
> psychotic conditions during his incarceration;  and (3) the unwillingness of many
> clinical staff to provide emergent evaluation of Mr. Galambos's serious medical
> condition following several obvious medical and mental health emergencies that
> occurred between December 8 and December 12, 2008.

(Response to Corizon Motion at 3, ECF No. 110.)  Cady says she has not waived a failure to

train or supervise claim, but she otherwise agrees that Corizon cannot be liable absent a policy,

custom, or practice analysis.  (<u>Id.</u> at 3-5, citing <u>Monell</u>, 436 U.S. at 691.)  Cady says she does not

take issue with Corizon's policies as they are written, but states that there is a practice of

systemic problems in implementing the written policies.  (<u>Id.</u> at 6 n.5.)  Otherwise, relying on

<u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483 (1986) (plurality opinion), Cady says she can

show a practice in this case based on action by a corporate agent with policymaking authority. (Id. at 5.)

Under Section 1983, municipalities cannot be held liable for constitutional violations perpetrated by municipal employees simply because they are the employers. Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)). Section 1983 claims against a municipal defendant will only be successful under Monell if the entity was responsible for a policy, custom, or practice that caused the violation in question. Id. Assuming that an underlying deprivation is established, proof of a municipal custom or policy claim involves two additional elements:

> First, the custom or practice must be attributable to the municipality, i.e., it must be "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989). Second, the custom must have been the cause of and "the moving force" behind the deprivation of constitutional rights. Id. at 1157.

Miller v. Kennebec Cnty., 219 F.3d 8, 12 (1st Cir. 2000). The first of these additional elements is generally referred to as a "deliberate indifference" element, Young v. City of Providence, 404 F.3d 4, 26 (1st Cir. 2005), but it is also referred to as a "culpability" or "fault" element, Haley v. City of Boston, 657 F.3d 39, 52 (1st Cir. 2011). The second additional element is causation and it requires evidence of a "direct causal link between the policy and the violation." Burrell, 307 F.3d at 10 (internal quotation marks omitted). Together, these additional elements require the plaintiff to "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Bd. of the Cnty. Comm'rs v. Brown, 520 U.S. 397, 402 (1997).

Cady and Corizon agree that the standard for municipal liability applies to Corizon because it was contracted to fulfill a governmental responsibility, so the court need not worry whether private entities like Corizon are appropriately treated as municipal entities under section

61

1983.  See Leavitt v. Corr. Med. Servs., 645 F.3d 484, 504 (1st Cir. 2011) (applying municipal

liability standard to claims against private medical services entity, but treating the issue as

conceded);  Woodward v. Corr. Med. Servs. of Ill., Inc., 368 F.3d 917, 927 (7th Cir. 2004)

(treating corporate entities as municipal entities in the context of section 1983 prison-medical-

care actions).

        Cady advances three claims of municipal liability.  First, she says that Corizon is

responsible for North's decision to immobilize Galambos in the pro-restraint chair and to over-

medicate him on December 10, 2008.  (Response to Corizon Motion at 7-12.)  Second, she

argues that Corizon has a practice of restricting and discouraging emergency send-outs and

refusing individualized medications.  (Id. at 12-18.)  Third, she argues that repeated instances by

clinical staff of ignoring or not responding to serious medical issues and providing grossly

inadequate treatment put Corizon on notice of systemic problems at CCJ.  (Id. at 18-20.)  I am

not persuaded by Cady that Corizon could be held liable solely on the basis of decisions North

made in the specific context of assisting with care or safety interventions on December 10, 2012.

However, I agree with Cady that a genuine issue exists whether this case demonstrates that

Corizon has developed policy, custom, and/or practice within CCJ that made possible the

deliberate indifference reflected in the underlying claims against Trueworthy, Walsh, and

Williams.

        Cady is correct to assert that "[a] plaintiff can establish the existence of an official policy

by . . . showing that the alleged constitutional injury was caused . . . by a person with final

policymaking authority."  Walden v. City of Providence, 596 F.3d 38, 55 (1st Cir. 2010)

(quoting Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008)).  See also Rodriguez-Garcia v.

Miranda-Marin, 610 F.3d 756, 769 (1st Cir. 2010).  Under this precedent, there must be a

showing that "a deliberate choice to follow a course of action [was] made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  Id. (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (plurality opinion)).  See also Brown, 520 U.S. at 405 ("To the extent that we have recognized a cause of action under § 1983 based on a single decision attributable to a municipality, we have done so only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation.").  The plaintiff "bears the burden of showing that, 'through its deliberate conduct, the municipality was the moving force behind the injury alleged.'"  Haley, 657 F.3d at (quoting Brown, 520 U.S. at 404).  In terms of assessing actionable conduct, deliberate indifference remains the standard for assessing a municipality's alleged inaction.  City of Canton v. Harris, 489 U.S. 378, 388-89 (discussing a claim for failure to train municipal employees).  See also St. Louis v. Praprotnik, 485 U.S. 112, 140 (1988) (Brennan, J., concurring) (explaining that "as long as the contested decision is made in an area over which the official . . . could establish a final policy capable of governing future municipal conduct, it is both fair and consistent with the purposes of § 1983 to treat the decision as that of the municipality itself, and to hold it liable for the resulting constitutional deprivation").

North was Corizon's administrator of health services, having supervisory authority with respect to all medical and ancillary services provided at CCJ, and having responsibility for Corizon's contract compliance.  As such, there is nothing untoward about basing corporate liability on constitutional deprivations in which North participated.  The evidence in this case, taken as a whole, permits a finding that Corizon has developed a policy, custom, or practice that resulted in deliberate indifference toward the serious medical need and substantial risk of serious

harm involved in this case.  This conclusion is based on multiple possible findings, including that there were shocking failures to step-up intervention to adequately address Galambos's persistent decline into psychosis and related self-injurious behavior;  that these failures were "systemic" in light of the involvement of Trueworthy, Williams, Walsh, and North[34] in combination;  that there was and is a belief within Corizon that the individual constitutional right to be free from forced medication without due process justifies a prison policy of permitting a psychotic inmate with a history of suicide attempts to refuse medication even as he succumbs to psychosis and determined suicidal behavior;  that there were recent statements from management that tended to have a chilling effect on the exercise of reasonable discretion in relation to emergency send-outs, even in regard to such an extreme case;  that the treatment of the December 8 "swan dive" as a non-emergency disregarded what was obviously a serious medical need;  and an inference that Corizon has a policy of short-staffing based on evidence that CCJ was "chaotically busy" on a day-to-day basis yet was regarded critically by CMS for having too much "casual" overtime. These possible findings are sufficient to demonstrate a policy, custom, or practice that was directly linked to the deprivation in question.

**D.     The County Defendants' Motion (ECF No. 101)**

The claims against the county defendants include the civil rights claims, the "MTCA claims," and the two claims based on Maine's Wrongful Death Statute.  These are addressed in turn.

---

[34]     North's personal knowledge of and involvement in these matters is reasonably inferred from the statements of fact in this case, including the facts that she supervised all medical and mental health staff, including both Walsh and Williams; considered Galambos a significant issue in the facility during December 2008;  and had "direct interaction" with Galambos as she would go "from room to room."  Additionally, Trueworthy's deposition testimony supports a finding that North handed him Galambos's chart on December 1 and requested that he discontinue Galambos's medication order.

### 1. The civil rights claim

The county defendants argue that they are entitled to summary judgment "because there was no constitutional violation and the right in question was not clearly established." (Motion at 9.) They explain that medical personnel made the decision to use the restraint chair out of concern for Galambos's safety and that Galambos was attended to during the approximately one hour and twenty minutes he sat in the restraint chair. They also note that Galambos calmed down while he was in the chair and walked to his next placement under his own power. They say there is no evidence that they "knew of and disregarded an excessive risk to Galambos's health or safety." (Id. at 11.) As for the County itself, the defendants assert that there can be no municipal liability because there was no underlying violation on the part of Moore, Gilpatrick, and Logan and because there is no evidence that any other constitutional injury to Galambos arose as a result of a county custom or policy or from a widespread and pervasive pattern of conduct of which its decision-makers should have known. (Motion at 12-13.)

I discuss the more broad-based claim against the County first, before turning to the more focused issue related to use of the restraint chair. For reasons that follow, I conclude that summary judgment for the county defendants is appropriate on the civil rights claims because the evidence does not support a finding that Galambos was subjected to a constitutional violation as the result of a county policy, custom, or practice of deliberate indifference and because the use of the restraint chair on December 10 was not an act of deliberate indifference on the part of Moore, Gilpatrick, or Logan.

### a. Deliberate indifference and municipal liability

For the deliberate indifference standard, see section C.1, above. For the municipal liability standard under section 1983, see section C.6, above.

b.      *Claim against the County*[35]

Insofar as the county defendants are concerned, Cady describes Galambos's violated right

as the rights of a pretrial detainee to be provided with basic human needs, which Cady says

includes the right to be subjected to conditions of confinement that are reasonably related to a

legitimate governmental interest.  (Pl.'s Opposition to County Defendants' Motion at 3-4, ECF

No. 113.)  Cady states:

> The Suicide Watch conditions of solitary confinement at CCJ to which Galambos
> was subjected denied him his right to therapeutic medical and mental health
> treatments from 12/2-12/12/08 in a psychiatric hospital.  He was denied his right
> to be free from the harsh conditions of his cells which he used to physically harm
> himself on several occasions.  He was denied his right to timely intervention of
> his emergency contact and his lawyer.  He was denied his right to be free of CCJ
> custody on 12/11/08 in light of the Court's determination, with an amended bail
> order, that he was no longer safe in the custody of CCJ.

(Opposition at 5.)  This set of assertions involves decisions related to medical care that were

made by individuals other than Moore, Gilpatrick, and Logan.  As far as those three state actors

are concerned, the record does not support an inference that they are responsible for any of the

violations alleged in this block quote.

Cady's operative pleading, fairly construed, does advance this broad claim of county

liability against the County itself (though Cady named CCJ as the defendant).  The county

defendants have anticipated a need to defend against such a claim and have not insisted that

Cady has abandoned a deliberate indifference claim against the County based on the entire

course of medical treatment provided by Corizon.  (See, e.g., County Defendants' Motion at 13

n.6, ECF No. 101.)

---

[35]      Cady does not have a claim against the jail administrator.  Instead, Cady filed a claim against "the
Cumberland County Jail."  Cady eventually sought to add Francine Breton as a defendant, but not until well after the
deadline for amendment of the pleadings and her motion to amend was denied for want of good cause to explain her
tardy filing.  (Order on Motion to Amend, ECF No. 86.)  At the Rule 56(h) conference, counsel for the county
defendants did not object to letting Cady substitute Cumberland County in place of the Cumberland County Jail, and
I have assumed that the substitution was effectuated even though Cady did not file a motion for substitution of
parties as she was instructed.

Cady attempts to support her claim against the County by referencing conduct on the part of Jail Administrator Francine Breton.  Cady asserts that Breton knew of Galambos's incapacity, the danger he presented to himself since at least December 8, 2008, and the fact that personnel within the jail had proved unable to prevent Galambos from harming himself.  Cady complains that Breton, despite her knowledge, allowed Galambos to return to a cell on suicide watch after his discharge from Maine Medical Center.  (Id. at 15-16.)  Cady maintains that the "series of failures" related to Galambos's care put jail administration on notice that medical and correctional staff were not capable of keeping Galambos safe in the jail setting.  (Opposition at 17-20.)

The stipulations support a finding that Breton, as of December 11, had knowledge of the difficulty jail personnel were having in relation to protecting Galambos from self-inflicted injury.  On this issue the parties stipulate that Walsh spoke with Breton to arrange one-to-one supervision for Galambos upon his return from Maine Medical Center and that North informed Breton that Galambos was a cause of concern and that there was an effort underway to obtain a transfer to the Riverview Psychiatric Center.  (Id. ¶¶ 28, 230.)  There is otherwise no evidentiary development of what Breton's understanding was or what her actual opinion or counsel was in the context of this particular predicament.  There is only argument asserting that Breton had it in her power to readily solve the problem but turned her back on Galambos out of indifference to his safety.  (Opposition at 16.)  Cady asserts that Breton should have contacted Galambos's emergency contact (his mother) so that she might arrange for a different placement outside of the jail or should have requested for Galambos to remain at Maine Medical Center, or Spring Harbor, or another medical facility.  (Id.)  Cady says that an alternative placement did not occur pending transfer to Riverview because of a policy of avoiding the costs and staffing problems

that arise from emergency send-outs to outside medical institutions.  (Id.)  She labels this an "unconstitutional send-out restriction" and says it was a "mandate" from CCJ administration that rose to the level of a custom or policy.  (Id. at 17.)

While it can be said that decisions related to the provision of medical care to Galambos contributed to his decompensation and that, as a result of his decompensation, Cumberland County was no longer a suitable custodian of his person, the evidence does not support a finding that there was a well-settled and widespread history of an inability to keep patients like Galambos safe such that a finder of fact could infer that Cumberland County knew that those in charge of CCJ would fail in their duties when it came to a suicidal and psychotic inmate.  The residual question is whether Cady has raised a genuine issue that someone serving the county's interest who had final policy-making authority within the jail engaged in or failed to engage in specific conduct that caused constitutional injury to Cady.  The person that Cady points to is Major Francine Breton, administrator of the jail.

As discussed previously in connection with the claim against Corizon, Cady is correct that she can establish municipal liability by showing that a final policymaking person caused a constitutional injury to Galambos.  Walden, 596 F.3d at 55.  This requires a showing that the individual in question made "a deliberate choice to follow a course of action" that caused the injury.  Id. (quoting Pembaur, 475 U.S. at 483).

Whether Breton has the requisite level of specific policymaking authority presents a question of state law.   Id. at 56.  The court's "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law."  McMillian v. Monroe Cnty., 520 U.S. 781, 786 (1997).  Maine law states that county sheriffs have "the custody and charge of the county jail and

of all prisoners in that jail and shall keep it in person, or by a deputy as jailer, master or keeper." 30-A M.R.S. § 1501. The Maine Board of Corrections also has oversight and one of the reasons for its existence is to "develop and implement a coordinated correctional system that . . . ensures the safety and security of . . . inmates." 34-A M.R.S. § 1801(1). The Board is assigned the additional duty to "adopt treatment standards and policies," including "standards for the treatment of inmates with mental illness within the correctional facilities and county jails, and in consultation with the State Forensic Service." Id. § 1803(3)(B). Maine law further states that sheriffs have duties in support of the State Board of Corrections, including the duty to "recommend a plan for the placement, housing and program development for inmates with mental illness in accordance with standards accepted by the board." 30-A M.R.S. § 406(4). In this case, the county defendants have offered a statement that the Sheriff of Cumberland County has final decision making authority with respect to all policy and operational matters at the Cumberland County Jail. Cady has merely responded that the Sheriff has "delegated certain responsibilities" to the jail administrator. (Statement ¶ 1.)

Maine law and the facts presented by the parties do not support a finding that county jail administrators have "final policy-making authority" for jail matters.[36] On this record, the proper conclusion is that Francine Breton, as jail administrator, lacked the authority to establish a final policy governing future municipal conduct in relation to inmates with mental health disorders. Praprotnik, 485 U.S. at 140 (1988) (Brennan, J., concurring) (explaining that "as long as the contested decision is made in an area over which the official . . . could establish a final policy capable of governing future municipal conduct, it is both fair and consistent with the purposes of § 1983 to treat the decision as that of the municipality itself, and to hold it liable for the resulting

---

[36] Neither party noted this fact, but the policies attached to the stipulated statement of facts all bear a signature line for the sheriff, not for the jail administrator.

constitutional deprivation").  Consequently, it is not appropriate to hold the County liable for a failure of oversight on the part of Breton based on a theory that her supervisory failures automatically amount to county policy.  See id.

Additionally, the evidence presented in the summary judgment statements does not establish that Breton made a deliberate choice to require or withhold any particular treatment for Galambos.  Policy F-310 provides that "all . . . matters involving medical judgment are the sole province of the responsible physician."  Policy F-320 provides that "all psychiatric matters involving medical judgment are the sole province of the responsible psychiatrist."  Breton did not countermand these policies, modify them in any way, or insert herself into a "sole province" reserved to Corizon's physician or psychiatrist.  Instead, the evidence reflects at most that on December 11 Breton "allowed" Galambos to return to CCJ from the Maine Medical Center after the December 10 incident.  At the time, Breton understood that a transfer to Riverview was to be completed on December 12 and that Galambos would receive one-to-one monitoring at the jail in the interim.  At the time, shortcomings in Galambos's care had already caused the severe injuries that resulted in his death, but the evidence does not support a finding that Breton knew or should have known that Galambos's death was imminent.  Breton's alleged decision to allow Galambos's return did not amount to a county policy or practice of deliberate indifference toward Galambos's serious medical needs.  As much as can be inferred about Breton's subjective fault on this record is that she acquiesced in Galambos's return knowing that someone in Galambos's condition did not belong in the jail but that steps had been taken to remove Galambos from the jail setting in the very near future.

Cady also argues that this is a case of "systemic" injury that should be attributable to the County.   Cady says that "CCJ Administration up the line was on notice that something was

amiss in putting injured inmates into a pro-restraint chair." (Opposition at 20.) In connection with this argument Cady cites <u>Owen v. City of Independence</u>, 445 U.S. 622 (1980). (Opposition at 20-21.) <u>Owen</u> holds that municipalities cannot assert qualified immunity based on the good faith of the officers or agents who may have violated a person's constitutional rights. 445 U.S at 638. <u>Owen</u> also demonstrates that municipalities may be held responsible for the isolated, unconstitutional acts of their legislative bodies. <u>Praprotnik</u>, 485 U.S. at 138 (Brennan, J., concurring). This case is unlike <u>Owen</u> because Breton is a supervisory officer serving in an executive capacity.

Cady additionally cites <u>Fairley v. Luman</u>, 281 F.3d 913 (9th Cir. 2002). In <u>Fairley</u>, the Ninth Circuit held that a verdict against the City of Long Beach on a <u>Monell</u> claim would stand even though the jury exonerated the individual officers of the underlying constitutional violation. The assessment was that the plaintiff had been permitted to languish too long in prison without any investigation into his repeated assertions that the arrest warrant applied to his brother and not to him. 281 F.3d at 915, 918. The Court concluded that the facts were sufficient to support a finding that the city's failure to attend to the issue in a timely fashion amounted to a policy of inaction even though the jury did not find any of the officer-defendants liable for a constitutional violation. <u>Id.</u> at 918.[37] Although <u>Fairley</u> is persuasive precedent supporting my recommendation concerning the claim against Corizon, as far as the County is concerned the policy and causation analysis is different. Breton's knowledge and opportunity to intervene—so far as the evidence suggests—was restricted to the December 11 through December 12 timeframe, when a

---

[37]      Cady also cites <u>Hopkins v. Andaya</u>, 958 F.2d 881 (9th Cir. 1992). In <u>Hopkins</u>, the Ninth Circuit concluded that the City of Oakland could be liable in connection with an officer's use of excessive force where the evidence showed that the officer in question had a history of citizen complaints of excessive force, a reputation for being hot-headed, and a history of several incidents of inappropriate use of a firearm. <u>Id.</u> at 884, 888. The basis for this holding was that the evidence supported a finding of "improper training or improper procedure" for allowing the officer to patrol with a weapon. <u>Id.</u> at 888. Cady's claim against Cumberland County is not comparable to the municipal claim in <u>Hopkins</u>.

resolution, a transfer to Riverview Psychiatric Hospital on December 12, was at hand.  These circumstances do not support an inference that a county policy, custom, or practice was the moving force behind the alleged injury.  Although it is true that the County's administrators made it known to in-jail care providers (in communications not specifically associated with Galambos's care) that significant costs and logistical problems arise from frequent emergency send-outs, there is no evidence of a policy preventing send-outs (Galambos himself was sent out twice), much less a policy preventing send-outs in extreme cases like Galambos's.

Finally, Cady contends that the County is liable for the use of the pro-restraint chair on December 10 because of Lt. Moore's participation.  However, there is no underlying constitutional deprivation when this incident is viewed from the perspective of the individual county defendants.  Even if there were, there is no evidence of a county policy, custom, or practice that gave rise to the harm in question.[38]  This claim is discussed in the following section.

### c.    Claim against the individual officers

Cady's civil rights claims are leveled against Moore, Gilpatrick, and Logan for their participation in placing Galambos in the pro-restraint chair on December 10.  The facts reflect that these officers arrived on the scene after Galambos had fallen to the floor and that they complied with instructions of Diane North and Barbara Walsh to escort Galambos to the medical department's pro-restraint chair and to secure Galambos there.  They complied and Galambos went to the chair under his own power and did not struggle or resist.  Cady has established that Moore knew at the time that Galambos had performed a flip from his cell table to the concrete floor.  Cady's position is that Moore had the authority to countermand North's and Walsh's instructions and that he should have known better than to allow Galambos to be strapped into the

---

[38]     Cady has not demonstrated that the failure of a particular county officer to notify her of her son's difficulties rose to the level of a constitutional deprivation or otherwise violated Galambos's federal rights.  I have not addressed the claim further because Cady has not offered any legal analysis or support for such a claim.

chair because no reasonable person could have thought Galambos presented a danger to himself at the time.  (Opposition at 7-8.)   Because Moore was the supervisor on duty at the time, Cady also contends that Moore's act was a policy-making act that is sufficient to impose liability on Cumberland County as well.  (Id. at 8.)  Cady also contends that Moore has supervisory liability because he directed Gilpatrick and Logan to secure Galambos in the chair and they complied. (Id.)

According to Cady, given Galambos's injured appearance, "it was contrary to basic standards of humane treatment to go ahead with the order of Lt. Moore," and the officers "each disregarded the obvious immediate risk of severe pain and exacerbation of the injuries they could see on Galambos's naked body."  (Id. at 9.)  In this vein she states:

> Logan and Gilpatrick were knowingly inflicting significant pain to Galambos while strapping him to the Chair, which he manifested by yelling and which was obvious from the multitude of injuries on his body.  Although Plaintiff makes no claim that they did so with an intention or purpose to inflict pain, the result was all the same for Galambos.

(Id. at 10.)  Cady says that it would have been "obvious to anyone" that "Galambos was extremely mentally ill and in poor physical condition, with among other things, a head wound." (Id. at 11.)  As she sees it:  "There would be little future benefit to him with such a harsh and painful measure of control that would outweigh the significant immediate risks to both his medical and mental health conditions, which all three CCJ defendants involved could plainly see."  Cady maintains that Moore was particularly at fault because he did not overhear either North or Walsh suggest that they have a physician or psychiatrist "evaluate the need or the dangers of the pro-restraint chair for Galambos."  (Id. at 11.)  Even though Moore, Gilpatrick, and Logan are not medical personnel, Cady says they can be liable for deliberate indifference to

a serious medical condition based on reason to believe that medical personnel were mistreating, or not treating, Galambos.  (Id. at 13.)

The evidence Cady has presented against Moore, Gilpatrick, and Logan does not support a finding of deliberate indifference.  Certainly the evidence does not reasonably support an inference that these officers placed Galambos in the restraint chair intending wantonly to inflict pain.  The question then is whether their conduct crossed some lower threshold that might suffice for a finding of deliberate indifference.  Because the evidence does not reasonably support an inference that these defendants knew that temporarily securing Galambos in the restraint chair would complicate Galambos's medical prognosis or exacerbate either his psychotic state or his physical injuries, or that they were wilfully blind to some obvious risk of additional serious injury, I conclude that the deliberate indifference threshold was not crossed by these defendants under the circumstances.

It is beyond dispute that Galambos presented a grave danger to himself, and possibly to others, because he was in an extended psychotic episode.  These individual defendants did not have any readily available means to prevent Galambos from throwing himself to the floor again and it was not deliberately indifferent to his needs to cooperate with a decision to temporarily restrain him so his latest wounds could be attended to and so his medication could take effect without further incident.  Nor is there evidence that these particular defendants bore responsibility for Galambos's mental decompensation.  Nor is it reasonable to find that they would have known the extent of Galambos's internal injuries and therefore would have known that Galambos would suffer serious additional harm from a period of immobilization in the restraint chair.   Because there was no underlying constitutional violation, there is no basis for

supervisory or municipal liability on the part of the County, either.  Wilson v. Town of Mendon,
294 F.3d 1, 6 (1st Cir. 2002).

Should the court disagree with this assessment and conclude that use of the restraint chair
under the circumstances gave rise to a discreet constitutional violation, then my alternative
recommendation would be that these individual officers are entitled to qualified immunity.

There is no evidence to support a finding that Moore, Gilpatrick, and Logan knowingly
violated the law.  Nor were they plainly incompetent.  The objective standard that applies to the
qualified immunity test asks whether "officers of reasonable competence could disagree on th[e]
issue" and, if so, "immunity should be recognized."  Malley v. Briggs, 475 U.S. 335, 341 (1986).
Reasonable minds could differ on the advisability of temporarily using a restraint chair to hold
Galambos following his self-injurious conduct on December 10.  Because it cannot be said that
no reasonable officer would have viewed that course of action as reasonable under the
circumstances, Moore, Gilpatrick, and Logan would be entitled to qualified immunity even if the
use of the restraint chair amounted to a constitutional violation.

In the event the court finds that the use of the restraint chair was a constitutional violation
but that the officers have immunity, Cady maintains that Cumberland County is liable for the
deprivation based on a custom or policy because Lieutenant Moore, in her view, was necessarily
delegated decision-making authority on behalf of the County with respect to use of the pro-
restraint chair on December 10, Moore being the highest ranking officer on the scene (shift
supervisor).  (Opposition at 14-15.)  As I understand this argument, it is another attempt to liken
this case to the Pembaur decision.  For reasons already discussed in the preceding discussion of
municipal liability, I find this position unpersuasive.  Moore was participating in the application
of an existing policy.  He was not establishing policy and did not have the authority to establish

policy in this area.  Cady has acknowledged that the applicable policy governing the use of restraints for medical reasons gave decision-making authority to the medical staff, not to correctional staff.

### 2.    MTCA Immunities and Counts II, IV, and V

The county defendants request judgment on the pleadings in connection with count two, which is captioned "Maine Tort Claims Act."  (Motion at 7.)  The defendants state that Cady failed to specify the tort that the defendants committed and that, therefore, the claim must be dismissed on the basis of the pleadings.  (Id.)  Alternatively, the defendants request summary judgment in their favor based on the immunities available under the Maine Tort Claims Act. (Motion at 16;  Reply at 2-3.)  The defendants assert a parallel challenge to the wrongful death claim in count IV and the conscious pain and suffering claim in count V.  (Motion at 17-20.)  As explained below, the third amended complaint includes allegations that state at least one plausible tort claim against each defendant.  Therefore, the motion for judgment on the pleadings is not dispositive of the tort claims.  However, the summary judgment facts demonstrate that the county defendants are entitled to judgment in their favor based on the immunities available under the Tort Claims Act.

"A Rule 12(c) motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss."  Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008).  The court accepts as true the allegations, views them in the light most favorable to the non-movant, and credits reasonable inferences that can be drawn from them.  Id.  The motion should be granted only if the allegations and reasonable inferences fail to set forth a plausible, non-speculative entitlement to relief.  Collins v. Univ. of N.H., 664 F.3d 8, 13-14 (1st Cir. 2011).

Cady's complaint does appear to lack a clear articulation, element by element, of a state law tort claim.  What Cady alleges is the following:

> 104.  Defendant CCJ and its employees are not entitled to immunity or qualified immunity from suit under the Maine Tort Claims Act as they acted intentionally, negligently, grossly negligently, recklessly, and with deliberate indifference to the welfare and rights of GALAMBOS and thereby did cause GALAMBOS severe personal emotional and bodily injury and death.

> 105.  The actions and omissions of defendant CCJ by and through it employees presently unknown, in withholding pertinent medical information from physicians and nurses at MMC, tortiously interfered with rights of GALAMBOS, were perpetrated in bad faith and thereby such defendants are not immune from suit under the statute.

(Third Amended Complaint at 34-35.)  In opposition to the motion, Cady simply restates that her tort claims are based on acts undertaken "intentionally, negligently, grossly negligently, recklessly, and with deliberate indifference on the part of named and unknown defendants" and that "defenses or immunities . . . would not apply to such circumstances."  (Opposition at 22.)  Cady's position seems to be that if there is a viable claim under section 1983 there must be an analogous state law tort.  Otherwise, Cady asserts that torts were committed in three specific contexts:

> (1) When information was withheld from the medical providers at Maine Medical Center because some unnamed "hospital detail deputies who acted outside any scope of their discretionary employment function in the failure to provide MMC with the accurate factual account of what had occurred to Galambos between 12/08/08 and 12/10/08 under CCJ watch."  (Id.)

> (2) When Moore, Gilpatrick, and Logan placed Galambos in the restraint chair, an act Cady says was "not undertaken pursuant to discretionary function" because Moore merely complied with the request of medical administrative staff and Gilpatrick and Logan merely complied with Moore's instructions.  (Id. at 23.)

> (3) When Cumberland County allegedly destroyed security camera videotape and distorted facts they later provided to investigative agencies to "obfuscate wrongdoing on the part of county staff."  (Id. at 23.)

In their reply the county defendants do not dig much deeper, complaining that Cady has not

sufficiently outlined her torts or how the named defendants committed them, though the county

defendants do tell us that tortious interference requires an act of fraud or intimidation. (Reply at

2, ECF No. 141.) Alternatively, if there is a well-plead tort claim, the county defendants

maintain that they are entitled to summary judgment because of their immunity under the Maine

Tort Claims Act. (Motion at 16; Reply at 2-3.) Each of the three categories specifically

identified by Cady will be addressed in turn. The discussion will also address the remaining

claims for wrongful death and conscious pain and suffering. For reasons that follow, the

plausible tort claims are overcome by the defendants' immunity under the Maine Tort Claims

Act.

> ### a.    Information supplied to MMC concerning Galambos's history

Cady contends that Galambos's custodians provided Maine Medical Center with

inadequate information about Galambos's history when they transferred him for emergency care

on December 10, 2008, most notably because they allegedly did not divulge Cady's dive from

the table on December 8. A review of Cady's fact statement reflects her assertion that Walsh

was the contact person who communicated with those involved at the Maine Medical Center.

(Additional Statement ¶¶ 194-195.)

Of the tort theories actually named by Galambos, the tort of negligence offers the

appropriate legal claim. See Darling v. Augusta Mental Health Institute, 535 A.2d 421, 429 (Me.

1987) (resolving negligence claim over adequacy of suicide prevention measures based on

application of MTCA immunity rules rather than for failure to state a claim). Construed

liberally, Cady's pleading can be read to assert a plausible claim of negligence in connection

with the medical transfer process. However, assuming that a plausible negligence claim is

stated, Cady has done nothing to explain why such a claim would be viable against any of the named county defendants.  Her statement of material facts states that Walsh was the individual who communicated with Maine Medical Center in relation to the transfer.  Walsh is not a county employee, but someone who administered medical services at CCJ for Corizon/CMS.  The pleadings do not state a plausible claim against Moore, Gilpatrick, or Logan for failure to provide information to Maine Medical Center because there is no suggestion that these men participated in the transfer or had any reason to believe that Walsh would not convey adequate information concerning Galambos's history.

    As for the County itself, under the Maine Tort Claims Act "a governmental entity is not liable for any claim which results from . . . [p]erforming or failing to perform a discretionary function or duty, whether or not the discretion is abused and whether or not any statute, charter, ordinance, order, resolution or policy under which the discretionary function or duty is performed is valid or invalid," subject to one exception not applicable here.  14 M.R.S. § 8104-B(3).  This language is a broad grant of immunity to governmental entities, of which Cumberland County is one.  Id. § 8102(2), (3).  Thus, even assuming that the correctional officers who transported and attended to Galambos at the Medical Center abused a discretionary function associated with the communication of information to care providers, that failure would not expose the County to liability.  The only exception would be if the County procures insurance against claims of this nature.  Id. § 8116;  Danforth v. Gottardi, 667 A.2d 847, 848 (Me. 1995) ("A governmental entity otherwise immune from suit waives its immunity to the extent it procures insurance.").  That exception does not apply in this case because Cumberland County has not procured insurance for any tort claim for which the County has immunity under the Maine Tort Claims Act.

### b. Use of restraint chair

Construed liberally, Cady's pleading can be read to assert a plausible claim of negligence against Moore, Gilpatrick, and Logan based on their placement of Galambos in the restraint chair.  Consequently, count two contains a tort claim that runs against the individual county defendants and judgment cannot be based entirely on the pleadings.  The county defendants seek summary judgment, as an alternative, based on an assertion of discretionary function immunity.

The Maine Tort Claim Act provides immunity to employees of governmental entities for "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused;  and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid."  14 M.R.S. § 8111(1)(C).  The purpose of discretionary function immunity is to protect "the 'independence of action' necessary for the effective management of state government."  Darling v. Augusta Mental Health Inst., 535 A.2d 421, 426 (Me. 1987) (quoting Restatement (Second) of Torts § 895D cmt. b (1979)).

In order to qualify for discretionary function immunity, an employee must be acting within the course and scope of employment.  "Conduct that is within the scope of employment is the type of conduct the employee was hired to perform;  occurs within the time and space of the employment;  and is undertaken, at least partially, to serve the employee's master."  Morgan v. Kooistra, 2008 ME 26, ¶ 20, 941 A.2d 447.  Here, Moore, Gilpatrick, and Logan were clearly acting within the scope of their employment when they fastened Galambos into the restraint chair.

To determine whether the conduct of a Maine government employee falls within the discretionary function category, state courts first seek to determine the scope of an employee's

duties.  Hildebrand v. Wash. Cnty. Comm'rs, 2011 ME 132, ¶ 10, 33 A.3d 425, 429.  If a statute

clearly outlines the duties of the employee, state courts make the discretionary function

determination in light of the statute.  Id.  Here, there is no state statute that lists the varied duties

of correctional officers.  Title 30-A merely indicates that the sheriff "has the custody and charge

of the county jail and of all prisoners in that jail" and may appoint subordinates to assist in the

keeping of the jail.  30-A M.R.S. § 1501(1).  Because a statute does not itemize the duties of

correctional officers, the court must resort to the following four-factor test to determine whether

the conduct in question was discretionary in nature:

> (1)  Does the challenged act, omission, or decision necessarily involve a basic
> governmental policy, program or objective?
>
> (2)  Is the questioned act, omission or decision essential to the realization or
> accomplishment of that policy, program, or objective as opposed to one which
> would not change the course or direction of the policy, program, or objective?
>
> (3)  Does the act, omission, or decision require the exercise of basic policy
> evaluation, judgment, and expertise on the part of the governmental agency
> involved?
>
> (4)  Does the governmental agency involved possess the requisite constitutional,
> statutory, or lawful authority and duty to do or make the challenged act, omission,
> or decision?

Darling, 535 A.2d at 426.  "The first, second, and fourth factors help determine whether the

governmental employee was performing or failing to perform an official 'function or duty.'"

Carroll v. City of Portland, 1999 ME 131, ¶ 7, 736 A.2d 279, 283.  "The third factor helps

determine whether that function or duty was 'discretionary' in nature, as opposed to merely

'ministerial.'"  Id.

Here, the answer to each of the four factors is yes.  The decision to place Galambos in the

restrain chair necessarily involved a basic governmental policy, including the application of

established policies (CCJ Policy D-244, Procedure B, ECF No. 89-9, and CMS Policy J-I-01.01,

ECF No. 94-27).  The policies in question authorized use of the chair in a mental health context in the interest of inmate safety.  The decision to restrain Galambos was essential to the realization or accomplishment of the policies, just as a decision not to use the restraint chair would have been.  The scenario called upon Moore (and North and Walsh) to make a policy evaluation and exercise judgment about how to proceed.  Lastly, Moore and his subordinate officers were carrying out a lawful statutory duty associated with the operation of a county jail.  The Maine Supreme Judicial Court has agreed that "the management and care of prisoners is a discretionary function."  Roberts v. State, 1999 ME 89, ¶ 9, 731 A.2d 855, 857 (quoting Erskine v. Comm'r of Corr., 682 A.2d 681, 686 (Me. 1996) (citing Ellis v. Meade, 887 F. Supp. 324, 331 (D. Me. 1995)).

The immunity that attends discretionary acts applies even if the discretion is abused.  Hildebrand v. Wash. Cnty. Comm'rs, 2011 ME 132, ¶ 9, 33 A.3d 425, 429.  "However, immunity is lost when the conduct so clearly exceeds the scope of an employee's authority that the employee cannot have been acting in his official capacity."  Id.  Moore's decision did not exceed the scope of Moore's authority.  Policy D-244 squarely put the burden on his shoulders because he was the shift supervisor when the issue presented.  In this case there is no evidentiary basis from which a finder of fact could reasonably conclude that Moore acted in a way that clearly exceeded the scope of his lawful authority so as to transform his decision into something other than an official-capacity act.  Cady acknowledges that Moore (and Gilpatrick and Logan) did not intend to cause harm.  (Opposition at 10 ("Although Plaintiff makes no claim that they did so with an intention or purpose to inflict pain, the result was all the same for Galambos.").)  Instead, her position is that they would have been aware that Galambos had experienced injuries

recently, would experience pain as a consequence of any restraint, and that they therefore

engaged in "intentional mistreatment."  (Id. at 10-11.)

      Because Moore performed a discretionary function when he authorized the placement of

Galambos in the restraint chair, he has immunity even if there is a genuine issue of fact about

abuse of discretion.  14 M.R.S. § 8111(1)(C).  My review of Maine decisional law has not turned

up a case clarifying whether subordinate officers who carry out an order associated with a

superior's discretionary function are likewise immunized under the discretionary function

immunity category.  The evidence reflects that Gilpatrick and Logan followed Moore's order

when they secured Galambos in the restraint chair and the Maine Supreme Judicial Court has

held that acts carried out pursuant to the order of another are ministerial in nature.  Kane v.

Anderson, 509 A.2d 656, 657 (Me. 1986) (holding that the execution of a search warrant is a

ministerial act).  However, the holding of Kane was superseded by amendment of 14 M.R.S. §

8111(1), as stated in Fulton v. Town of Rumford, No. 95-173-P-H, 1996 U.S. Dist. Lexis 3064,

at *2, 1996 WL 118278, at *1 (D. Me. Feb. 16, 1996)).  The amendatory language is as follows:

> The absolute immunity provided by paragraph C shall be applicable whenever a
> discretionary act is reasonably encompassed by the duties of the governmental
> employee in question, regardless of whether the exercise of discretion is
> specifically authorized by statute, charter, ordinance, order, resolution, rule or
> resolve and shall be available to all governmental employees . . . who are required
> to exercise judgment or discretion in performing their official duties.

Id. § 8111(1) (emphasis added).  Based on this language and also based on the Maine Supreme

Judicial Court's conclusion that decisions related to the management and care of prisoners are

discretionary in nature, Roberts, 1999 ME 89, ¶ 9, 731 A.2d at 857, Gilpatrick and Logan are

entitled to share in the discretionary function immunity that arises in light of Lt. Moore's

discretionary decision to put Galambos in the restraint chair.  Gilpatrick and Logan are routinely

required to exercise judgment or discretion in the handling of prison inmates and they had the authority to place Galambos in the restraint chair based on Lt. Moore's discretionary call.

Cady's final challenge is that the court should not recognize discretionary function immunity in this case because Moore's testimony suggests that he relied on the judgment of North and Walsh and therefore failed to exercise independent judgment concerning the presence of a safety risk.  (Opposition at 23.)  This argument is unpersuasive.  Moore exercised a discretionary function when he directed Gilpatrick and Logan to put Galambos in the restraint chair.  The fact that he based his decision on the views expressed to him by North and Walsh does not make his decision other than an exercise of discretion.  "A *discretionary* act requires judgment or choice, whereas a *ministerial* act is mandatory and requires no personal judgment or choice."  Carroll v. City of Portland, 1999 ME 31, ¶ 9, 736 A.2d 279, 283.  There was nothing ministerial about the decision Moore faced.  Moore was presented with a choice concerning the use of the restraint chair because the policy gave him that responsibility as shift supervisor and he chose to exercise his authority in the manner requested by North and Walsh.  Cady has not cited authority for the proposition that the law deems a discretionary decision ministerial whenever the decision-maker bases his or her decision on the advice or recommendation of another.  Many discretionary calls depend on the representations and advice of others.[39]

       *c.    Spoliation of evidence*

Both this court and the Maine Superior Court have noted that the Maine Supreme Judicial Court has never recognized spoliation of evidence as an actionable tort.  Gagne v. D. E. Jonsen,

---

[39]      The defendants have also raised "intentional act immunity."  (Motion at 18.)  The Tort Claims Act provides that employees of governmental entities also have immunity from personal civil liability for "[a]ny intentional act or omission within the course and scope of employment," provided that the actions in question were not performed in bad faith.  14 M.R.S. § 8111(1)(E).  The act of restraining Galambos was in the course and scope of employment and was intentional, and the evidence does not reasonably support a finding that the officers acted in bad faith, such as with an intent to cause harm or for some ulterior purpose.

Inc., 298 F. Supp. 2d 145, 147 (D. Me. 2003);  Santiago v. Adamen, No. CV-08-457, 2009 Me.

Super. Lexis 45, at *10, 2009 WL 1747876 (Me. Sup. Ct. Mar. 11, 2009).  My research has not

uncovered any change in Maine law and Cady has not attempted to advance this claim with more

than conclusory language.  Even if the claim were viable, Cady has not attempted to identify an

exception to governmental entity immunity in the Maine Tort Claims Act.  Thus, this claim

could not proceed against the County in any event.

d.      *Wrongful death and conscious pain and suffering*

In her fourth and fifth counts, Cady alleges that the defendants caused Galambos's death

following a period of conscious pain and suffering "jointly, severally, individually, and in their

representative capacities by their wrongful, intentional, negligent, grossly negligent and/or

reckless actions and omissions."  (Third Am. Complaint ¶¶ 110, 113.)  Claims under the

Wrongful Death Statute, 18-A M.R.S. § 2-804, "depend[] on an independent cause of action to

exist under the law."  Jackson v. Town of Waldoboro, 751 F. Supp. 2d 263, 276 n.13 (D. Me.

2010);  see also Shaw v. Jendzejec, 1998 ME 208, 717 A.2d 367, 369 ("The wrongful death

cause of action [is] dependent on a cause of action that the deceased would have possessed had

death not ensued [and] is a separate and distinct cause of action that statutorily is granted to the

deceased's family members or heirs.").

This discussion assumes that Cady's allegations set forth plausible claims that

Galambos's death and suffering were the result of negligent acts and that judgment on the

pleadings is not appropriate.  However, like the tort claims already considered, Cady's tort

claims under the Wrongful Death Statute are subject to the Maine Tort Claims Act's immunity

provisions.  Jackson, 751 F. Supp. 2d at 276;  Brooks v. Augusta Mental Health Inst., 606 A.2d

789, 790 (Me. 1992) (affirming dismissal of claims for wrongful death and conscious pain and

85

suffering based on immunity provisions of the MTCA).  Even if the court concludes that it would

be reasonable for a jury to find that someone in the County's employ abused his or her discretion

in relation to Galambos's care and safety and that this person's acts or omissions contributed to

Galambos's suffering and death, Maine law provides that the County is immune from liability on

such a claim.  14 M.R.S. § 8104-B(3).  As for the remaining county defendants, the only theory

of liability relates to their placement of Galambos in the restraint chair and Maine law provides

them discretionary function immunity under the circumstances.

CONCLUSION

For the reasons set forth in the foregoing discussion, I recommend that the court grant the

county defendants' motion for summary judgment (ECF No. 101) against all counts in the

complaint and deny the Corizon defendants' motions for summary judgment (ECF Nos. 103,

104, 105, and 106) in full, leaving for trial the count I and count III deliberate indifference claims

against the Corizon defendants.

NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought,
together with a supporting memorandum, and request for oral argument before the
district judge, if any is sought, within fourteen (14) days of being served with a
copy thereof. A responsive memorandum and any request for oral argument
before the district judge shall be filed within fourteen (14) days after the filing of
the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de
novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 22, 2013